ACCEPTED
15-24-00114-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/29/2025 4:09 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00114-CV

# In the Fifteenth Court of Appeals
# Austin, Texas

FILED IN
15TH COURT OF APPEALS
AUSTIN, TEXAS
9/29/2025 4:09:30 PM
CHRISTOPHER A. PRINE
Clerk

CECILE ERWIN YOUNG, in her Official Capacity as the Executive Commissioner of the Texas Health and Human Services Commission; MOLINA HEALTHCARE OF TEXAS, INC.; and AETNA BETTER HEALTH OF TEXAS, INC.,

*Appellants,*

*v.*

COOK CHILDREN'S HEALTH PLAN, TEXAS CHILDREN'S HEALTH PLAN, SUPERIOR HEALTH PLAN, INC., and WELLPOINT INSURANCE COMPANY,

*Appellees.*

On Appeal from the 353rd Judicial District of Travis County,
No. D-1-GN-24-003839

## BRIEF OF APPELLANT
## MOLINA HEALTHCARE OF TEXAS, INC.

SCOTT DOUGLASS &
McCONNICO LLP

JASON R. LAFOND
State Bar No. 24103136
jlafond@scottdoug.com
CHERYL JOSEPH LAFOND

303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300

*Counsel for Appellant Molina Healthcare of Texas, Inc.*

*Oral Argument Requested*

## Identity of Parties and Counsel

### Appellants

| *Parties* | *Counsel* |
|---|---|
| Cecile Erwin Young | **Office of the Attorney General** |
| | William F. Cole |
| |   William.Cole@oag.texas.gov |
| | Cory A. Scanlon |
| |   Cory.Scanlon@oag.texas.gov |
| | Jennifer Cook |
| |   Jennifer.Cook@oag.texas.gov |
| | Thomas Bevilacqua |
| |   Thomas.Bevilacqua@oag.texas.gov |
| | P.O. Box 12548 (MC 059) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 936-1700 |
| | Fax: (512) 474-2697 |
| | |
| Molina Healthcare of Texas, Inc. | **Scott, Douglass, & McConnico, LLP** |
| | Jason R. LaFond |
| |   jlafond@scottdoug.com |
| | Cheryl Joseph LaFond |
| |   clafond@scottdoug.com |
| | 303 Colorado Street, Suite 2400 |
| | Austin, Texas 78701 |
| | Tel.: (512) 495-6300 |
| | Fax: (512) 495-6399 |
| | |
| Aetna Better Health of Texas, Inc. | **Ewell, Brown, Blanke & Knight LLP** |
| | Joseph R. Knight |
| |   jknight@ebbklaw.com |
| | 111 Congress Avenue, 28th Floor |
| | Austin, Texas 78701 |

Tel.: (512) 770-4010
Fax: (877) 851-6384

Taft Stettinius & Hollister LLP

Marc J. Kessler (pro hac vice)
 mkessler@taftlaw.com
41 South High Street, Ste 1800
Columbus, OH 43215-6106
Tel.: (614) 220-0237
Fax: (614) 221-2007

**Appellees**

| *Parties* | *Counsel* |
|---|---|
| Cook Children's Health Plan | Alexander Dubose & Jefferson LLP |
| | Amy Warr<br> awarr@adjtlaw.com<br>Anna M. Baker<br> abaker@adjtlaw.com<br>100 Congress Avenue, Suite 1450<br>Austin, Texas 78701-2709<br>Tel.: (512) 482-9300<br>Fax: (512) 482-9303 |
| | Burgess Law PC |
| | Karen Burgess<br> kburgess@burgesslawpc.com<br>Katie Dolan-Galaviz<br> kgalaviz@burgesslawpc.com<br>404 West 13th Street<br>Austin, Texas 78701<br>Tel.: (512) 482-8808<br>Fax: (512) 900-6325 |
| | Perkins Coie LLP |
| | Matthew P. Gordon<br> mgordon@perkinscoie.com<br>1201 Third Avenue, Ste 4900 |

Seattle, Washington
Tel.: (206) 359-8000
Fax: (206) 359-9000

| | |
|---|---|
| Texas Children's Health Plan | NORTON ROSE FULBRIGHT US LLP |

Susan Feigin Harris
  susan.harris@nortonrosefulbright.com
Warren S. Huang
  warren.huang@nortonrosefulbright.com
1550 Lamar, Suite 2000
Houston, Texas 77010
Tel.: (713) 651-5151
Fax: (713) 651-5246

Paul D. Trahan
  paul.trahan@nortonrosefulbright.com
98 San Jacinto Boulevard, Ste 1100
Austin, Texas 78701
Tel.: (512) 474-5201
Fax: (512) 536-4598

Thomas A. Coulter
  tom.coulter@nortonrosefulbright.com
799 9th Street, NW, Ste 1100
Washington, D.C. 20001
Tel.: (202) 662-0200
Fax: (202) 662-4643

| | |
|---|---|
| Superior Health Plan, Inc. | HOLLAND & KNIGHT LLP |

Richard B. Phillips, Jr.
  rich.phillips@hklaw.com
One Arts Plaza
1722 Routh Street, Ste 1500
Dallas, Texas 75201
Tel.: (214) 964-9500
Fax: (214) 964-9501

Karen D. Walker
  karen.walker@hklaw.com
Tiffany Roddenberry
  tiffany.roddenberry@hklaw.com
315 South Calhoun Street, Ste 600
Tallahassee, Florida 32301
Tel.: (850) 425-5612
Fax: (850) 224-8832

Wellpoint Insurance
Company

FOLEY & LARDNER LLP

Robert F. Johnson III
  rjohnson@foley.com
600 Congress Avenue, Ste 3000
Austin, Texas. 78701
Tel.: (512) 542-7000
Fax: (512) 542-7100

Michelle Y. Ku
  mku@foley.com
Stacy R. Obenhaus
  sobenhaus@foley.com
2021 McKinney, Ste 1600
Dallas, Texas 75201
Tel.: (214) 999-3000
Fax: (214) 999-4667

Benjamin J. Grossman
  bjgrossman@foley.com
106 East College Avenue, Ste 900
Tallahassee, Florida 32301
Tel.: (850) 222-6100
Fax: (850) 561-6475

# Table of Contents

**Page**

Identity of Parties and Counsel ..................................................................... i

Table of Authorities .............................................................................. viii

Statutory Changes ................................................................................ xv

Statement of the Case ........................................................................... xvi

Statement Regarding Oral Argument ....................................................... xvii

Issues Presented ............................................................................... xviii

Introduction ...................................................................................... 1

Statement of Facts................................................................................ 2

   A.  STAR, CHIP, and STAR Kids ........................................................ 2

   B.  The STAR CHIP procurement process .......................................... 3

      1.  The STAR CHIP RFP ........................................................... 4

      2.  The notice of intent to award ................................................ 6

      3.  The Losing Plans' protests .................................................... 7

         a.  Protests generally.............................................................. 7

         b.  Wellpoint's solicitation protest ........................................... 8

         c.  The Losing Plans' award protests...................................... 8

   C.  Procedural history.................................................................... 9

   D.  The intervening legislative session........................................... 12

Standard of Review ............................................................................ 12

Summary of the Argument .................................................................. 14

Argument........................................................................................ 16

I.  The Losing Plans' Claims Fail to Overcome Sovereign Immunity, and Should Be Dismissed with Prejudice. ....................................... 16

   A.  The Losing Plans lack sufficient interest to maintain their ultra vires claims. ........................................................................... 16

1. Government procurement standards do not create private rights. ............................................................. 18

2. Even if procurement standards could create private rights, the Losing Plans waived them. .................................... 19

B. Commissioner Young's authority does not depend on how she or other HHSC officials apply procurement standards. ........... 27

1. Commissioner Young's authority. ...................................... 29

2. Commands are distinct from consequences. ........................ 30

3. The procurement standards the Losing Plans rely on are not conditions on Commissioner Young's authority. ................. 33

C. Commissioner Young's unconstrained discretion precludes the Losing Plans' ultra vires claims. .................................... 36

1. Commissioner Young's ultimate and unrestrained objective in the procurement process is to interpret collateral law. ...... 37

2. Commissioner Young has unconstrained discretion to procure for best value. ................................................ 41

3. No specific, substantive, or objective standards govern Commissioner Young's exercise of judgment. ................... 45

II. Alternatively, the Losing Plans' Claims Should Be Dismissed Without Prejudice for Failure to Exhaust Administrative Remedies. .............................................................. 53

III. Equitable Factors Do Not Support the Temporary Injunction. ........ 55

A. The status quo is Commissioner Young's authority to procure STAR CHIP contracts. ................................................ 56

B. The Losing Plans have no probable right to relief. .................... 56

C. The Losing Plans' claimed irreparable harm arises from the expiration of their contracts, not HHSC's reprocurement. ........ 56

D. The balance of the equities weighs against the Losing Plans. .......... 58

Conclusion and Prayer ...................................................... 59

Certificate of Compliance .................................................. 61

# APPENDIX

**TAB**

| | |
|---|---|
| **1** | Order denying Commissioner Young's Plea to the Jurisdiction and Granting Plaintiffs' Application for Temporary Injunction |
| **2** | PX38: STAR CHIP Request for Proposals |
| **3** | Tex. Gov't Code § 522.0051 |
| **4** | Tex. Gov't Code § 523.051 |
| **5** | Tex. Gov't Code § 525.0101 |
| **6** | Tex. Gov't Code § 532.0051 |
| **7** | Tex. Gov't Code § 540.0051 |
| **8** | Tex. Gov't Code § 540.0203 |
| **9** | Tex. Gov't Code § 540.0204 |
| **10** | Tex. Gov't Code § 540.0206 |
| **11** | Tex. Gov't Code § 543A.0052 |
| **12** | Tex. Gov't Code § 2155.076 |
| **13** | Tex. Gov't Code § 2155.144 |
| **14** | Tex. Health & Safety Code § 62.051 |
| **15** | Tex. Health & Safety Code § 62.053 |
| **16** | Tex. Health & Safety Code § 62.055 |
| **17** | Tex. Health & Safety Code § 62.155 |
| **18** | Act of May 29, 2023, 88th Leg., R.S., ch. 1170, § 1, art. IX, sec. 17.09 |
| **19** | 1 Tex. Admin. Code 91.101 |
| **20** | 1 Tex. Admin. Code § 391.209 |
| **21** | 1 Tex. Admin. Code § 391.307 |
| **22** | 1 Tex. Admin Code § 111.3 (1997) |

# Table of Authorities

**Page(s)**

## Cases

*AC Ints., L.P. v. TCEQ,*
543 S.W.3d 703 (Tex. 2018) ............................................................................. 35

*Acker v. Tex. Water Comm'n,*
790 S.W.2d 299 (Tex. 1990) ............................................................................. 37

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ......................................................................................... 35

*Ascendant Servs., LLC v. United States,*
160 Fed. Cl. 275 (2022) ....................................................................................51

*Blue & Gold Fleet, L.P. v. United States,*
492 F.3d 1308 (Fed. Cir. 2007) .........................................................19, 20, 24

*Blue Cross Blue Shield of Texas v. Duenez,*
201 S.W.3d 674 (Tex. 2006) ............................................................................. 53

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002) ............................................................................... 54

*Campbell v. Wilder,*
487 S.W.3d 146 (Tex. 2016) ............................................................................. 56

*City of Dall. v. Dall. Consol. Elec. St. Ry.,*
148 S.W. 292 (Tex. 1912) ................................................................................. 16

*City of El Paso v. Heinrich,*
284 S.W.3d 366 (Tex. 2009) ........................................................................ 15, 35

*City of Hous. v. Rhule,*
417 S.W.3d 440 (Tex. 2013) ............................................................................. 53

*City of Hous. v. Gomez,*
716 S.W.3d 161 (Tex. 2025) ............................................................................. 12

*Cobb v. Harrington,*
190 S.W.2d 709 (Tex. 1945) ..............................................................................15

*Dall. Cnty. v. Sweitzer,*
881 S.W.2d 757 (Tex. App.—Dallas 1994, writ denied) ...................................... 56

*Davis v. State*,
12 S.W. 957 (Tex. 1889) ...................................................... 30

*Delta Data Sys. Corp. v. Webster*,
744 F.2d 197 (D.C. Cir. 1984) .............................................. 36

*Ex parte Young*,
209 U.S. 123 (1908) ............................................................ 16

*Fed. Sign v. Tex. S. Univ.*,
951 S.W.2d 401 (Tex. 1997)................................................15

*Fort Worth Cavalry Club v. Sheppard*,
83 S.W.2d 660 (Tex. 1935) ..................................................31

*Foxwood Homeowners Ass'n v. Ricles*,
673 S.W.2d 376 (Tex. App.—Houston [1st Dist.] 1984), writ ref'd n.r.e.) .......... 54

*French v. Edwards*,
80 U.S. (13 Wall.) 506 (1872) .............................................. 30

*Friends of Canyon Lake, Inc. v. Guadalupe–Blanco River Auth.*,
96 S.W.3d 519 (Tex. App.—Austin 2002, pet. denied)...................... 30

*Hall v. McRaven*,
508 S.W.3d 232 (Tex. 2017)............................... 27, 36, 39

*Hayes Int'l Corp. v. McLucas*,
509 F.2d 258 (5th Cir. 1975) ............................................... 39

*Helena Chem. Co. v. Wilkins*,
47 S.W.3d 486 (Tex. 2001)................................................. 35

*Honors Acad., Inc. v. TEA*,
555 S.W.3d 54 (Tex. 2018) ................................................ 28

*Hous. Belt & Terminal Ry. v. City of Hous.*,
487 S.W.3d 154 (Tex. 2016) .................................36, 44, 45

*In re Morris*,
663 S.W.3d 589 (Tex. 2023)............................................. 30, 45

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004) .............................................. 18

*In re Rudolph Auto., LLC*,
674 S.W.3d 289 (Tex. 2023)............................................. 12

*In re State*,
692 S.W.3d 466 (Tex. 2021) ....................................................................... 55

*In re Stetson Renewables Holdings, LLC*,
658 S.W.3d 292 (Tex. 2022) ..........................................................28, 29, 32, 35

*Indus. Specialists, LLC v. Blanchard Ref. Co.*,
652 S.W.3d 11 (Tex. 2022) ................................................................... 44, 45

*Janek v. Gonzalez*,
2013 WL 1748795 (Tex. App.—Austin 2013, no pet.) ....................................... 53

*Jessen Assocs., Inc. v. Bullock*,
531 S.W.2d 593 (Tex. 1975) ..................................................................... 31

*K-Con, Inc. v. Sec'y of Army*,
908 F.3d 719 (Fed. Cir. 2018) ................................................................ 24, 25

*Kinnett Dairies, Inc. v. Farrow*,
580 F.2d 1260 (5th Cir. 1978) .................................................................. 36

*Labatt Food Serv., Inc. v. United States*,
577 F.3d 1375 (Fed. Cir. 2009) ................................................................. 51

*Landry's Seafood Inn & Oyster Bar-Kemah, Inc. v. Wiggins*,
919 S.W.2d 924 (Tex. App.—Houston [14th Dist.] 1996, no pet.) ....................... 58

*Mo., Kan. & Tex. Ry. v. Shannon*,
100 S.W. 138 (Tex. 1907) ........................................................................ 16

*Morath v. Kingsville ISD*,
710 S.W.3d 918 (Tex. App.—15th Court 2025, no pet.) ...........................27, 30, 40

*Morath v. Pecos-Barstow-Toyah ISD*,
2025 WL 1833467 (Tex. App.—15th Court 2025, no pet.) ................................ 27

*Ojo v. Farmers Grp., Inc.*,
356 S.W.3d 421 (Tex. 2011) ..................................................................... 33

*Packard Elevator v. I.C.C.*,
782 F.2d 112 (8th Cir. 1986) .................................................................... 56

*Perkins v. Lukens Steel Co.*,
310 U.S. 113 (1940) .............................................................................. 17

*Phillips v. McNeill*,
635 S.W.3d 620 (Tex. 2021) ..................................................................... 15

*Rivercenter Assocs. v. Rivera*,
  858 S.W.2d 366 (Tex. 1993) ................................................................ 57

*S.C. v. M.B.*,
  650 S.W.3d 428 (Tex. 2022) ............................................................... 32

*Sanchez v. Saghian*,
  2009 WL 3248266 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ................. 56

*Schroeder v. Escalera Ranch Owners' Ass'n, Inc.*,
  646 S.W.3d 329 (Tex. 2022) ..........................................................35, 39

*State ex rel. Dep't of Crim. Just. v. VitaPro Foods, Inc.*,
  8 S.W.3d 316 (Tex. 1999) ..............................................................31, 32

*State v. $435,000*,
  842 S.W.2d 642 (Tex. 1992) ............................................................... 33

*State v. Hollins*,
  620 S.W.3d 400 (Tex. 2020) ............................................................... 56

*State v. Loe*,
  692 S.W.3d 215 (Tex. 2024) ............................................................... 12

*State v. Reagan Cnty. Purchasing Co.*,
  186 S.W.2d 128 (Tex. App.—El Paso 1944, writ ref'd w.o.m.) ..................... 32

*State v. Sw. Bell Tel. Co.*,
  526 S.W.2d 526 (Tex. 1975) ............................................................... 55

*TEA v. Devereux Tex. League City*,
  2023 WL 3325932 (Tex. App.—Austin 2023, no pet.) .............................. 45

*TEA v. Hous. ISD*,
  660 S.W.3d 108 (Tex. 2023) ............................................................... 27

*Terrell v. Kasch*,
  10 S.W.2d 208 (Tex. App.—Austin 1928, writ ref'd) .............................. 16

*Tex. Highway Comm'n v. El Paso Bldg. & Const. Trades Council*,
  234 S.W.2d 857 (1950) .................................................................. 17, 39

*Tex. Logos, L.P. v. Tex. Dep't of Transp.*,
  241 S.W.3d 105 (Tex. App.—Austin 2007, no pet.) ................................ 32

*Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*,
  712 S.W.3d 943 (Tex. App.—15th Court 2025, mandamus denied) ................ 39

*Tex. State Bd. of Examiners in Optometry v. Carp*,
343 S.W.2d 242 (1961) ...................................................................56, 57

*Tex. Tech Univ. Health Scis. Ctr. v. Niehay*,
671 S.W.3d 929 (Tex. 2023) ................................................................. 38

*Thomas v. Long*,
207 S.W.3d 334 (Tex. 2006) ................................................................ 53

*TMRJ Holdings, Inc. v. Inhance Techs., LLC*,
540 S.W.3d 202 (Tex. App—Houston [1st Dist.] 2018, no pet.) ........................ 27

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) ............................................................................ 30

*Warrior Focused Sols., LLC v. United States*,
175 Fed. Cl. 416 (2025) ..................................................................... 19

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................. 56

## Constitutional Provisions

Tex. Const. art. I, § 13 .....................................................................11

## Statutes

Act of May 29, 2023, 88th Leg., R.S., ch. 1170, § 1, art. IX, sec. 17.09(b)(4) ... 20, 41

Tex. Gov't Code
§ 311.016(2)–(3) ............................................................................. 35
§ 523.0051 .................................................................................... 28
§ 524.0001(b) ................................................................................ 40
§ 525.0101 .................................................................................... 28
§ 532.0051 .................................................................................... 29
§ 540.0051 .................................................................................10, 21
§ 540.0051(a)(1)(B), (a)(6) ................................................................ 48
§ 540.0203 .................................................................................... 47
§ 540.0203(a) ....................................................................... 6, 11, 33
§ 540.0204 .................................................................................... 45
§§ 540.0204, 543A.0052 ................................................................... 21
§ 540.0204(1) ........................................................................... 10, 22
§ 540.0204(3) .......................................................................10, 23, 46
§ 540.0206 ...............................................................................*passim*
§ 543A.0052 .................................................................................. 46

§ 543A.0052(d) ............................................................................ 10

§ 2155.076 ................................................................................. 18, 29

§ 2155.076(a) .............................................................................. 34, 37

§ 2155.083(j) ............................................................................... 33

§ 2155.131 ..................................................................................... 51

§ 2155.144 .......................................................................... *passim*

§ 2155.144(b), (b-1)(2) ............................................................ 37

§ 2155.144(c)–(d) ...................................................................... 40

§ 2155.144(d), (d)(11) .............................................................. 42

§ 2155.144(d)(5) ....................................................................... 44

§ 2155.144(f) .............................................................................. 42

§ 2155.444(a) ............................................................................. 46

Tex. Health & Safety Code

§ 62.051 ....................................................................................... 2, 47

§ 62.051(e) .................................................................................. 11, 47

§ 62.052(1) .................................................................................. 28

§ 62.053(3) .................................................................................. 8, 49

§ 62.155 ....................................................................................... 29, 49

§ 62.155(c)(1) ............................................................................. 49

Tex. Hum. Res. Code § 32.021(a) ............................................. 2

Tex. Loc. Gov't Code

§ 252.061 ..................................................................................... 33

§§ 252.061(2), 262.003 ............................................................ 39

**AGENCY MATERIALS**

12 Tex. Reg. 2986 (Sept. 4, 1987) ............................................ 19

12 Tex. Reg. 4523 (Dec. 4, 1987) ............................................. 18

Ctrs. for Medicare & Medicaid Servs., *Medicaid Managed Care Enrollment and Program Characteristics: 2021* (2023) ................................... 3

HHSC, *Request for Public Comment on Best Value Criteria for STAR & CHIP Managed Care Procurement* (Apr. 28, 2022) .......................... 4

*In re Armorworks Enters., LLC,*
B-400394, 2008 WL 4415709 (Comp. Gen. 2008) ................. 24

*In re DynCorp Int'l LLC,*
B-415349, 2018 WL 397133 (Comp. Gen. 2018)) ................... 19

*In re Veterans2work, Inc.*,
  B-416935, 2019 WL 497577 (Comp. Gen. 2019)..................................................20

*STAR CHIP Managed Care Services*, Electronic State Business Daily,
  https://tinyurl.com/zyc7j889 (Addendum No. 2 HHSC Responses to
  Questions) ...............................................................................................6

*Star Kids*, Tex. Health & Hum. Servs., https://tinyurl.com/7a22ann5....................3

Tex. Att'y Gen. Op. No. GA-0685 (2008) .............................................................17

## Other Authorities

Marshall J. Doke, Jr., *State and Local Government Bidding Preferences*,
  42 Procurement Law 7 (Summer 2007) ...........................................................46

3 Sutherland Statutory Construction § 57:5 (8th ed.).....................34

Webster's Third New International Dictionary (unabr.
  2002 ed.) .................................................................................................48

# STATUTORY CHANGES

During this appeal (on April 1, 2025), several provisions of the Government Code relevant to the appeal moved locations. Molina cites the current statutes and parenthetically notes their prior location. For ease of reference, here is a key to the changes:

| Out-of-Date Government Code Provisions Cited in the District Court | Current Location in the Government Code |
|---|---|
| § 533.002 | § 540.0051 |
| § 533.003(a) | § 540.0204 |
| § 533.0035 | § 540.0203 |
| § 533.004 | § 540.0206 |
| § 536.052 | § 543A.0052 |

# STATEMENT OF THE CASE

Nature of the Case:
Appellees, disappointed bidders in an HHSC procurement, sued the agency's apex official, Appellant Commissioner Young, under an ultra vires theory, seeking declaratory and injunctive relief to halt the awarding, execution, and performance of Medicaid and CHIP managed care contracts under the STAR CHIP and STAR Kids requests for proposals (RFPs). CR.3308–41, 3510–57, 4231–82, 4716–65 (live petitions).

Trial Court:
353rd Judicial District Court, Travis County, Cause No. D-1-GN-24-003839, Hon. Laurie Eiserloh

Course of Proceedings:
Appellees applied for a temporary injunction, CR.3339–40, 3549, 4276, 4762–63, and Commissioner Young filed a plea to the jurisdiction, CR.2949–3113. The district court considered both at a multi-day evidentiary hearing. 5.RR–8.RR.

Trial Court Disposition:
The district court denied Commissioner Young's plea to the jurisdiction and entered a temporary injunction enjoining Commissioner Young "and all other persons or entities in active concert or participation with" Commissioner Young "from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting process for the STAR & CHIP RFP." CR.5875–5884. The district court granted similar injunctive relief as to the STAR Kids RFP. CR.5883.

## STATEMENT REGARDING ORAL ARGUMENT

Molina Healthcare of Texas, Inc. respectfully requests oral argument. This appeal presents important questions about the proper role of each branch of government in ongoing state procurements. At stake are not only the immediate procurements but also the broader rules that govern how disappointed bidders may (or may not) enlist courts to halt state contracting. The Court's resolution will have significant implications for how procurement disputes are handled in Texas and for the scope of judicial involvement in ongoing agency proceedings. Oral argument will give the Court the opportunity to probe the doctrinal boundaries of ultra vires claims, test the interplay between procurement statutes and sovereign immunity, and ensure clarity in an area of law with far-reaching consequences.

# Issues Presented

1.     Does a plaintiff state a viable ultra vires claim when the plaintiff's rights are not at stake, the official sued has the express authority to take the actions attacked as unlawful, and the claim attacks an official's unconstrained discretion?

2.     When the Legislature has granted exclusive jurisdiction to an agency to resolve a dispute, may a plaintiff bring that same dispute to court before the agency's resolution?

3.     Does a district court abuse its discretion when it issues a temporary injunction that upsets the status quo in favor of a plaintiff who has no probable right to relief and has not shown any irreparable harm traceable to the actions the plaintiff seeks to enjoin?

HHSC spent years designing a fair and transparent process for procuring managed care contracts serving millions of Medicaid and CHIP beneficiaries. Four participants in the STAR CHIP procurement—Cook Children's, Texas Children's, Superior, and Wellpoint (the "Losing Plans")—were disappointed by its results. Rather than proceed through the administrative process the Legislature directed HHSC to establish, the Losing Plans slapped "ultra vires" on their procurement grievances and sued.

The ultra vires exception to sovereign immunity is narrow. It does not invite disappointed bidders to bypass administrative channels, nor does it empower courts to supervise procurement minutiae. Texas courts do not sit as super-procurement officers second-guessing agency evaluations of proposals, applications of amorphous procurement standards, and best-value determinations. Yet that is the role the district court seized for itself here: haling senior and apex HHSC officials into court to justify their procurement decisions, rejecting their justifications, and forbidding them from completing a massive and critically important procurement. The district court's approach threatens to transform every disappointed bidder into a potential plaintiff, and to destabilize state contracting.

This Court should reverse and render because sovereign immunity bars disappointed bidders from policing state procurements with lawsuits against agency officials. The Losing Plans' claims do not satisfy the ultra vires exception because the Losing Plans' rights are not at stake, because Commissioner Young has express

authority to perform the acts the Losing Plans seek to enjoin, and because the standards the Losing Plans rely on do not constrain Commissioner Young's discretion. And even if the Losing Plans had brought viable ultra vires claims, they would be premature: HHSC has exclusive jurisdiction over this dispute at least until the Losing Plans exhaust administrative remedies.

In the alternative, and at a minimum, the Court should reverse the district court's temporary injunction because none of the relevant factors favors extraordinary equitable relief.

## STATEMENT OF FACTS

### A. STAR, CHIP, and STAR Kids

In the underlying procurements, HHSC is seeking vendors to serve beneficiaries (or "members") under two federal-state benefit programs: Medicaid and the Children's Health Insurance Program (CHIP). HHSC administers both programs for Texas. *See* Tex. Hum. Res. Code § 32.021(a); Tex. Health & Safety Code § 62.051.

The "State of Texas Access Reform (STAR) Program" is "the Medicaid managed care program in which HHSC contracts with MCOs [Managed Care Organizations] to provide, arrange, and coordinate preventive, primary, acute care, behavioral health, and pharmacy [services] for low-income families, children, and pregnant women." 12.RR.DX54.027. "As of January 2021, contracted MCOs participating in STAR served an estimated 3,930,310 Members statewide." 12.RR.DX54.006.

CHIP's beneficiaries are primarily children in families with low incomes, but not incomes low enough to qualify for Medicaid. *See* 12.RR.DX54.006. "HHSC

2

contracts with MCOs to provide, arrange for, and coordinate Covered Services for enrolled CHIP Members." 12.RR.DX54.011. "As of August 2021, contracted MCOs participating in CHIP served an estimated 213,213 Members statewide." 12.RR.DX54.007. HHSC has discretion to "coordinate [CHIP] with the Medicaid program." 12.RR.DX.54.006 (quoting Tex. Health & Safety Code § 62.053(3)).

Another Medicaid program, STAR Kids, is the subject of a separate ongoing procurement that uses the same best value structure as STAR CHIP. MCOs have submitted STAR Kids proposals, but oral presentations have yet to occur, and HHSC has not issued a notice of selected vendors. STAR Kids beneficiaries are up to 20 years old and have disabilities. *Star Kids*, HHSC, https://tinyurl.com/7a22ann5 (last visited Sept. 15, 2025). As of 2021, MCOs participating in STAR Kids served an estimated 168,194 members statewide. *See* Ctrs. for Medicare & Medicaid Servs., *Medicaid Managed Care Enrollment and Program Characteristics: 2021* at 151–152 (2023), https://tinyurl.com/3sckypp7.

### B. The STAR CHIP procurement process

The current STAR CHIP procurement began in 2019, when HHSC hired Mercer Health Benefits to assess HHSC's managed care evaluation tools and procedures. 9.RR.PX92.002. Mercer's report focused primarily on the development and assessment of best value criteria. *Id.* The report discussed forming a workgroup to determine: (1) the criteria's content, weighting of best value criteria for the questions comprising the competition, and submission requirements, 9.RR.PX19.011–012;

3

(2) the process for finalizing and approving the criteria, 9.RR.PX19.015–018; and (3) the process for evaluating proposals against the criteria, 9.RR.PX19.021–028.

Building on Mercer's recommendations, HHSC's Medicaid Managed Care Procurement Collaboration Committee began to develop the evaluation process for the STAR CHIP procurement. 9.RR.PX92.002. HHSC then solicited public input on HHSC's proposed best value criteria. CR.4833 n.9.[1] And HHSC staff met with MCOs, including the Losing Plans, in "pre-solicitation meetings, so to speak, where the managed care organizations could come in and look at [HHSC's] best value criteria and give us feedback on that criteria." 6.RR.198:5–199:3; 6.RR.195:22–196:3.

### 1. The STAR CHIP RFP

The result of that process was the STAR CHIP Request for Proposals (RFP), released December 2022, after approval from the multiagency Contract Advisory Team and the federal government. *See* CR.942, 1997; *see also* Molina Resp. to Mots. for Temp. Relief at 7–8, 19–20. HHSC planned to have new STAR CHIP contracts in place by February 2025. *See* 9.RR.PX38.010.

The STAR CHIP RFP advised that HHSC's conception of best value would guide its evaluation of proposals: "HHSC shall make an award to the Respondent that, ***in HHSC's sole determination, provides the best value*** to the State of Texas as set out in this Solicitation." 9.RR.PX38.021 (emphasis added). The RFP clearly set out what best value meant to HHSC, and informed vendors that scores on their

---

[1] *See* HHSC, *Request for Public Comment on Best Value Criteria for STAR & CHIP Managed Care Procurement* (Apr. 28, 2022), https://tinyurl.com/2zshb6j5 (archived Feb. 27, 2023); *see also* 6.RR.196:4–6.

answers to the RFP's Technical Questions would be tied to HHSC's best value criterion. *See* 9.RR.PX38.025–026, .033–040; *see also* 9.RR.PX290 (RFP sample scoring rubric); 12.RR.DX54 (RFP scope of work); CR.1905 (RFP exhibit stating how many points were available for each Technical Question).

The RFP also detailed how HHSC would select MCOs for awards. HHSC would evaluate proposals on a 2000-point scale—1800 points available for responses to 18 Technical Questions, and 200 points available for Oral Presentations. HHSC intended to make 45 awards across the State's 13 service areas (three to five MCOs per area). 9.RR.PX38.029–030. HHSC would not award an MCO more than seven service areas. 9.RR.PX38.029–030. The only exception to this rubric was for MCOs linked to hospital districts under Government Code § 540.0206, "Mandatory Contracts." And the RFP stated that HHSC would award no more than one mandatory contract in any service area. 9.RR.PX38.030.

HHSC followed up the release of the RFP with multiple opportunities for prospective MCOs to ask questions about the procurement. HHSC held a pre-proposal conference for prospective MCOs. *See* 9.PX.38.010. And the RFP offered MCOs an opportunity to submit questions about the solicitation, while cautioning that failing to alert HHSC to "any ambiguity, conflict, discrepancy, exclusionary specification, or other error" in the RFP by the deadline for questions would "waive[] any claim of error." 9.PX.38.011–013. HHSC answered 110 vendor questions, several of which pertained to the best value criteria, and HHSC incorporated the questions and answers into the RFP at Addendum 2. *See STAR CHIP Managed Care Services*, Electronic State Business Daily, https://tinyurl.com/zyc7j889 (Addendum No. 2 HHSC

Responses to Questions). "No issue was raised as to the location or inclusion of [any] statutory preferences in the" RFP's "BVCs [best value criteria] or Technical Questions in the Vendor Q&A or pre-solicitation meetings." 9.RR.PX157.002 n.3; *see also* 9.RR.PX158.005 n.9.

Following submissions, HHSC evaluated the MCOs and certified that each is reasonably able to fulfill the contract terms, including all federal and state law requirements, as required by Government Code § 540.0203(a). *See, e.g.*, 9.RR.PX.84; (certification); 9.RR.PX.192.

### 2. The notice of intent to award

In March 2024, HHSC released the results of its evaluation in a Notice of Intent to Award. *See* 9.RR.PX95; *see also* 12.RR.PX284 (HHSC "Action Memorandum" detailing evaluation). HHSC first assigned five mandatory contracts to their respective MCOs, then assigned the highest scoring plan its top-ranked service areas, then the second-highest scoring MCO its top-ranked service areas, and so on. *See* 9.RR.PX92.006–.007. As service areas reached their maximum number of MCOs, plans that competed in many service areas but did not score as highly would not be selected for their preferred service areas or for as many service areas as hoped.

Molina was the high-scoring plan, with 1,942 of 2,000 points, and so HHSC assigned Molina each of its seven top-ranked service areas. *See* 9.RR.PX95.001; 9.RR.PX195; 9.RR.PX198. Wellpoint finished fifth (1,874 points), and was selected in the six service areas it ranked second, fourth, fifth, sixth, twelfth, and thirteenth. *See id.* Superior finished seventh (1,830 points), and was assigned to three service areas

6

it ranked eighth, eleventh, and twelfth. *See id.* Neither Cook Children's (eighth place with 1,826 points)—competing for only its single current service area—nor Texas Children's (fourteenth place with 1,636 points)—competing for only its two current service areas—were selected to serve in any service area. *See id.*

### 3. The Losing Plans' protests

#### a. Protests generally

HHSC has promulgated "procedures for resolving protests relating to purchases as required by Texas Government Code § 2155.076." 1 Tex. Admin Code § 391.301. These rules provide bidders two opportunities to inform HHSC of potential inconsistencies with statutes and regulations: solicitation protests and award protests. *Id.* § 391.303(b).

Protests raising issues present in a solicitation—e.g., the criteria for evaluation, scoring ground rules, etc.—"must be filed no later than the date that responses . . . are due." *Id.* § 391.305(a)(1). Protests raising issues specific to evaluations and awards must be filed within 10 days of HHSC's notice of intent to award. *Id.* § 391.305(a)(2). Any protest ground not timely raised is waived. *See id.* § 391.307(a)(1)(A), (c), (d)(1); *see also, e.g.*, 9.RR.PX158.002.

HHSC delegates to its Deputy Commissioner for Procurement the authority to "determine[]" whether HHSC violated "the specific statutory or regulatory provisions, cited by the protestant" and, if so, "any appropriate remedial action." 1 Tex. Admin Code § 391.307(c)(1)–(2). A bidder dissatisfied with that determination may appeal to Commissioner Young. *Id.* § 391.307(d). Because Commissioner Young's

review is limited to the Deputy Commissioner for Procurement's determination and is the final decision on protest issues, *id.* § 391.307(d)(3), that review, too, concerns whether a "specific statute or regulation has been violated."

HHSC generally does not award contracts when protests are pending. *Id.* § 391.309.

### b.     Wellpoint's solicitation protest

Only one of the Losing Plans—Wellpoint—submitted a timely solicitation protest in the STAR CHIP procurement. Wellpoint raised a single objection: that it would be improper to award CHIP contracts to the MCOs awarded mandatory contracts under Government Code § 540.0206. Wellpoint argued that because the mandatory contracts statute only applies to Medicaid, and CHIP is not a Medicaid program, attaching CHIP awards to STAR awards in the case of mandatory contracts was inconsistent with certain statutes. *See* 9.RR.PX44; *but see, e.g.*, Tex. Health & Safety Code § 62.053(3) (allowing HHSC to "coordinate" Medicaid and CHIP).

The Deputy Commissioner for Procurement denied Wellpoint's protest, and Commissioner Young denied Wellpoint's appeal. CR.1956, 1996. Wellpoint did not respond with an ultra vires claim. Instead, Wellpoint voluntarily submitted to evaluation and award under the RFP as written.

There were no administrative protests of the terms of the STAR Kids RFP.

### c.     The Losing Plans' award protests

In the wake of the Notice of Intent to Award, eight MCOs filed protests, including the four plaintiffs here. *See* 6.RR.131:2–15. The Deputy Commissioner for

8

Procurement denied each of the protests in eight separate "determination letters." 5.RR.147:6–9; 9.RR.PX155; 9.RR.PX157–59. All eight protesting MCOs appealed to Commissioner Young. 6.RR.131:11–15. Those appeals remain pending.

## C.    Procedural history

Rather than await the result of their respective administrative appeals, the Losing Plans sued. Because the Legislature has not provided for judicial review of state procurement decisions, the Losing Plans sued Commissioner Young, attempting to plead ultra vires claims. Their claims merely parrot their administrative filings, relabeling protest grounds as ultra vires acts. *Compare, e.g.*, CR.3531–49 (Superior live petition), *and* CR.4719–20 (Texas Children's live petition), *with* CR.1567–94 (Superior's protest), *and* CR.5800–01 (Texas Children's protest).

The Losing Plans seek to permanently stop Commissioner Young from deciding their appeals, completing the procurement, or executing and performing the resulting contracts. *See* CR.3308–41, 3510–57, 4231–82, 4716–65. But the Losing Plans' petitions do not claim, and they never tried to prove, that any of the errors they allege prejudiced them or caused the result of the STAR CHIP procurement to be any different than it would have been had the alleged errors not occurred.

The Losing Plans also applied for temporary injunctive relief enjoining the STAR CHIP and STAR Kids procurements. *See id.*; CR.3339–40. Commissioner Young opposed the applications for a temporary injunction and filed a plea to the jurisdiction. CR.2949–3113. The district court held a multiday evidentiary hearing on the Losing Plans' application and Commissioner Young's plea to the jurisdiction

9

in which high-ranking HHSC officials were forced to justify the agency's procurement decisions. *See* 5.RR–8.RR. At the hearing's conclusion, the Losing Plans pressed seven purportedly ultra vires acts (CR.5841):

The evidence has established that Defendant is violating the following statutory and regulatory requirements:

| Defendant Will Act *Ultra Vires* | |
|---|---|
| § 533.003(a)(1) | Existing provider network preference |
| § 536.052(d) | Quality initiatives preference & benchmark preference |
| § 2155.144(c) | Past performance & failure to document |
| § 533.002 | Continuity of care & reducing nonfinancial barriers |
| § 533.004 | Improper mandatory contract awards |
| § 533.003(a)(3) | Needs of different populations |
| Texas Admin. Code | Fatal disclosure of proposals |

[2]

The district court denied Commissioner Young's plea to the jurisdiction and entered a sweeping temporary injunction. 5.RR–8.RR; CR.5875–5884. The district court concluded that various "statutory and regulatory violations" occurred during the STAR CHIP procurement and leading up to HHSC's notices of intent to award contracts from that procurement. CR.5878. In addition to accepting alleged

---

[2] Former Government Code § 533.003(a)(1) is now § 540.0204(1); former Government Code § 536.052(d) is now § 543A.0052(d); former Government Code § 533.002 is now § 540.0051; former Government Code § 533.004 is now § 540.0206; and former Government Code § 533.003(a)(3) is now § 540.0204(3).

violations pressed by the Losing Plans, the district court also found two other statutory and regulatory violations:

1. The procurement purportedly violated Government Code § 540.0203(a) (née § 533.0035(a)) and Health & Safety Code § 62.051(e) because HHSC supposedly failed "to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract . . . and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract," CR.5877; and

2. HHSC's protest determinations purportedly violated 1 Texas Administrative Code § 391.307(d)(1) by "refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline . . . when good cause for delay is shown," CR.5878.

The district court found that any single one of these purported "statutory or regulatory violations" is alone sufficient to make the "intended contract awards . . . invalid and unlawful." *Id.*[3] As a result, the district court concluded, any "further execution and implementation of such intended contract awards will be *ultra vires* acts." *Id.*

The district court's temporary injunction enjoins Commissioner Young "and all other persons or entities in active concert or participation with" Commissioner

---

[3] In addition to these supposed "statutory and regulatory violations," the district court found that Commissioner Young somehow violated the Constitution's *open courts* guarantee "by not providing a meaningful bid protest process after promising one." CR.5878 (citing Tex. Const. art. I, § 13). But the district court did not find that this supposed constitutional violation made concluding the procurement and executing and performing the contracts ultra vires. *See id.* (citing only "statutory and regulatory violations").

11

Young "from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting process for the STAR & CHIP RFP." CR.5875–5884. The district court granted similar injunctive relief as to the STAR Kids RFP. CR.5883.

Molina intervened and appealed the temporary injunction. CR.5946–52, 5964–67.

## D.   The intervening legislative session

The Court abated this appeal during the most recent legislative session. During that session, a handful legislators introduced ten bills that would have impacted the noticed awards, such as by suspending the awards or creating a new statutory scheme in line with the Losing Plans' desires (House Bills 2388, 3538, 5183, 5184, 5185, and 5284; and Senate Bills 2331; 2547, 2548, and 2988), but none progressed even to a hearing. A rider to the General Appropriations Act targeting the procurement also failed.

## STANDARD OF REVIEW

Orders on temporary injunctions are reviewed for an abuse of discretion, *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024), but courts of appeals "review legal determinations de novo," *id.*, and a trial court always "abuses its discretion when it makes an error of law." *In re Rudolph Auto., LLC*, 674 S.W.3d 289, 302 (Tex. 2023).

## Summary of the Argument

The district court's temporary injunction rests on the Losing Plans' ultra vires claims. CR.5878–79. But the Losing Plans' allegations and evidence do not satisfy the ultra vires exception to sovereign immunity. The Losing Plans' claims fail to overcome sovereign immunity for multiple independent reasons and thus should have been dismissed with prejudice. *See* **Part I**.

At the outset, the Losing Plans lack the interest necessary to satisfy the ultra vires exception. *See* **Part I.A**. Viable ultra vires claims require more than disappointment; they require an invasion of rights. But the procurement standards the Losing Plans invoke are directives to government, not private rights enforceable in court. *See* **Part I.A.1**. And even if they were private rights, the Losing Plans waived those rights by sitting silent until after losing. *See* **Part I.A.2**.

Still more, the Losing Plans' ultra vires theory is fatally incomplete. *See* **Part I.B**. Sovereign immunity yields when a plaintiff shows that an official threatens to act without authority. The Legislature has expressly vested in Commissioner Young authority to procure managed care contracts, and to execute and perform those contracts. *See* **Part I.B.1**. Even so, the Losing Plans say Commissioner Young lacks that authority here because the STAR CHIP procurement offended various procurement standards. But that flawed logic fails to appreciate the difference between commands and consequences. *See* **Part I.B.2**. None of the standards the Losing Plans invoke withdraws Commissioner Young's express authority, so none can support the Losing Plans' claims. *See* **Part I.B.3**.

Beyond those antecedent defects, the Losing Plans' claims run aground on Commissioner Young's unconstrained discretion to interpret and apply the standards governing the challenged procurements. *See* **Part I.C**. The Legislature established a procurement system that delegates to state agencies authority and discretion to interpret collateral laws related to the agency's procurement processes—often-overlapping purposes, considerations, preferences, etc. Those interpretations are not subject to second-guessing in an ultra vires suit. *See* **Part I.C.1**. If that were not enough, the Legislature specifically delegated authority to Commissioner Young to: (a) procure things like managed care contracts according to "best value," and (b) the unconstrained discretion to determine what constitutes "best value" in a particular procurement. *See* **Part I.C.2**. And none of the standards the Losing Plans rely on includes the type of specific, substantive, or objective standards necessary to subject Commissioner Young's exercise of discretion to review in an ultra vires suit. *See* **Part I.C.3**.

The deficiencies in the Losing Plans' ultra vires claims are not the only jurisdictional defect the district court overlooked. Procurement disputes are within HHSC's exclusive jurisdiction at least until a disappointed bidder exhausts the protest and appeal process. The Losing Plans have not exhausted that process, so the district court lacked jurisdiction to adjudicate their claims. *See* **Part II**.

Finally, even if the district court had jurisdiction, its temporary injunction is an abuse of discretion because it alters the status quo, the Losing Plans do not have a probable right to relief, the Losing Plans failed to show irreparable harm, and the balance of the equities weighs against the Losing Plans. *See* **Part III**.

14

**I. The Losing Plans' Claims Fail to Overcome Sovereign Immunity, and Should Be Dismissed with Prejudice.**

The ultra vires doctrine provides that "an action to determine or protect a private party's rights against a state official who has acted *ultra vires*—that is, without legal or statutory authority—is not a suit against the State that sovereign immunity bars." *Phillips v. McNeill*, 635 S.W.3d 620, 628 (Tex. 2021). The Losing Plans' claims do not overcome sovereign immunity because the Losing Plans' rights are not at stake, and because the Losing Plans cannot show that Commissioner Young lacks authority to complete the underlying procurements and to execute and perform the resulting contracts.

**A. The Losing Plans lack sufficient interest to maintain their ultra vires claims.**

Ultra vires claims are an accepted exception to sovereign immunity only because they are necessary to "protect a private party's rights against a state official" acting without authority or failing to perform a ministerial act. *Phillips*, 635 S.W.3d at 628. Protecting a "private party's *rights*" is thus at the heart of "the rationale behind" the ultra vires exception. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009) (quoting *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997) (emphasis added)); *accord Cobb v. Harrington*, 190 S.W.2d 709, 712 (Tex. 1945) ("[A]n action against the officials by one whose rights have been invaded or violated by such acts, for the determination and protection of his rights, is not a suit against the State within the rule of immunity of the State from suit.").

15

That feature of modern ultra vires law has a strong pedigree. An invasion of private rights has always been a fundamental prerequisite of equitable actions against state officials. Paralleling *Ex parte Young*, it has been "well settled" for at least a century in Texas "that [an] injunction is a proper remedy to prevent a public officer from exceeding his authority under the law *when such conduct seriously invades the private rights of an individual* without a corresponding benefit to the public." *Terrell v. Kasch*, 10 S.W.2d 208, 210 (Tex. App.—Austin 1928, writ ref'd) (emphasis added).[4] As a result, "without such invasion of rights there can be no lawful exercise of judicial authority" against government officials. *City of Dall. v. Dall. Consol. Elec. St. Ry.*, 148 S.W. 292, 295 (Tex. 1912).[5]

The Losing Plans have the understandable desire to acquire valuable government contracts. But that desire is insufficient for an ultra vires claim. The Losing Plans lack sufficient interest because the procurement standards they rely on do not create rights. And even pretending the procurement standards the Losing Plans raise could bestow rights, the Losing Plans waived those rights for the STAR CHIP procurement by failing to raise any objection until HHSC had completed its evaluation of proposals and noticed its intent to award. For either reason, the Losing Plans may

---

[4] *See Ex parte Young*, 209 U.S. 123, 154 (1908) ("a suit against individuals, for the purpose of preventing them, as officers of a state, from enforcing an unconstitutional enactment, *to the injury of the rights of the plaintiff*, is not a suit against the state within the meaning of that [11th] Amendment" (emphasis added) (quotation marks omitted)).

[5] *Accord, e.g.*, *Mo., Kan. & Tex. Ry. v. Shannon*, 100 S.W. 138, 140 (Tex. 1907) (Texas "courts have no power to enjoin the officers of a state from taking action under a statute claimed to be unconstitutional and deemed to be prejudicial to the complainants, **unless** the officers are about to do some act which, if not authorized by a valid law, **constitutes an unlawful interference with their rights**." (emphases added)).

not invoke the equitable power of the courts to interfere with the underlying procurements.

### 1. Government procurement standards do not create private rights.

The Supreme Court has made clear that legislative directives instructing agencies how to go about procuring goods and services are "not intended to be a bestowal of litigable rights upon those desirous of selling to the Government." *Tex. Highway Comm'n v. El Paso Bldg. & Const. Trades Council*, 234 S.W.2d 857, 860 (1950); *see also* Molina Resp. to Mots. for Temporary Relief 16–20 ( July 24, 2025); Tex. Att'y Gen. Op. No. GA-0685 (2008) ("Other than requiring each state agency to develop and adopt rules to resolve vendor protests, we find no provision in the Purchasing Act by which a bidder or any other person can compel a state agency to reconsider the application of bidding preferences.").

*Texas Highway Commission* relied on *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940), which explained that when the Legislature "lay[s] down guide posts by which its agents are to proceed in . . . procurement," it does so "for the purpose of keeping its own house." *Id.* at 127. A procurement standard thus "create[s] duties to the Government alone." *Id.* It "is a self-imposed restraint for violation of which the Government—but not private litigants—can complain." *Id.*

With no rights at stake, the Losing Plans may not invoke the ultra vires exception to sovereign immunity.

### 2. Even if procurement standards could create private rights, the Losing Plans waived them.

Even if procurement standards could create rights, rights may be waived, including by failing to comply with required procedures. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 130 (Tex. 2004). The Losing Plans waived any rights they may have had in most of the procurement standards they now raise, because they sat on those hypothetical rights when they should have been invoking them.

### *The Waiver Rule*

Protests raising issues apparent on the face of a "solicitation"—here, the STAR CHIP RFP—"must be filed no later than the date that responses . . . are due." 1 Tex. Admin. Code § 391.305(a)(1). Failure to timely protest results in waiver. *Id.* § 391.307(d)(1)[6]; *see also* 9.PX.38.011 (additional waiver rule in RFP § 2.2).

The Legislature endorsed the waiver rule in 1997, when it amended the Purchasing Act to direct agencies to "develop and adopt protest procedures . . . *consistent with the comptroller's* [previously the State Purchasing and General Services Commission's] rules." Tex. Gov't Code § 2155.076 (emphasis added). At that time, the Comptroller's predecessor agencies had a similar waiver rule. *See* 1 Tex. Admin Code § 111.3(a), (i) (1997)[7]; 12 Tex. Reg. 4523, 4523 (Dec. 4, 1987) (adopting original 1 Tex. Admin Code § 111.3(a), (i), without change as proposed in 12 Tex. Reg. 2986,

---

[6] "A protest or appeal that is not timely filed shall not be considered unless good cause for delay is shown or the HHSC Executive Commissioner determines that an appeal raises issues that are significant to HHSC′s procurement practices or procedures in general."

[7] The Secretary of State's online regulatory archive goes back only to 1999. The 1999 rule's source note shows it had not been amended since 1992. *See* 1 Tex. Admin Code § 111.3 (1999); *see also* 17 Tex. Reg. 6894, 6894 (Oct. 6, 1992) (amending rule). The 1997 version is included in the appendix.

2986–87 (Sept. 4, 1987)). The Legislature essentially directed other agencies to adopt the waiver rule, which HHSC did.

Texas's waiver rule mirrors the federal practice. Protests submitted to federal agencies that are "based on alleged improprieties in a solicitation shall be filed before bid opening or the closing date for receipt of proposals." 48 C.F.R. § 33.103(e); *accord* 4 C.F.R. § 21.2(a)(1) (analogous rule of the Government Accountability Office). Thus, "a protester may not wait until after an award has been made to protest alleged flaws in a procurement's ground rules that are apparent prior to submitting its proposal." *In re DynCorp Int'l LLC*, B-415349, 2018 WL 397133, *7 (Comp. Gen. 2018)). "The government must conduct acquisitions in accordance with applicable law. However, a bidder with knowledge of a solicitation defect may not choose to stay silent when submitting its proposal." *Warrior Focused Sols., LLC v. United States*, 175 Fed. Cl. 416, 426 (2025).

Alleged defects in a solicitation that are not protested before proposals are due are forever waived. *See, e.g.*, 1 Tex. Admin. Code § 391.307(d)(1); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). Commissioner Young may consider an untimely protest in specific circumstances. *See* 1 Tex. Admin. Code § 391.307(d)(1). But that is Commissioner Young's right; not the protesting party's. *Contra* CR.5878.

The goals of the waiver rule are manifest and manifold. It discourages sand-bagging, promotes fairness, and preserves resources:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

*Blue & Gold Fleet*, 492 F.3d at 1314; *cf.* CR.4186 (Wellpoint hoping HHSC will "have to cancel the procurement and restart it"). The rule also helpfully ensures that "challenges to the fundamental ground rules by which a competition is conducted [are] resolved as early as practicable during the solicitation process" and "without unduly disrupting or delaying the procurement process." *In re Veterans2work, Inc.*, B-416935, 2019 WL 497577, at *3 (Comp. Gen. 2019). Indeed, the Legislature directed HHSC (and other procuring agencies) to "[e]nsure that contract award decisions are determined based on best value criteria *established in solicitation documents*." Act of May 29, 2023, 88th Leg., R.S., ch. 1170, § 1, art. IX, sec. 17.09(b)(4), 2023 Tex. Gen. Laws 3573, 4510 (emphasis added).

The Losing Plans have made the alleged obviousness of the procurement defects a central feature of their case. They have walked themselves into waiver.

**Preferences, Considerations, Continuity of Care, and Past Performance**

The Losing Plans insist, for example, that HHSC erred by failing to give **preferences** during its evaluation of proposals as supposedly required by Government

20

Code §§ 540.0204, 543A.0052 (née §§ 533.003, 536.052). *See, e.g.*, CR.5841–45. They also claim HHSC failed to consider or document **past performance** as supposedly required by Government Code § 2155.144. *See, e.g.*, CR.5845–47. They also claim that HHSC failed to promote **continuity of care**, as supposedly required by Government Code § 540.0051 (née § 533.002). *See, e.g.*, CR.5848–49. These errors are plain, they say, because the RFP did not ask for the information HHSC needed to comply with those statutes.

From their opening at the evidentiary hearing:

> [HHSC] did not ask the health plans – *they did not ask us for the information*. They didn't even put in the questions the information that you would need to find out about past *performance* or *quality initiatives* or *continuity of care*.[8]

And again:

> The various statutes require HHSC to give a preference. There are some of the statutes that require them to consider specific factors. And it's *simply impossible for the defendant and HHSC to have considered or to give preference if they did not ask in the RFP* for the respondents to provide that information so that they had information on all of the respondents. . . .
>
> But *if the question is not asked*, and if the data is not assembled for all of the respondents, then *it's impossible to actually give consideration or preference*.[9]

This theme continued in their questioning of HHSC's Deputy Commissioner for Procurement. For example:

---

[8] 5.RR.30:5–9 (emphases added); *see also, e.g.*, Children's Plans Mot. for Temp. Relief at 37 ( July 10, 2025) ("[T]he procurement did not ask bidders for data or evidence about successful implementation of existing or prior quality initiatives," and "did not ask bidders to submit information on their past performances.").

[9] 5.RR.49:7–22 (emphases added).

> Q. Well, it *didn't mention the word "preference"*; correct?
>
> A. Yes. I mean, the word "preference" is not in the RFP.[10]

And here:

> Q. Now, *in the RFP, HHSC did not specifically ask about past vendor performance, did it?*
>
> A. No.
>
> Q. And the published *evaluation criteria in the RFP don't use the words "past performance," do they?*
>
> A. No.[11]

The Losing Plans also object that the RFP did not provide a preference for MCOs whose provider networks include "each health care provider in the region who has traditionally provided care to Medicaid and charity care patients." Tex. Gov't Code § 540.0204(1) (née § 533.003(a)(1)). The structure of the RFP—which required each MCO to submit a single statewide proposal no matter the number of service areas for which they were competing—prevented such region-by-region assessments:

> Q. Now, Section 533.003(a)(1) uses the word "region"; right? . . .
>
> A. I think region's there, yes.
>
> Q. Okay. *But the responses to the RFP weren't broken down by region, were they?*
>
> A. *No. It was a statewide procurement.*[12]

---

[10] 5.RR.86:2–5 (emphasis added).

[11] 5.RR.105:18–23 (emphases added).

[12] 5.RR.97:15–23 (emphases added); *see also, e.g.*, Children's Plans Mot. at 38 ("[T]he STAR & CHIP procurement did not ask bidders to provide information about charity care providers in their

### *Mandatory Contracts*

The Losing Plans also complain HHSC violated Government Code § 2155.144 and the Health & Safety Code by automatically awarding CHIP service areas to MCOs entitled to mandatory Medicaid contracts in those areas under Government Code § 540.0206 (née § 533.004). *See* CR.5849–50. But they acknowledge that HHSC's approach was clear from the RFP, which "does not provide a separate process for awarding CHIP contracts to respondents that also meet section 533.004's requirements for mandatory Medicaid contracts." Superior Mot. for Temp. Relief at 5–6 (July 10, 2025). That is why Wellpoint protested on this ground before submissions were due, noting that "courts and administrative bodies throughout the country routinely hold that legal infirmities evident on the face of a procurements specifications *must be raised at the outset of the procurement*." CR.1961. The rest of the Losing Plans did not, and therefore waived their identical complaints.

### *Different Populations*

Another alleged flaw in the procurement was HHSC's supposed failure to "consider the need to use different managed care plans to meet the needs of different populations." Tex. Gov't Code § 540.0204(3) (née § 533.003(a)(3)); CR.5850–81. But the Losing Plans concede that this supposed flaw is plain from the very nature of the RFP, which "is conducted in a statewide manner," CR.5850, and because the

---

*existing* networks."); Superior Mot. for Temp. Relief at 13 (July 10, 2025) ("[T]he proposals were not divided by region because the RFP was a statewide procurement, and there was no scoring based on region."); *id.* at 14 ("[N]othing in the RFP asked respondents to provide information about their existing provider networks from which the preference in section 533.003(a)(1) could be determined."); CR.3520 (Superior live petition) (similar).

RFP does not ask questions to elicit information about serving different populations. *See* 6.RR.89:14–90:25.

### *The Losing Plans' Excuses Fall Flat*

As this evidence shows, the RFP "clearly placed offerors on notice of its intended" evaluation criteria. *In re Armorworks Enters., LLC*, B-400394, 2008 WL 4415709, *4 (Comp. Gen. 2008) (finding protest untimely). The Losing Plans should have known of every complaint they have about the criteria HHSC used (or did not use) to evaluate RFP responses *before* they responded and voluntarily submitted to HHSC's advertised method of evaluation. *See, e.g.*, *Blue & Gold Fleet*, 492 F.3d at 1313 ("The terms of the solicitation prospectus did not include any requirement that the bidders consider the Service Contract Act . . . . Therefore, Blue & Gold's assertion that the proposals should have been evaluated according to the Act is a challenge to the solicitation."). So their current complaints are untimely and waived.

Below, the Losing Plans tried to avoid the consequences of their sandbagging, hiding behind the RFP's statement that HHSC intended to conform to state law: "Proposals shall be evaluated in accordance with State law, including, but not limited to, applicable provisions of Chapters 533, 536, and 2155 of the Texas Government Code." 9.RR.PX38.021 (RFP § 3.1.1); *see, e.g.*, CR.4064 (Children's Plans); *see also* CR.3931 (Superior). The Losing Plans' excuse does not withstand scrutiny.

A solicitation "defect is patent if it could have been discovered by reasonable and customary care." *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 722 (Fed. Cir. 2018). A reasonable respondent's concern is *how* the government *interprets* the law it commits to follow. Crucially, as just shown by the Losing Plans' own words, the RFP itself

24

"would place a reasonable contractor on notice" that HHSC's interpretation of the law differed from the Losing Plans' interpretation. *Id.*

Even more, the difference in interpretations is clear just from the RFP sections the Losing Plans rely on as excuses. The Children's Plans rely on RFP § 3.1.1, which makes plain that HHSC views its best value criteria as set out in the RFP as complying with applicable law—in direct conflict with the Losing Plans' interpretation of the law:

> **3.1.1 Conformance with State Law**
>
> Proposals shall be evaluated in accordance with state law, including, but not limited to, applicable provisions of Chapters, 533, 536, and 2155 of the Texas Government Code. . . . ***HHSC shall make an award to the respondent that, in HHSC's sole determination, provides the best value to the state of Texas as set out in this solicitation.***[13]

And Superior relies on RFP § 3.1.4, which just as plainly reveals HHSC's view that applying the RFP's express best value criteria and the RFP's express scoring guides satisfies its legal obligations—in direct conflict with the Losing Plans' interpretation of the law:

> **3.1.4 Best Value Evaluation Criteria**
>
> ***Best Value Evaluation Criteria for this Solicitation is the basis upon which the written responses to the Technical Questions*** . . . will be scored, in addition to the considerations provided by the Technical Question Scoring Guide . . . . Responses to the Oral Presentation scenarios ***will also be scored against Best Value Evaluation Criteria*** and the Oral Presentation Scoring Guide . . . .
>
> Best Value Evaluation Criteria, Technical Questions, and Oral Presentation Scenarios were developed ***to ensure HHSC requests the information necessary***

---

[13] 9.RR.PX38.021 (emphasis added).

> *to ensure that the Respondent selected for Contract award can achieve the outcomes mandated in Texas Government Code Sections 533.002, 533.003(a)(1), 536.052, and 2155.144.*[14]

Wellpoint, meanwhile, points to only the single issue it timely raised in a solicitation protest. CR.4187. For every other issue, however, Wellpoint is in the same position as the rest of the Losing Plans.[15]

The Losing Plans cannot escape their collective choice to stay silent until they saw the results of the procurement. They have waived any rights the cited standards may have given them.

### B. Commissioner Young's authority does not depend on how she or other HHSC officials apply procurement standards.

Even if the Losing Plans' rights were at stake, their ultra vires theory still fails because, of the many procurement standards they raise, just one arguably constrains Commissioner Young's authority to procure, execute, or perform contracts. And HHSC officials plainly complied with that standard. The rest are irrelevant. Commissioner Young maintains authority to move forward with the STAR CHIP and STAR Kids procurements.

The Losing Plans seek to stop Commissioner Young from completing the STAR CHIP and STAR Kids procurements, and from executing and performing resulting contracts. *See* CR.5876–78. The Losing Plans' burden is thus to show that

---

[14] 9.RR.PX38.024–25 (emphasis added).

[15] Wellpoint also mistakenly says its solicitation protest was denied as premature. CR.4187. In fact, Commissioner Young denied it on the merits. *See* 9.RR.PX160.002 (describing Commissioner Young's decision).

such future conduct "would exceed the bounds of the Commissioner's legal authority or conflict with the law itself." *Morath v. Pecos-Barstow-Toyah ISD*, 2025 WL 1833467, at *2 (Tex. App.—15th Court 2025, no pet.); *see also TEA v. Hous. ISD*, 660 S.W.3d 108, 118 (Tex. 2023) ("The question . . . is whether the evidence shows that the Commissioner will act ultra vires under current law."); *Hall v. McRaven*, 508 S.W.3d 232, 243 (Tex. 2017) ("[O]nly when these improvident actions are unauthorized does an official shed the cloak of the sovereign and act ultra vires.").

Commissioner Young, however, has express authority to procure, execute, and perform contracts with MCOs to carry out the STAR and CHIP programs. And running afoul of a legislative instruction or a regulation does not mean the offending official loses authority to continue to act as the Legislature expressly authorized. *See, e.g.*, *Morath v. Kingsville ISD*, 710 S.W.3d 918, 925 (Tex. App.—15th Court 2025, no pet.) (violating a statute did not mean official lost authority to issue order). To succeed, then, it is not enough for the Losing Plans to show that Commissioner Young failed to follow some procurement standard (they have not, *see infra*, Part I.C). The Losing Plans must establish that any such failure would withdraw Commissioner Young's express authority to perform the acts the Losing Plans seek to enjoin. *See, e.g.*, *TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 212 (Tex. App—Houston [1st Dist.] 2018, no pet.) (Bland, J.) ("An injunction . . . must not . . . enjoin a defendant from acting within its lawful rights.").

The Losing Plans have not met and cannot meet their burden because they do not and cannot show that Commissioner Young's authority to complete the underlying procurements or to execute and perform the resulting contracts is tied to

27

complying with the various procurement standards they rely on. This reality does not mean HHSC and Commissioner Young are free to violate the cited procurement standards; it means only that the Losing Plans' ultra vires claims are not the way to ensure compliance with those standards. *See In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022).

### 1.    Commissioner Young's authority.

"'Ultra vires claims depend on the scope of the state official's authority,' not the quality of the official's decisions." *Honors Acad., Inc. v. TEA*, 555 S.W.3d 54, 68 (Tex. 2018) (citation omitted). Commissioner Young's authority over HHSC matters is expansive, as she alone governs the agency:

> **Gov't Code § 523.0051. Executive Commissioner**
> (a) The commission is governed by an executive commissioner.
> (b) The governor appoints the executive commissioner with the advice and consent of the senate . . . .

As a result, HHSC's authority and discretion is also her authority and discretion.[16]

Commissioner Young has the unconditional authority to enter contracts for the performance of HHSC activities:

> **Gov't Code § 525.0101. General Contract Authority**
> The commission may enter into contracts as necessary to perform any of the commission's powers or duties.[17]

---

[16] References below to Commissioner Young's authority and discretion thus include authority and discretion granted to HHSC.

[17] *See also*, *e.g.*, Tex. Health & Safety Code § 62.052(1) ("The commission may . . . implement contracts with health plan providers under" CHIP).

Commissioner Young has the specific authority to procure contracts with MCOs to help deliver Medicaid benefits to beneficiaries (all emphases added):

> **Gov't Code § 532.0051. Commission Administration of Medicaid**
>
> (a) The commission is the state agency designated to administer federal Medicaid funds.
>
> (b) The commission shall:
>
> > (1) in each agency that operates a portion of Medicaid, *plan and direct* Medicaid, including the management of the Medicaid managed care system and the development, *procurement*, management, and monitoring *of contracts necessary to implement that system*; . . . .

And contract with MCOs to help deliver CHIP benefits:

> **Health & Safety Code § 62.155. Health Plan Providers**
>
> (a) The commission shall select the health plan providers under the program through a competitive *procurement* process. . . .

Commissioner Young also has the authority to hear and decide administrative protests to HHSC procurement decisions:

> **Gov't Code § 2155.076. Protest Procedures**
>
> (a) The comptroller and *each state agency by rule shall develop and adopt protest procedures for resolving vendor protests relating to purchasing issues.* An agency's rules *must be consistent with the comptroller's rules.* . . . .

### 2. Commands are distinct from consequences.

"All law should be followed." *Stetson*, 658 S.W.3d at 297. But the consequences for not following the laws, like the laws themselves, "are the proper domain of the legislature." *Id.* Here, even assuming HHSC did not follow the procurement standards the Losing Plans raise, a question remains: What consequence, if any, did

the Legislature intend as a result? The Losing Plans and the district court assumed that the consequence for not following a procurement standard is loss of authority over the procurement. They mistakenly ignored the difference between commands and consequences.

This distinction between commands and consequences is well established. Courts have "long recognized" that a public official's failure to follow a statutory direction does not alone reduce the official's sphere of authority. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993) (applying *French v. Edwards*, 80 U.S. (13 Wall.) 506, 511 (1872)). This Court recognized the distinction between commands and consequences recently in *Morath v. Kingsville ISD*, holding that an official's missing a mandatory deadline did not strip his authority to continue to act because the Legislature did not impose that consequence for violating the statute. *See* 710 S.W.3d at 925.

So, even if it "may be granted" that a procurement standard is "a command to" HHSC and Commissioner Young, "it does not follow that it is mandatory in the sense that it makes . . . compliance . . . essential to the legality of the" procurement. *Davis v. State*, 12 S.W. 957, 962 (Tex. 1889); *see also, e.g.*, *In re Morris*, 663 S.W.3d 589, 595 & n.30 (Tex. 2023); *Friends of Canyon Lake, Inc. v. Guadalupe–Blanco River Auth.*, 96 S.W.3d 519, 528 (Tex. App.—Austin 2002, pet. denied) (applicant's "fail[ure] to provide statutorily required information to the TNRCC" as part of permit application process did not vitiate agency's authority to issue permit).

The importance of that distinction is magnified in the case of procurements. The Losing Plans and the district court posit that *any* foul-up during a procurement

30

destroys the official-in-charge's authority to continue that procurement and to execute and perform the resulting contract(s). The Losing Plans "allege that Defendant administered the RFP in a manner that violates Texas law and that consequently, any award, execution, or implementation of the intended STAR & CHIP managed care contract . . . will constitute ultra vires acts." CR.5876. And the temporary injunction order the Losing Plans drafted for the district court sets out a laundry list of grievances and then declares:

> These statutory and regulatory violations, each ***singly*** and together collectively, have resulted in intended contract awards that *will be invalid and unlawful*, and the further *execution and implementation of such intended contract awards will be ultra vires acts*.

CR.5878 (emphases added). To them, without a perfect procurement, there's no authority to contract.

But if an error in a procurement vitiates authority to continue that procurement and to execute and perform the resulting contract, then procured contracts face untenable uncertainty. Actions exceeding an official's authority "have no effect." *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 598 (Tex. 1975). Thus, contracts entered without authority are "null and void." *Fort Worth Cavalry Club v. Sheppard*, 83 S.W.2d 660, 665 (Tex. 1935); *accord, e.g.*, *State ex rel. Dep't of Crim. Just. v. VitaPro Foods, Inc.*, 8 S.W.3d 316, 322 (Tex. 1999) ("[O]nly persons *authorized* by the Constitution or a statute can make a contract binding on the State." (emphasis added)). If the Losing Plans' ultra vires theory is correct, either party to a procured contract could, years into a contract, use a procurement error to escape its obligations. *See,*

31

*e.g.*, *VitaPro Foods*, 8 S.W.3d at 326 (State's counterparty could not enforce unauthorized contract); *State v. Reagan Cnty. Purchasing Co.*, 186 S.W.2d 128, 135–37 (Tex. App.—El Paso 1944, writ ref'd w.o.m.) (State could not enforce agreement executed by Attorney General without authority).

### 3. The procurement standards the Losing Plans rely on are not conditions on Commissioner Young's authority.

An "accurate [statutory] construction frequently eliminates consequences that otherwise might seem troubling." *S.C. v. M.B.*, 650 S.W.3d 428, 450 (Tex. 2022). So it is here. "[T]he Purchasing Act . . . does not reflect legislative intent to render void an otherwise-authorized contract executed in violation of its requirements." *Tex. Logos, L.P. v. Tex. Dep't of Transp.*, 241 S.W.3d 105, 121 (Tex. App.—Austin 2007, no pet.). Violating a procurement standard does not vitiate existing express authority to complete a procurement or to execute or perform a resulting contract.

As elsewhere, "the legislature has ample authority to examine [any] failure to comply" with procurement standards, and to engage "legislative responses." *In re Stetson*, 658 S.W.3d at 297; *see supra*, p. 12 (discussing legislative activity).[18] The Legislature likewise has the power to condition HHSC's (and other government entities') authority to contract, and the validity of its contracts, on HHSC's compliance with procurement standards. For example, "[a] contract or procurement award made by a state agency that violates the applicable minimum time for [public] posting . . . *is*

---

[18] In addition to the Legislature, HHSC and its officials also answer on procurement issues to the Governor, the Attorney General, the Comptroller, the State Auditor, and the cross-agency Contract Advisory Team. *See* Molina Resp. to Mots. for Temp. Relief at 19–20.

*void*." Tex. Gov't Code § 2155.083(j) (emphasis added). And, for municipal procurements, "[i]f the contract is made without compliance with [procurement standards], it is void and the performance of the contract, including the payment of any money under the contract, may be enjoined." Tex. Loc. Gov't Code § 252.061.

But just one of the standards raised here could possibly impose a condition on Commissioner Young's authority: That statute provides that, "***[n]otwithstanding any other law***," HHSC "***may not award a contract*** under" the Medicaid managed care program to an MCO that HHSC has not "evaluate[d] and certif[ied] . . . is reasonably able to fulfill the contract terms, including all federal and state law requirements." Tex. Gov't Code § 540.0203(a) (emphasis added) (formerly § 533.0035(a)). There is no question, however, that HHSC evaluated and certified the MCOs in the STAR CHIP procurement. *See, e.g.*, 9.RR.PX.84.007–008 (certification); 9.RR.PX.192 (certification questionnaire). The Losing Plans complain only about *how thoroughly* HHSC conducted its evaluation, *see, e.g.*, CR.5852–53—but that is a subject § 540.0203(a) does not cover. *See infra*, Part I.C.3. So the one possible condition to an effective award that the Losing Plans cite is satisfied.

"Because the Legislature chose not to" impose any similar condition or consequence for failing to follow the rest of the procurement standards the Losing Plans rely on, "but did do so" elsewhere in the Government Code and other codes, we should "conclude that the Legislature did not intend" any similar condition or consequence here. *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 427 (Tex. 2011); *see also, e.g.*, *State v. $435,000*, 842 S.W.2d 642, 644 (Tex. 1992) ("If the Legislature had intended dismissal to be the consequence of a failure to hear a forfeiture case within

the prescribed period, it could easily have said so."); 3 SUTHERLAND STATUTORY CONSTRUCTION § 57:5 (8th ed.) ("[C]ontrasting language in similar statutes may indicate a legislature intended a different standard of compliance in one than in the other, and make clear that one is mandatory and the other directory.").

Government Code § 2155.076(a) provides still more support, as it shows the Legislature expected that procurements would continue even if some statutory or regulatory standard had not been followed. It directs agencies to adopt protest rules "consistent" with those of the Comptroller and its predecessors. In 1997, when the Legislature enacted § 2155.076, the rules of the Comptroller's predecessor—endorsed by the Legislature—left remedial action in the case of a statutory or regulatory violation during a procurement to the discretion of the agency:

> If the director determines that a violation of the rules or statutes has occurred in a case where a contract has not been awarded, he shall so inform the protesting party . . . by letter which sets forth the reasons for the determination *and the appropriate remedial action*.

1 Tex. Admin. Code § 111.3(e)(2) (1997) (emphasis added)). That rule would be superfluous if running afoul of a procurement standard vitiated an agency's authority to continue with the procurement—for example, by deciding the proper remedy for some violation. *See* 1 Tex. Admin. Code § 391.307(c)(2) (HHSC's nearly identical rule). The Legislature knew and approved that an agency's authority to procure was not tied to compliance with every procurement standard.

The Losing Plans observe that "[e]ach of these statutes imposes a mandatory duty on the Commissioner by using the command 'shall.'" Children's Plans Mot.

34

for Temp. Relief 33. But "shall" does not alone create a condition precedent or any consequence. *See* Tex. Gov't Code § 311.016(2)–(3). So even accepting that the standards create a mandatory duty, there is still "no corresponding provision dictating" any consequence "for noncompliance" with the duty. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 495 (Tex. 2001). This "lack of guidance is what guides us" because "creat[ing] a statutory consequence for noncompliance . . . is the Legislature's job, not" the courts'. *AC Ints., L.P. v. TCEQ*, 543 S.W.3d 703, 713 (Tex. 2018).

Judicial imposition of "mandatory private enforcement" for breaching a statute is "a limitation unheard-of with regard to state legislatures." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (refusing to allow *Ex parte Young* claim). Instead, "it is primarily for the legislature to determine how far it is worth pressing to achieve compliance with its own statutory directives." *In re Stetson*, 658 S.W.3d at 297. The Legislature has not gone as far as the Losing Plans need.

### C. Commissioner Young's unconstrained discretion precludes the Losing Plans' ultra vires claims.

Putting aside the Losing Plans' lack of rights and the procurement standards' lack of consequences, the Losing Plans' lawsuit still fails because the discretion Commissioner Young has over procurements forecloses ultra vires claims. An ultra vires "suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. It follows that when an officer's discretion is unconstrained, no ultra vires claim is viable. *See Schroeder v. Escalera Ranch Owners' Ass'n, Inc.*, 646 S.W.3d 329, 333–36 (Tex. 2022);

*Hall*, 508 S.W.3d at 241–43; *Hous. Belt & Terminal Ry. v. City of Hous.*, 487 S.W.3d 154, 161 (Tex. 2016).

Courts often "are 'ill-equipped to settle the delicate questions involved in procurement decisions.'" *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984) (Scalia, J.) (quoting *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978)). The Legislature thus established a procurement process that leaves Commissioner Young with unconstrained discretion to interpret and apply procurement standards while evaluating proposals and making awards. Commissioner Young answers to other Executive Branch officials and the Legislature for HHSC's exercise of discretion—not to desirous vendors in litigation.

This ultra-vires-killing discretion has three independent sources: (1) The Legislature's decision to channel bidders' statute- and regulation-based complaints into the administrative protest procedure; (2) the Legislature's decision to accord "best value" primacy above all other procurement standards; and (3) the Legislature's decision to omit specific, substantive, or objective standards to govern Commissioner Young's exercise of judgment in applying procurement standards.

### 1. Commissioner Young's ultimate and unrestrained objective in the procurement process is to interpret collateral law.

The Legislature has tasked Commissioner Young with procuring HHSC contracts and finally resolving complaints that HHSC procurements violated statutes or regulations. The procurement structure established by the Legislature has left the interpretations of statutes and regulations that guide the setting of evaluation criteria and assessments of proposals to the unrestrained discretion of HHSC as the

36

procuring agency. That discretion precludes the Losing Plans' ultra vires claims based on their complaints that HHSC's choice of evaluation criteria was inconsistent with various procurement standards or that the procurement was unfair for this or that reason.

In 1997, the Legislature significantly revised the State Purchasing and General Services Act, Gov't Code tit. 10, subtit. D, including by enacting sections 2155.076 and 2155.144. Section 2155.144 expressly delegates to HHSC unconditional authority to procure goods and services, including from MCOs. Tex. Gov't Code § 2155.144(b), (b-1)(2). Section 2155.076 directs all state agencies to "develop and adopt protest procedures for resolving vendor protests relating to purchasing issues" and required that such rules "be consistent with the comptroller's [previously the State Purchasing and General Services Commission's] rules." *Id.* § 2155.076(a). At the same time, the Legislature did not provide for judicial review of protest resolutions. As a result, HHSC has the authority to evaluate the bids and proposals of prospective vendors, and finally resolve vendor complaints about its evaluation.

While the Legislature did not define "vendor protests relating to purchasing issues" in section 2155.076(a), context makes clear that the Legislature had in mind claims—like the Losing Plans'—that a purchasing agency had misapplied some statute or regulation. That context is the State Purchasing and General Services Commission's protest rules at the time the Legislature enacted § 2155.076. *See Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it."); *see also Tex. Tech Univ. Health Scis. Ctr. v. Niehay*, 671 S.W.3d 929,

936 (Tex. 2023) ("[W]e can presume that the Legislature was aware of this regulatory interpretation and was accepting of that meaning . . . when it adopted the ADA definition of 'disability.'"). Under those rules, protests consisted *exclusively* of "statutory or regulatory provision(s) that the action complained of is alleged to have violated." 1 Tex. Admin. Code § 111.3(c)(1)–(2) (1997). As directed, HHSC adopted an essentially identical rule. *See* 1 Tex. Admin Code § 391.305(c).

And while the Legislature did not define "resolving," the same context makes clear that the Legislature intended that the agency would "determine[]" whether or not "a violation of the rules or statutes has occurred," and if so, "the appropriate remedial action." 1 Tex. Admin. Code § 111.3(e)–(h) (1997); *see id.* § 391.305(c) (HHSC's essentially identical rule). When the Legislature directed agencies to adopt rules "consistent with" the State Purchasing and General Services Commission's rules, it knew it was delegating to state agencies the same authority the State Purchasing and General Services Commission exercised under the existing rule: The authority to interpret collateral laws related to the agency's procurement processes. And the Legislature did not provide for judicial review of final protest determinations. The upshot is that the Legislature intended agencies like HHSC to have the last word in resolving vendor complaints about alleged violations of statutory and regulatory requirements in the procurement process.

The Legislature's structure of the procurement process—granting HHSC unconditional authority to procure and channeling legal disputes into HHSC proceedings in which HHSC is tasked with determining the existence and effect of alleged statutory and regulatory violations *by HHSC*—created the type of duty whose

38

exercise is "not subject to judicial review." *Schroeder*, 646 S.W.3d at 334. Like the defendants in *Schroeder* and *Hall*, when Commissioner Young is procuring contracts, "the ultimate and unrestrained objective of [her] duty is to interpret collateral law" in the form of overlapping and sometimes conflicting procurement preferences, considerations, purposes, goals, and other standards. *Id.* at 333 (quoting *Hall*, 508 S.W.3d at 242).

Thus, "a misinterpretation is not overstepping such authority; it is a compliant action even if ultimately erroneous." *Id.* (quoting *Hall*, 508 S.W.3d at 242). The Losing Plans may "disagree[] with" HHSC's "determination," but the scheme established by the Legislature "does not 'allow third parties to second-guess [HHSC] in this way.'" *Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*, 712 S.W.3d 943, 959 (Tex. App.—15th Court 2025, mandamus denied) (quoting *Schroeder*, 646 S.W.3d at 335).

Like the platting process in *Schroeder*, the state procurement "process is intended to be an expeditious one that favors" contracting. *Id.* at 336; *see, e.g.*, *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 258 (5th Cir. 1975) (noting the "strong public interest in avoiding disruptions in procurement"); *see also Tex. Highway Comm'n*, 234 S.W.2d at 860 (noting "the traditional principle of" keeping executive branch procurement "free from vexatious and dilatory restraints at the suits of prospective or potential sellers." (quotation marks omitted)). So, like in *Schroeder*, the Legislature has intentionally "not created a mechanism for . . . judicial review," unlike in similar areas, 646 S.W.3d at 336—here, municipal and county procurements. *See* Tex. Loc. Gov't Code §§ 252.061(2), 262.003. Yet, to this point, the STAR CHIP procurement

has been saddled with delays worse than those Chief Justice Brister found so frustrating in *Kingsville ISD*. *See* 710 S.W.3d at 931 (Brister, C.J., concurring).

Commissioner Young's unrestrained discretion to determine the meaning of the statutes and regulations the Losing Plans rely on is fatal to their ultra vires claims.

### 2. Commissioner Young has unconstrained discretion to procure for best value.

The procurement standards the Losing Plans rely on are independently insufficient because none overcome the Legislature's prime directive to Commissioner Young: Procure for "best value." Tex. Gov't Code § 2155.144(c)–(d); *see also* Tex. Gov't Code § 524.0001(b) ("The commission shall implement the powers and duties given to the commission under Section[] . . . 2155.144.").

The Legislature granted Commissioner Young the authority to procure goods and services according to best value, plus the discretion to determine what is relevant to best value (all emphases added):

> **Gov't Code § 2155.144.**
> **Procurements by Health and Human Services Agencies**
>
> . . .
>
> (b) An agency to which this section applies is ***delegated the authority to procure its goods and services***, except as provided by this section.
>
> (c) An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human Services Commission that ***provides the best value to the agency***. The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition.
>
> (d) Subject to Subsection (e) [repealed], the agency ***may consider all relevant factors in determining the best value***, including:
>
> . . .

> (11) *any other factor relevant* to determining the best value for the agency in the context of a particular acquisition. . . .

Plus the specific authority (and instruction) to award contracts based on whatever best value criteria are set out in its published request for proposals. Each biennial General Appropriations Act provides:

> ### General Appropriations Act
> ### Art. IX, Sec. 17.09. Contract Management and Oversight.
>
> . . .
>
> (b) Agencies and institutions should manage contracts consistent with state statute, . . . including: . . . (4) ensure that *contract award decisions* are determined *based on best value criteria established in solicitation documents* to ensure fair and open competition; . . . .[19]

The Legislature also accorded priority to "best value" over other procurement standards, with just two exceptions:

> ### Gov't Code § 2155.144.
> ### Procurements by Health and Human Services Agencies
>
> . . .
>
> (n) To the extent of any conflict, *this section prevails over any other state law relating to the procurement of goods and services* except a law relating to contracting with historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities. . . . [20]

---

[19] Act of May 29, 2023, *supra*, § 1, art. IX, sec. 17.09(b)(4).

[20] *See, e.g.*, Tex. Gov't Code § 2155.441 (preexisting preference for products of persons with intellectual or physical disabilities). By expressly exempting two procurement standards from this conflict provision, the Legislature made clear its conclusion that the myriad procurement standards that dot the Texas codes and direct HHSC to apply this preference or that consideration conflict with the freedom § 2155.144 gives the agency to procure for best value. Otherwise, the exemptions would be superfluous. For the same reason, HHSC need not reconcile that conflict by folding all the various procurement standards into its best value determination.

Implementing § 2155.144, HHSC's procurement rules have long made that priority clear without objection from the Legislature: The rules' express "purpose . . . is to . . . obtain best value when purchasing goods and services." 1 Tex. Admin. Code § 391.101(3). And they plainly advise that, when procuring good and services through an RFP, "[a] contract is awarded to the respondent whose proposal offers the best value." *Id.* § 391.209(5).

The best value standard controls and is inherently discretionary. The Legislature did not attempt to control ex ante the considerations that go into determining best value. Rather, it freed HHSC to consider "all relevant factors in determining the best value," including "any . . . factor relevant to determining the best value for the agency in the context of a particular acquisition." *Id.* § 2155.144(d), (d)(11).

This freedom includes the selection and implementation of preferences, considerations, purposes, standards, criteria and other factors spread throughout the State's statutes and regulations—including Government Code Chapters 540 and 543A, Health & Safety Code Chapter 62, and HHSC's rules—all under § 2155.144's ultimate objective of "best value." And this freedom makes plain the Legislature's recognition that HHSC officials like Commissioner Young—not courts—are best positioned to determine what's best for HHSC and the State in these circumstances. Confirming the intended exclusion of judicial scrutiny of best value, the Legislature provided its own method of ex post review: Audit. *See id.* § 2155.144(f) ("The state auditor may audit the agency's acquisitions of goods and services before or after a warrant is issued to pay for an acquisition.").

The STAR CHIP procurement shows why the Legislature's chosen structure makes sense. HHSC's bid protest process is a far better forum for adjudicating the solicitation and awards of MCO contracts than the courts. The STAR CHIP contracts ultimately may total $150 billion,[21] and, as shown, the best value criteria for this procurement has been in development since at least 2019. The "preferences" and "considerations" about which the Losing Plans complain are just a few of the hundreds of potential factors, explicit and implied in statute, HHSC weighed in developing the RFP, with inputs from many stakeholders, including the MCOs. And, as demonstrated by the long roster of counsel, all MCOs were advised by experienced public health care and procurement counsel from Texas and around the country. Most of this lawsuit will have been spent trying to educate judges on managed care complexities that dozens of professionals on all sides have devoted their professional careers to learning. But for this judicial detour, Commissioner Young long ago would have fairly and conclusively decided this matter within HHSC's protest process.

The Losing Plans do not contend, and the district court did not find, that Commissioner Young sought anything but best value. Commissioner Young honored the Legislature's direction by determining the best value for STAR CHIP would be obtained by an assessment of the competitors' responses to 18 Technical Questions and four oral presentation scenarios. *See* 9.RR.PX38.025–26, 33–40; *see also* 9.RR.PX290 (sample scoring rubric included with RFP); 12.RR.DX54 (RFP scope of work). Upon

---

[21] In the years before the 2022 release of the RFP, the approximate spend on STAR CHIP was $9.7 billion annually, and, with options, these new contracts will last up to 12 years. 9.RR.PX.38.006.

publishing the RFP, those criteria guided HHSC's evaluation, just as the Legislature intended. In sum, HHSC carefully crafted the RFP "to ensure HHSC requests the information necessary to ensure [the selected MCOs] can achieve the outcomes mandated" by the governing statutes. 9.RR.PX38.024.[22]

Commissioner Young's unconstrained discretion in determining best value, together with her unquestioned pursuit of her conception of best value, dooms the Losing Plans' claims.

### 3. No specific, substantive, or objective standards govern Commissioner Young's exercise of judgment.

Even if some procurement standard could constrain Commissioner Young's discretion, the standards the Losing Plans rely on cannot. Below, the Losing Plans leaned hard into *Houston Belt & Terminal Railway v. City of Houston*. But *Houston Belt* shows why their claims fail.

In the first place, Commissioner Young's statutory authority to procure and contract is unconditional. *See supra*, Part I.B.1. So, unlike the defendant's authority in *Houston Belt*, Commissioner Young's statutory authority is not "explicitly limited." 487 S.W.3d at 166. The unconditional and unreserved nature of this authority "distinguishes [it] from other grants of authority that have supported ultra vires

---

[22] Yet the district court concluded, as the Losing Plans argued, that the STAR CHIP procurement nonetheless violated § 2155.144 by "fail[ing] to consider MCOs past performances." CR.5877. Not so. Section 2155.144 allows but does *not require* Commissioner Young to consider past performance. *See* Tex. Gov't Code § 2155.144(d)(5) ("[T]he agency *may* consider all relevant factors in determining the best value, including . . . past vendor performance." (emphasis added)). The "nature of the word 'may'" is "fundamentally discretionary." *Indus. Specialists, LLC v. Blanchard Ref. Co.*, 652 S.W.3d 11, 17 (Tex. 2022).

claims where, for example, the grants require the decisionmaker to act only 'according to' or 'in accordance with' another law." *TEA v. Devereux Tex. League City*, 2023 WL 3325932, at *5 (Tex. App.—Austin 2023, no pet.) (Jones, J.) (rejecting ultra vires claim, distinguishing *Houston Belt*).

Even more, *Houston Belt* clarified that the "type of discretion that immunity protects" is "discretion where no specific, substantive, or objective standards govern the exercise of judgment." *Hous. Belt*, 487 S.W.3d at 161. That description fits the standards relied on by the Losing Plans. Directives to "give preference," "consider," "to the extent possible," "evaluate," and "review" are inherently and intentionally vague, not specific, substantive, or objective. And "[e]ven if we . . . believe that guiding principles are 'particularly important' in these circumstances, we cannot rewrite a statute that imposes no such principles." *Indus. Specialists, LLC v. Blanchard Ref. Co.*, 652 S.W.3d 11, 16 (Tex. 2022); *see also In re Morris*, 663 S.W.3d at 608 (Young, J., dissenting) (discussing issue not reached by majority, explaining that a statutory "requirement" is not "judicially cognizable" unless courts "have access to judicially administrable standards").

Take the preferences and considerations, for example (all emphases added):

> ### Gov't Code § 540.0204.
> ### Contract Considerations Relating to Managed Care Organizations
> In awarding contracts to managed care organizations, the commission shall:
>
> (1) give *preference* to an organization that has significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients; . . .

> (3) *consider* the need to use different managed care plans to meet the needs of different populations; . . . [23]

---

**Gov't Code § 543A.0052.**
**Financial Incentives and Contract Award Preferences**

. . .

(d) In awarding contracts to managed care organizations under the child health plan program and Medicaid, the commission shall, in addition to considerations under Section 540.0204 of this code and Section 62.155, Health and Safety Code, give *preference* to an organization that offers a managed care plan that:

> (1) successfully implements quality initiatives under Subsection (a) as the commission determines based on data or other evidence the organization provides; or

> (2) meets quality-of-care and cost-efficiency benchmarks under Subsection (b).

---

Many preference statues throughout the country direct how a statutory preference is to be applied. *See* Marshall J. Doke, Jr., *State and Local Government Bidding Preferences*, 42 Procurement Law 7, 7–8 (Summer 2007); *see also* Tex. Gov't Code § 2155.444(a)(1) (where cost and quality are equal, requiring purchase from a service-disabled Texas resident and then to other Texas residents before awarding to out-of-state vendors). But not these preference statutes. Supplying a "preference" does not, for example, direct HHSC to ask questions about preferences in an RFP, or to reflect preferences in scoring proposals at all. *Contra* CR.5841–45. The same goes for "consider." *Contra* CR.5845–47, 5850–51.[24]

---

[23] *See also* Tex. Gov't Code § 543A.0052(d) (referring to § 504.0204's "considerations").

[24] As an HHSC official explained, HHSC has "consider[ed] the need to use different managed care plans to meet the needs of different populations," Tex. Gov't Code § 540.0204(3), and so set up

"[E]valuate" and "review" are similarly amorphous:

> **Gov't Code § 540.0203. Certification by Commission**
>
> (a) Before the commission may award a contract under this chapter to a managed care organization, the commission shall *evaluate* and certify that the organization is reasonably able to fulfill the contract terms, including all federal and state law requirements. . . .

> **Health & Safety Code § 62.051.**
> **Duties of Executive Commissioner and Commission in General**
>
> . . .
>
> (e) The commission shall conduct a *review* of each entity *that enters into a contract* under Section 62.055 or 62.155 to ensure that the entity is available, prepared, and able to fulfill the entity's obligations under the contract in compliance with the contract, this chapter, and rules adopted under this chapter. . . .

The terms suggest some sort of appraisal, but they tell one nothing about the depth required.[25] The statutes say nothing about what sorts of information is sufficient or insufficient. *Contra* CR.5852–53.

The record easily disproves the substance of the Losing Plans' assertion in any event. HHSC certified MCOs only after independently assessing MCOs' responses to certification questions and supporting documentation. *See, e.g.*, CR.174 (explaining that HHSC completed "a comprehensive certification process"); CR.2041-44

---

entirely separate STAR programs (STAR, STAR Kids, STAR PLUS, and STAR Health) with entirely separate procurements. *See* 6.RR.102:1–104:5.

[25] Also, Health & Safety Code § 62.051(e)'s "review" is of an MCO that "enters into a contract," and thus does not need to occur during the procurement.

(HHSC's determination that Molina met the certification criteria based on a review of 57 pages of supporting documentation submitted in response to questions).

The other statutes the Losing Plans rely on are of no more assistance to their position. The Losing Plans (at CR.5848–49) rely on Government Code § 540.0051(a)(1)(B) and (a)(6), which provide:

> **Government Code § 540.0051. Purpose and Implementation**
> The commission shall implement the Medicaid managed care program by *contracting with managed care organizations in a manner* that, *to the extent possible*:
> (1) improves the health of Texans by: . . . (B) promoting continuity of care; and . . .
> (6) reduces administrative and other nonfinancial barriers for recipients in obtaining health care services.

"To the extent possible" deprives the statute of any specific, substantive, or objective standard. HHSC decides what is possible without further direction.

Regardless, the statute has nothing to do with procurement. The foremost "manner" of "contracting" to achieve some goal is to *put it in the contract*. *See Contract* (v., sense 1.a), WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 494 (unabr. 2002 ed.) ("to establish or undertake by contract"). HHSC has done that. *See, e.g.*, 12.RR.DX54.272 (requiring a turnover plan that "assure[s] . . . [t]he least disruption in the delivery of Covered Services to Members during the transition to a subsequent contractor.").

The Losing Plans also insist that pairing CHIP service areas with mandatory Medicaid MCO contracts, *see* Tex. Gov't Code § 540.0206, runs afoul of

48

requirements for "best value" and "competitive" procurements. CR.5849–50 (citing Tex. Gov't Code § 2155.144; Tex. Health & Safety Code § 62.155). But neither of those terms is defined in the cited statutes. So it would be within Commissioner Young's discretion to conclude that an MCO being entitled to a mandatory Medicaid contract in a particular service area made that MCO more competitive or of better value for CHIP in that service area by, for example, making it easier for HHSC to "coordinate [CHIP] with the Medicaid program." Tex. Health & Safety Code § 62.053(3). On top of that, Health & Safety Code § 62.155(c)(1) expressly allows Commissioner Young to "give preference to a person who provides similar coverage under the Medicaid program."

Thus, Commissioner Young did not award "mandatory CHIP contracts" to any MCO. *Contra* CR.5888. Commissioner Young linked Medicaid and CHIP as she has the discretion to do. And Commissioner Young had compelling reasons to link STAR and CHIP here. Federal law requires states to offer CHIP members a choice of plans, so each service area must have at least two plans. *See* 9.RR.PX92.009. But CHIP alone is a tiny piece of HHSC's managed care portfolio: In 2021, the 3.9 million STAR members outnumbered the 200,000 CHIP members about 20-to-1. *See* 12.RR.DX54.006–.007. As a result, "an MCO offering only CHIP services in a [service area] may not be sustainable or may result in uneconomical services." 9RR.PX92.008 (action memorandum to Commissioner Young); *cf.* CR.1298 (Cook Children's observing that large managed care programs "provide[] economies of scale").

So, as Commissioner Young testified, HHSC has long "had a very difficult time getting people to bid on CHIP, so they've always been awarded together." 6.RR.154:16–18. Given the small number of potential members for which multiple CHIP-only plans would be vying, it made sense for HHSC to ensure that each service area could support at least two plans by awarding the smaller CHIP program to the plans chosen to serve the much larger STAR membership in the service area.

The regulations the Losing Plans rely on are no better. During the STAR CHIP procurement, proposals were inadvertently released to an affiliate of one respondent, Aetna. *See* 9.RR.PX77–78; 9.RR.PX80–81. The release occurred after the evaluations of the 1,800-point Technical Question responses, but before the 200-point oral presentations. *See* 9.RR.PX77. The Losing Plans say this accidental disclosure violated the "purpose" of HHSC's procurement rules to "provide for consistent and uniform management of procurement and contracting processes." 1 Tex. Admin. Code § 391.101(2) (cited at CR.5851).

Declaring a "purpose," however, is facially insufficient to limit discretion, and says nothing about disclosure in any case. The same goes for HHSC's statement that it "utilizes an evaluation method which provides for . . . the fair consideration of proposals." *Id.* § 391.209(3)(A) (cited at CR.5851). That statement is nothing more than informational. The Losing Plans' reliance on the Comptroller's regulation about disclosures is even farther afield. *See* CR.5851 (citing 34 Tex. Admin. Code § 20.208(d)(3)). That regulation does not offer any standards for HHSC because it does not apply to HHSC. The rules of which it is a part apply only to agencies that, unlike HHSC, have been delegated purchasing authority by the Comptroller via

50

regulation. *See* 34 Tex. Admin. Code § 20.81(b) ("Chapter 20 of this title applies to any state agency delegated the authority to purchase goods and services pursuant to the Act *and these rules*." (emphasis added)); *cf.* Tex. Gov't Code § 2155.131 ("The comptroller may delegate purchasing functions to a state agency.").

In any case, the more important regulation is HHSC's rule that a protestor must show that it suffered an "adverse impact." 1 Tex. Admin. Code § 391.305(c); *see also, e.g.*, *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (requiring bid protestor to show competitive prejudice); *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 288 (2022) (noting that a "finding of prejudicial error requires that the correction of the error must yield a different result") (internal quotations and citations omitted).

The Losing Plans never attempted to show prejudice from the release of proposals, instead resorting to general assertions of unfairness and procurement integrity. *See, e.g.*, CR.5851–52. That is because the inadvertent disclosure of proposals before oral presentations could not have prejudiced the Losing Plans. HHSC scored all 18 plans highly on oral presentations, assigning to each MCO between 170 and 200 points of the 200 oral presentation points available. 9.RR.PX195. HHSC evaluated Aetna's oral presentation at 190 points. *Id.* Of the Losing Plans, Wellpoint scored the highest with 1,874 points, finishing 48 points behind Aetna. *See id.* Aetna would have finished below Wellpoint only if it received an implausible 140 oral presentation points—50 points lower than Aetna actually scored and 30 points below any of the other 17 MCOs. The inadvertent disclosure was harmless.

The district court's reliance on HHSC's protest rules is likewise misplaced. The district court said Commissioner Young acted ultra vires by not considering untimely "supplemental protests." CR.5878. But no statute or regulation even provides for supplemental protests. And no statute or regulation "require[s] consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown." *Id.* (citing 1 Tex. Admin. Code § 391.307(d)(1)). Section 391.307(d)(1) provides that an untimely protest "shall *not* be considered *unless* good cause for delay is shown" (emphases added). The text beginning with "unless" is an authorization, not a command. Anyway, determining "good cause" is inherently discretionary.

The Losing Plans' ultra vires claims fail because they merely ask the courts to substitute their discretion for HHSC's and Commissioner Young's. Sovereign immunity forbids that result.

## II. Alternatively, the Losing Plans' Claims Should Be Dismissed Without Prejudice for Failure to Exhaust Administrative Remedies.

Every disappointed bidder in a state procurement knows the rules. Complaints must be raised in a timely protest, may be appealed within the agency, and are resolved administratively. That route is not optional; it is the Legislature's chosen mechanism for balancing fairness and efficiency in procurement. The Losing Plans here knew that process, participated in it, and even have administrative appeals still pending. Yet rather than await the result, they rushed to court and persuaded the district court to seize jurisdiction the Legislature had reserved exclusively for HHSC.

The comprehensive legislative scheme for procuring MCO contracts and resolving protests at the very least shows that HHSC has exclusive jurisdiction to make

an initial determination on the issues presented in this litigation. *See Thomas v. Long*, 207 S.W.3d 334, 340–42 (Tex. 2006); *see also, e.g.*, *Blue Cross Blue Shield of Texas v. Duenez*, 201 S.W.3d 674, 676 (Tex. 2006) ("A party cannot circumvent an agency's exclusive jurisdiction by filing a declaratory-judgment action if the subject matter of the action is one over which the Legislature intended the administrative agency to exercise exclusive jurisdiction." (cleaned up)); *Janek v. Gonzalez*, 2013 WL 1748795, at *6 (Tex. App.—Austin 2013, no pet.) (exclusive jurisdiction barred ultra vires claims against HHSC Commissioner). Molina Resp. to Mots. for Temp. Relief 27–31.

Courts do not have subject matter jurisdiction over a case that is within an agency's exclusive jurisdiction at least until the aggrieved party has exhausted available administrative remedies. *City of Hous. v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam). The Losing Plans have not exhausted administrative remedies.

The Losing Plans exercised their option to appeal the denials of their protests to Commissioner Young; *see* CR.3315 n.1, 3529, 4249–50, 4264, 4717 n.2; 1 Tex. Admin. Code § 391.307(d). But rather than let Commissioner Young decide the appeals, the Losing Plans contemporaneously sued Commissioner Young. And then they obtained an injunction forbidding Commissioner Young from "taking action . . . to further the procurement . . . processes for the STAR & CHIP RFP." CR.5883. The Losing Plans' administrative appeals thus remain outstanding and unresolved, but not prejudged, as Commissioner Young explained:

> A. . . . [A]ssuming the Court will allow me to move forward, I would then finish the appeals process, the review of the appeals, and make a decision, one or the

other, on each of the individual appeals. And then once that process is finished, then I would move forward. . . . Depending on how those appeals come out.

. . .

Q. And in deciding the appeal -- the appeals, you, yourself, still need to determine whether the State complied with the law --

A Yes.

Q -- in relation to this procurement?

A Yes, sir.[26]

So even if sovereign immunity did not bar the Losing Plans' claims, the district court still lacked jurisdiction to adjudicate them.

## III. Equitable Factors Do Not Support the Temporary Injunction.

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Its "purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Id*. The party seeking a temporary injunction must show "a probable right to the relief sought" and an "irreparable injury" in the absence of an injunction. *Id*. And because "[i]njunctive relief is an equitable remedy," courts consider "the balance of the equities," including whether "the complaining party . . . ha[s] acted promptly to enforce its right." *Foxwood Homeowners Ass'n v. Ricles*, 673 S.W.2d 376, 379 (Tex. App.—Houston [1st Dist.] 1984), writ ref'd n.r.e.). None of these factors favor the Losing Plans.

---

[26] 6.RR.132:7–23.

**A.    The status quo is Commissioner Young's authority to procure STAR CHIP contracts.**

"The status quo is the last actual, peaceable, noncontested status which preceded the pending controversy." *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975). When a claim challenges the authority of a government official to act, the status quo turns on whether the official "asserted his authority" before a challenge arose. *In re State*, 692 S.W.3d 466, 467 (Tex. 2021) (per curiam). Here, Commissioner Young has always maintained her authority to procure STAR CHIP contracts. The status quo is Commissioner Young exercising her authority, and the district court's injunction upsets that status quo.

**B.    The Losing Plans have no probable right to relief.**

As shown, sovereign immunity and HHSC's exclusive jurisdiction foreclose the Losing Plans' claims. As a result, the Losing Plans cannot show a probable right to relief.

**C.    The Losing Plans' claimed irreparable harm arises from the expiration of their contracts, not HHSC's reprocurement.**

The district court found that the Losing Plans would suffer irreparable harm unless the court enjoined "the award, execution, and implementation of the intended STAR & CHIP contracts." CR.5879. The district court clearly erred—all the harm identified results from the expiration of the Losing Plans' contracts, not from any of the acts the Losing Plans claim are ultra vires.

Allegedly "unlawful acts of public officials may be restrained when they would *cause* irreparable injury." *Tex. State Bd. of Examiners in Optometry v. Carp*, 343 S.W.2d

55

242, 245 (1961) (emphasis added).[27] Thus, only irreparable harm that "would result" from allegedly *ultra vires* acts can support an injunction. *See* CR.5879; *Carp*, 343 S.W.2d at 245; *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020); *see also, e.g.*, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin."); *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) (same).

The irreparable harms identified by the district court all stem from the Losing Plans' loss of incumbency. Thus, the district court describes harm from "[t]he *loss of* STAR CHIP contracts," not the award of a desired contract to others. CR.5879 (emphasis added). For Cook, this loss threatened its participation "in the STAR Kids program" because its "larger STAR & CHIP contracts" allow for "economies of scale" that the smaller STAR Kids contracts do not. *Id.* Cook's customers will be forced to change plans. *Id.* Cook is suffering "hiring difficulties and the delay of needed internal projects." *Id.* Cook "can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans." Cook's "375 employees are at risk of losing their jobs." "New STAR & CHIP entrants in the Tarrant Service area will likely poach Cook Children's experienced employees." The "irreparable harm" for the other Losing Plans tracks Cook's. *See* CR.5879–81.

---

[27] *Accord Campbell v. Wilder*, 487 S.W.3d 146, 152 (Tex. 2016); *Sanchez v. Saghian*, 2009 WL 3248266, at *7 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Dall. Cnty. v. Sweitzer*, 881 S.W.2d 757, 769 (Tex. App.—Dallas 1994, writ denied).

These harms are all tied to loss of incumbency.[28] The Losing Plans' loss of incumbency, however, results directly from *their existing contracts expiring*,[29] ***not*** from HHSC procuring *new* contracts with others. The only way the STAR CHIP procurement could have saved the Losing Plans from the harm they allege is if its result was to award the Losing Plans new contracts in their current service areas. But the Losing Plans did not try to show (and cannot show) that, but for the alleged ultra vires acts, they would have received those new contracts. *See, e.g.*, CR.3928 ("Superior does not, as Defendant contends, 'allege that the sole and mandatory outcome of the procurement is that [Superior] be awarded all the contracts [it] desire[s].'").

None of the alleged "unlawful acts of public officials" here have "cause[d] irreparable injury," so there is no basis for an injunction. *Carp*, 343 S.W.2d at 245.

## D.     The balance of the equities weighs against the Losing Plans.

"Equity aids the diligent and not those who slumber on their rights." *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (quotation marks omitted). Most of the objections the Losing Plans now raise were apparent on the face of the STAR CHIP RFP, and so the Losing Plans needed to raise those objections before the proposal deadline, when HHSC began the arduous task of evaluating proposals. Instead, the Losing Plans waited to see the results before complaining. That is not

---

[28] And many are self-inflicted. For Superior and Wellpoint, the district court also found harm from contracts Superior and Wellpoint entered into with others to assist Superior and Wellpoint in performing their incumbent contracts but that have terms beyond Superior's and Wellpoint's expiring contracts. CR.5880–81. No one, least of all Commissioner Young, forced Superior and Wellpoint to take those risks.

[29] *See* 6.RR.145:14–15 ("We have reached the end date for . . . the current contracts that we have.").

diligence. *See, e.g., Landry's Seafood Inn & Oyster Bar-Kemah, Inc. v. Wiggins*, 919 S.W.2d 924, 927-28 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (rejecting temporary injunction where plaintiff waited eight months, until just before defendant's operations began, to sue). The same result holds for Wellpoint's timely solicitation protest about mandatory contracts: Rather than bring an ultra vires claim immediately, Wellpoint sat on its hands after its protest and appeal were denied and as the procurement proceeded. That is not diligence. *See id.*

The post-solicitation objections the Losing Plans raise does not shift the balance of the equities in their favor because they fail to show any prejudice. They complain that HHSC violated general procurement standards of "fair and equal" treatment by disclosing competitors' proposals to Aetna-affiliated entities in between responses to technical questions and oral presentations. But, as explained *supra*, Part I.C.3., the Losing Plans failed to show that any advantage Aetna could have possibly gained through this disclosure was enough to make a difference in the final tally of scores and thus the noticed awards.

## Conclusion and Prayer

The Court should reverse and render judgment dismissing the Losing Plans' claims with prejudice.

Respectfully submitted,

**SCOTT DOUGLASS & McCONNICO LLP**

JASON R. LAFOND
  State Bar No. 24103136
  jlafond@scottdoug.com
CHERYL JOSEPH LAFOND
  State Bar No. 24104015
  clafond@scottdoug.com
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300
CHERYL JOSEPH LAFOND

*Counsel for Appellant Molina Healthcare of Texas, Inc.*

## Certificate of Compliance

Microsoft Word 2019 reports that this brief contains 14,189 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

Jason R. LaFond

# In the Fifteenth Court of Appeals
# Austin, Texas

CECILE ERWIN YOUNG, in her Official Capacity as the Executive Commissioner of the Texas Health and Human Services Commission; MOLINA HEALTHCARE OF TEXAS, INC.; and AETNA BETTER HEALTH OF TEXAS, INC.,

*Appellants,*

*v.*

COOK CHILDREN'S HEALTH PLAN, TEXAS CHILDREN'S HEALTH PLAN, SUPERIOR HEALTH PLAN, INC., and WELLPOINT INSURANCE COMPANY,

*Appellees.*

## APPENDIX

**TAB**

1     Order denying Commissioner Young's Plea to the Jurisdiction and Granting Plaintiffs' Application for Temporary Injunction

2     PX38: STAR CHIP Request for Proposals

3     Tex. Gov't Code § 522.0051

4     Tex. Gov't Code § 523.051

5     Tex. Gov't Code § 525.0101

6     Tex. Gov't Code § 532.0051

7     Tex. Gov't Code § 540.0051

8     Tex. Gov't Code § 540.0203

Tex. Gov't Code § 540.0204

Tex. Gov't Code § 540.0206

Tex. Gov't Code § 543A.0052

Tex. Gov't Code § 2155.076

Tex. Gov't Code § 2155.144

Tex. Health & Safety Code § 62.051

Tex. Health & Safety Code § 62.053

Tex. Health & Safety Code § 62.055

Tex. Health & Safety Code § 62.155

Act of May 29, 2023, 88th Leg., R.S., ch. 1170, § 1, art. IX, sec. 17.09

1 Tex. Admin. Code § 391.101

1 Tex. Admin. Code § 391.209

1 Tex. Admin. Code § 391.307

1 Tex. Admin Code § 111.3 (1997)

# TAB 1

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| **COOK CHILDREN'S HEALTH PLAN;** | § | **IN THE DISTRICT COURT** |
| **TEXAS CHILDREN'S HEALTH PLAN;** | § | |
| **SUPERIOR HEALTHPLAN, INC.; and** | § | |
| **WELLPOINT INSURANCE COMPANY,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **CECILE ERWIN YOUNG, in her official** | § | |
| **capacity as Executive Commissioner of the** | § | |
| **Texas Health and Human Services** | § | |
| **Commission,** | § | |
| | § | |
| **Defendant.** | § | **353rd JUDICIAL DISTRICT** |

## TEMPORARY INJUNCTION AND ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION

Before the Court are the Applications for Temporary Injunction (the "Applications") filed

by Plaintiffs Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan

("TCHP"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company

("Wellpoint," and collectively, "Plaintiffs"); and the Plea to the Jurisdiction (the "Plea") filed by

Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner

of the Texas Health and Human Services Commission ("HHSC"). After considering Plaintiffs'

Applications and Defendant's response; Defendant's Plea and Plaintiffs' responses; the pleadings

and attached evidence in these consolidated cases (Nos. D-1-GN-24-003839, D-1-GN-24-003874,

D-1-GN-004059, and D-1-GN-24-004327); the parties' prehearing briefing; the evidence admitted

in the record and adduced at the hearing held on September 30, October 1, October 2, and October

applicable authorities; the arguments of counsel, and all other matters properly before the

Court, the Court DENIES Defendant's Plea and GRANTS Plaintiffs' Applications.

The Court makes the following findings:

1. The Court has subject-matter jurisdiction over the claims in these consolidated cases because Plaintiffs have alleged and offered evidence demonstrating that Defendant will act *ultra vires* in awarding, executing, and implementing the contracts arising out of Request for Proposals No. HHS0011152 (the "RFP" or "STAR & CHIP RFP") because she has acted *ultra vires* in administering the RFP. Plaintiffs properly seek only prospective relief—specifically, injunctive relief prohibiting Defendant from awarding, executing, or otherwise implementing the intended RFP contracts and thus preventing further unlawful acts in connection with Defendant's procurement or contracting processes, as well as accompanying declaratory relief. Accordingly, sovereign immunity does not bar Plaintiffs' claims or deprive the Court of subject-matter jurisdiction.

2. The Court has personal jurisdiction over the parties in these consolidated cases.

3. Venue is proper in this Court.

4. Through the RFP, Defendant sought to procure managed care services for the State of Texas Access Reform ("STAR") Medicaid program and the Children's Health Insurance Program ("CHIP," and together with STAR, "STAR & CHIP").

5. Plaintiffs allege that Defendant administered the RFP in a manner that violates Texas law and that, consequently, any award, execution, or implementation of the intended STAR & CHIP managed care contracts that Defendant announced on March 7, 2024, will constitute *ultra vires* acts.

6. Plaintiffs have established a cause of action against Defendant and a probable right to the relief sought on their claims that Defendant has violated and, unless enjoined, will continue to violate statutory and regulatory requirements applicable to the RFP.

7. Specifically, Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful, because:

- Defendant's intended contract awards will fail to give preference to managed care organizations ("MCOs") that have significant participation in their provider networks from each healthcare provider in the region who has traditionally provided care to Medicaid and charity care patients as required by Texas Government Code § 533.003(a)(1);

- Defendant's intended contract awards will fail to give preference to MCOs that have successfully implemented quality initiatives as required by Texas Government Code § 536.052(a) and (d);

- Defendant has failed to develop and implement the cost-efficiency and quality of care benchmarks mandated by Texas Government Code § 536.052(b) despite being subject to an obligation to do so for over a decade. Defendant's intended contract awards will likewise fail to give preference to MCOs that have met such benchmarks as required by Texas Government Code § 536.052(d);

- Defendant's intended contract awards will fail to consider MCOs' past performances as required by Texas Government Code § 2155.144;

- Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by Texas Government Code § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code § 62.051(e);

- In August 2023 and again in October 2023, Defendant wrongfully disclosed the RFP proposals of Plaintiffs and other respondents—with the August disclosure recipients including legal counsel for Aetna, one of the competing respondents, while the procurement was ongoing and prior to completion of the oral presentations—thus, destroying any integrity of the procurement process and creating an unlevel playing field that cannot ensure fair consideration of all proposals and is far from consistent, uniform, and transparent as required by 1 Texas Administrative Code §§ 391.101 and 391.209;

  Defendant's intended contract awards will fail to implement the Medicaid managed care program in a manner that improves the health of Texans by promoting

Page 5877

continuity of care and provides a medical home for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to reduce administrative and other nonfinancial barriers for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to consider the need to use different managed care plans to meet the needs of different populations as required by Texas Government Code § 533.003(a)(3);

- Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155;

- Defendant's intended award of mandatory CHIP contracts will fail to give consideration to statutorily required factors, including those under Texas Government Code § 533.003, in violation of Texas Government Code § 533.004(a);

- Defendant's continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates the Due Course of Law provision of Article I, Section 13 of the Texas Constitution by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391; and

- Defendant's continuing practice of refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline is inconsistent with the procedural protections promised to protestants in bid protest rules that require consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown under 1 Texas Administrative Code § 391.307(d)(1).

8. These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts.

9. Furthermore, Defendant is currently evaluating bids for STAR Kids, a separate Texas Medicaid managed care program, through Request for Proposals No. HHS0013071 (the STAR Kids RFP"). The procurement processes in the STAR & CHIP RFP and the STAR Kids RFP are substantively identical. Plaintiffs have demonstrated that Defendant has no intention of

Page 4 of 10

voluntarily correcting her course of action for future procurements, including altering the processes and procedures used in administering the STAR Kids RFP. The resulting STAR Kids contract awards will therefore also violate statutory and regulatory requirements and be *ultra vires*.

10.    Plaintiffs have established a probable right to relief and that Defendant's award, execution, and implementation of the intended, unlawfully procured STAR & CHIP contracts will, if not enjoined, cause Plaintiffs to suffer imminent and irreparable injury.

11.    Cook Children's has established that execution and implementation of the contracts would result in irreparable harm to Cook Children's because:

- The loss of STAR & CHIP contracts threatens Cook Children's financial viability and might lead to the forced wind-down of the entity;

- Cook Children's participation in the STAR Kids program is in jeopardy because the larger STAR & CHIP contracts provide economies of scale to limit losses from STAR Kids;

- Cook Children's 100,000-plus STAR & CHIP members will be forced to change to different health plans from different companies, risking disruption to the members' healthcare and their access to their current primary care providers, specialty care providers, or both;

- Cook Children's has suffered immediate operational disruptions, including hiring difficulties and the delay of needed internal projects;

- Cook Children's can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans and consequently will need to pay more for pharmaceuticals;

- Cook Children's 375 employees are at risk of losing their jobs—both the 70% of employees who focus on STAR & CHIP and the 30% who focus on STAR Kids; and

- New STAR & CHIP entrants in the Tarrant Service Area will likely poach Cook Children's experienced employees before the new contracts go into effect—thus threatening Cook Children's STAR & CHIP operations while it is still required to provide services under its current contracts.

12.    TCHP has established that execution and implementation of the contracts would result in irreparable harm to TCHP because:

- TCHP's 425,000 STAR & CHIP members will be forced to change their health plans, impacting their access to care;

- TCHP has suffered and will continue to suffer disruptions in workforce—threatening the future viability of the health plan—as employees voice concern about job security in light of the intended contract awards;

- TCHP's 650 employees are at risk of losing their jobs, impacting the financial health of its entire Texas Children's Health Care System beyond that of the health plan;

- TCHP has already suffered and will continue to suffer the poaching of its well-trained employees by other MCOs—further endangering its operations while it remains under contract with HHSC;

- TCHP will lose members and providers, further threatening the viability of the health plan and confusing members and providers;

- TCHP has and will suffer damage to its reputation and goodwill; and

- TCHP's participation in the STAR Kids program is at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. If TCHP loses its STAR Kids contract, its 26,000 STAR Kids members would need to change their health plans, thereby adversely impacting those members' access to care, adversely impacting TCHP's workforce, adversely impacting TCHP's ability to operate and damaging TCHP's reputation and goodwill.

13. Superior has established that execution and implementation of the contracts would result in irreparable harm to Superior because:

- Superior will experience a reduction in the number of STAR & CHIP members it serves today, forcing members to change plans even before the operational start date of the new contracts;

- Superior will need to begin reducing its workforce just as new MCO entrants and MCOs expanding their membership will seek to poach Superior's employees, who are already grappling with the uncertainty of their jobs in light of the intended awards;

- Providers will be less likely to contract with Superior as contract renewals are being negotiated over the next few months and Superior's leverage in provider contract negotiations will be substantially diminished;

Superior has made substantial investments in partnerships that promote HHSC's value-based care priorities. These partnerships involve risk-sharing agreements



between Superior and the partner entities and have been built to scale over time. Superior will lose the benefit of its initial investments in these partnerships; and

- Superior's ability to provide the same level of service currently provided under existing STAR & CHIP contracts through the August 31, 2025, expiration date will be diminished due to workforce challenges that would be caused by execution of the STAR & CHIP contracts, which will impact Superior's operations and cause it to suffer reputational damage.

14. Wellpoint has established that execution and implementation of the contracts would result in irreparable harm to Wellpoint because:

- Almost 380,000 current Wellpoint members will be forced to change their health plan, thus losing access to their existing Wellpoint provider network;

- Wellpoint will be forced to consider substantial reductions in and/or relocations of its existing 1,200-plus-person workforce dedicated to the Texas Medicaid programs;

- Wellpoint has already suffered and will continue to suffer the poaching of its highly trained employees by other MCOs. During the review and transition period, which HHSC has stated will take at least a full year, Wellpoint must continue to provide uninterrupted healthcare to its members, and its ability to do so will be substantially jeopardized if there are key staff vacancies;

- Wellpoint has already suffered and will continue to suffer difficulty retaining its existing, robust provider network in the impacted service areas. Maintaining its network of healthcare providers is critical to Wellpoint's commitment to providing high-quality, cost-efficient healthcare for the entire duration of its existing contracts. Worse yet, Wellpoint has learned that some providers are informing members that Wellpoint will no longer be providing STAR & CHIP services in impacted areas and are encouraging them to switch plans on the basis of Defendant's intended contract awards;

- Wellpoint has made significant investments in service areas that it will be forced to exit and has longstanding provider partnerships with alternative payment models that were developed and built to scale over multiple years. Wellpoint will lose the benefit of its investments in those service areas and partnerships.

- There is no legal remedy that can fully compensate Wellpoint for (1) the loss of its members, (2) the harm to its business resulting from the intended, unlawfully procured contract awards, and (3) the harm to its ability to compete in a fair and lawful procurement process in future procurements; and

- The harm to Wellpoint is imminent because Defendant did not follow the requirements of Texas law in procuring the STAR & CHIP contracts but



nevertheless intends to execute and begin implementing the intended, unlawfully procured contract awards. In addition, the harm to Wellpoint is imminent as Defendant does not intend to correct her unlawful course of action for future procurements or the ongoing STAR Kids RFP.

15. Plaintiffs have also presented evidence that they will begin losing STAR & CHIP members now, even though operations under the intended STAR & CHIP contract awards are not scheduled to start until September 1, 2025. Providers are already informing Plaintiffs' members that Plaintiffs will no longer be providing STAR & CHIP services in certain service areas of the state and are encouraging members to switch plans. The confusion among providers and members alike will only worsen if the intended contract awards are executed notwithstanding the pending challenge to their legality.

16. Money damages are not adequate compensation because the harms Plaintiffs will suffer cannot be measured by any certain pecuniary standard. Furthermore, Plaintiffs cannot be adequately compensated in damages because Defendant is immune from suit for damages and any limited waiver of immunity is insufficient to compensate for Plaintiffs' harms.

17. The harms to Plaintiffs outweigh any potential harms to Defendant or HHSC that would result from preserving the status quo during the pendency of these consolidated cases. Neither Defendant nor HHSC would be harmed if the execution and further implementation of the intended STAR & CHIP contracts are delayed given that (1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the RFP several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time.

18. The public will not suffer harm if a temporary injunction is granted but will suffer harm if Defendant executes and implements the intended, unlawfully procured contract awards. The intended contract awards will impose significant harm and confusion on millions of Texas's

STAR & CHIP members. More than 1.5 million Texans, mostly children—and 43% of the total STAR & CHIP population—will be forced to change health plans. This in turn would cause significant harms to those beneficiaries, for which there is no adequate remedy at law available against Defendant, including:

- Confusion among those beneficiaries due to difficulties in informing them of the change in available health plans;

- Disruption to those beneficiaries' access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries; and

- Administrative burdens of finding new health plans and potentially new healthcare providers.

19. The injunctive relief Plaintiffs request is narrow in scope and tailored to prohibit Defendant from continuing to act *ultra vires*. The balance of equities and public interest weigh in favor of granting Plaintiffs' requested injunctive relief.

Accordingly, it is therefore ORDERED that Defendant's Plea to the Jurisdiction is DENIED.

It is further ORDERED that Plaintiffs' Applications for Temporary Injunction are GRANTED. The Court ORDERS that:

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP; and

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP.



IT IS FURTHER ORDERED that Defendant shall provide notice of this Temporary Injunction to her officers, agents, servants, employees, and attorneys, as well as any persons or entities in active concert or participation with Defendant.

IT IS FURTHER ORDERED that Plaintiffs' bond or cash deposit in lieu of bond is set in the amount of $1,000.

IT IS FURTHER ORDERED that, on the filing by Plaintiffs of the bond and on approving the bond according to law (or the cash deposit in lieu of bond), the Clerk shall issue a Temporary Injunction in conformity with the law and the terms of this order.

IT IS FURTHER ORDERED that this Temporary Injunction shall not expire until final judgment in this case is entered or this case is otherwise dismissed by this Court.

IT IS FURTHER ORDERED that the trial on Plaintiffs' *ultra vires* claims seeking declaratory relief, permanent injunctive relief, and mandamus relief is set for November 3, 2025.

SIGNED on _October 4_, 2024.

_____
JUDGE PRESIDING

**Judge Laurie Eiserloh**
**455th District Court**

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 11/01/2024 09:28:21

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH
16931725l.2

# TAB 2



**TEXAS**
**Health and Human Services**

Cecile E. Young, Executive Commissioner

Request for Proposals (RFP)

for

STAR & CHIP Managed Care Services

RFP No. HHS0011152

Date of Release: December 7, 2022

Responses Due: February 17, 2023 by 10:30 a.m. Central Time

**958-56 Health Care Management Services, Including Managed Care Services**

**915-20 Call Center Services**

**948-07 Administration Services, Health**

HHSC_CP_0019296

P-038.001

# Table of Contents

Article I. Introduction, Definitions, and Authority ........................................................................5

   1.1    Introduction ........................................................................................................................5

      1.1.1   Scope of Work ..............................................................................................................5

      1.1.2   Contract Award, Term, and Historical Compensation...............................................5

      1.1.3   No Guarantee of Volume, Usage, or Compensation..................................................6

   1.2    Definitions..........................................................................................................................6

   1.3    Authority ............................................................................................................................9

Article II. Administrative Information.............................................................................................10

   2.1    Schedule of Events ..........................................................................................................10

   2.2    Ambiguity, Conflict, or Discrepancy ..............................................................................11

   2.3    Inquiries...........................................................................................................................11

      2.3.1   Sole Point of Contact .................................................................................................11

      2.3.2   Prohibited Communication ........................................................................................12

      2.3.3   Exception to Sole Point of Contact............................................................................12

      2.3.4   Solicitation Questions ................................................................................................12

      2.3.5   Pre-Proposal Conference ...........................................................................................13

   2.4    Proposal Composition Requirements ..............................................................................15

      2.4.1   General Information....................................................................................................15

      2.4.2   Page Limit and Supporting Documentation...............................................................15

      2.4.3   Discrepancies .............................................................................................................15

      2.4.4   Exceptions..................................................................................................................16

      2.4.5   Assumptions...............................................................................................................16

      2.4.6   Binding Offer.............................................................................................................16

      2.4.7   Modifications and Withdrawals .................................................................................17

   2.5    Proposal Submission and Delivery ..................................................................................17

      2.5.1   Deadline.....................................................................................................................17

      2.5.2   Submission Instructions .............................................................................................17

      2.5.3   Labeling and Delivery................................................................................................18

      2.5.4   Submission Checklist.................................................................................................19

Article III. Proposal Evaluation and Award Process .....................................................................21

   3.1    Evaluation Criteria ..........................................................................................................21

      3.1.1   Conformance with State Law.....................................................................................21

HHSC_CP_0019297

P-038.002

3.1.2 Mandatory Contracts ....................................................................................... 21

3.1.3 Selection Methodology .................................................................................. 21

3.1.4 Best Value Evaluation Criteria ...................................................................... 24

3.1.5 Oral Presentation Criteria ............................................................................. 26

3.1.6 Final Weighted Score .................................................................................... 27

3.1.7 Final Consideration for Award ...................................................................... 28

3.1.8 Final Award Determination ........................................................................... 31

Article IV. Executive Summary and Technical Questions ............................................... 31

4.1 Executive Summary .............................................................................................. 31

4.2 Technical Questions .............................................................................................. 32

Article V. Additional Required Documentation .............................................................. 41

5.1 Affirmations and Certifications ............................................................................ 41

5.2 HUB Subcontracting Plan ..................................................................................... 41

5.3 Authorization to Conduct Business in Texas ........................................................ 41

5.4 Company Profile ................................................................................................... 42

5.5 Required Financial Information ............................................................................ 44

5.5.1 Company Organization .................................................................................. 45

5.5.2 Material Subcontractor Information .............................................................. 45

5.5.3 Dun and Bradstreet Report ........................................................................... 47

5.5.4 Financial Statements ..................................................................................... 47

5.5.5 Alternate Report ............................................................................................ 49

5.5.6 Disclosures .................................................................................................... 49

5.5.7 Corporate Guarantee ..................................................................................... 50

5.6 Key Personnel ...................................................................................................... 50

Article VI. General Terms and Conditions ..................................................................... 51

6.1 General Conditions ............................................................................................... 51

6.1.1 Changes, Modifications, and Cancellation ................................................... 51

6.1.2 Offer Period ................................................................................................... 51

6.1.3 Cost Incurred ................................................................................................. 51

6.1.4 Contract Responsibility ................................................................................. 51

6.1.5 Public Information Act – Respondent Requirements Regarding Disclosure ........... 51

6.1.6 Respondent Waiver – Intellectual Property ................................................... 54

6.1.7 Standards of Conduct for Vendors ................................................................ 54

HHSC_CP_0019298

P-038.003

6.1.8     Disclosure of Interested Parties ......................................................................54

6.2     Insurance ................................................................................................................55

6.2.1     Required Coverage................................................................................................55

6.3     Bonds......................................................................................................................55

6.4     Protest....................................................................................................................55

Article VII. List of Exhibits and Attachments .............................................................56

HHSC_CP_0019299

P-038.004

# ARTICLE I. INTRODUCTION, DEFINITIONS, AND AUTHORITY

## 1.1 INTRODUCTION

The State of Texas, by and through the Texas Health and Human Services Commission (HHSC), announces the request for proposals (RFP) No. HHS0011152 for State of Texas Access Reform (STAR), Children's Health Insurance Program (CHIP) Managed Care Services, and Healthy Texas Women (HTW) (collectively STAR & CHIP). Information regarding HHSC and its programs is available online and can currently be accessed at https://hhs.texas.gov. Additional information regarding STAR, CHIP, and HTW can be found in **Exhibit H, STAR & CHIP Scope of Work (SOW)**.

HHSC may, at its discretion, add new Services or populations to STAR & CHIP at any time during the Contract as described in **Exhibit H, STAR & CHIP Scope of Work (SOW), Section 2.6.4 (Future Initiatives)**.

### 1.1.1 Scope of Work

The Scope of Work and information concerning the programs and eligible population is provided in **Exhibit H, STAR & CHIP Scope of Work (SOW)**.

### 1.1.2 Contract Award, Term, and Historical Compensation

#### 1.1.2.1 Contract Award and Execution

HHSC intends to award Contracts to at least three (3) Managed Care Organizations (MCOs) for each Service Area (SA) as a result of this Solicitation. HHSC intends to award a set number of Contracts to MCOs for each Service Area (SA) as a result of this Solicitation and in accordance with **Section 3.1.7.2 (Service Areas)**. Any award is contingent upon approval of the HHSC executive commissioner or their designee.

If, for any reason, a final Contract cannot be executed with a Respondent selected for award within sixty (60) Days of HHSC determination to seek to Contract with that Respondent, HHSC may negotiate a Contract with another Respondent in accordance with **Article III** or may withdraw or modify this Solicitation.

Affiliates of the same parent organization shall not submit separate Proposals in response to this RFP; only one Proposal is permitted on behalf of all Affiliates of the same parent organization. If multiple Affiliates of the same parent organization submit Proposals, HHSC will determine which Proposal moves forward in the process, and the remaining Proposal(s) will be disqualified. HHSC may contact the parent organization for clarifying information in making this determination. If a determination cannot be made, HHSC reserves the right to disqualify all affected Proposals.

HHSC_CP_0019300

P-038.005

### 1.1.2.2 Contract Term

a. The initial term of any Contract resulting from this Solicitation will be six (6) years. HHSC, at its sole option, may extend or renew the resulting Contract for a maximum of three (3) periods of two (2) years each. Except as provided in Subsection (b), the maximum Contract term, including the initial Contract term and allowable renewals or extensions, is twelve (12) years.

b. Following the initial Contract term and allowable extensions and renewals, HHSC may, if authorized by applicable law, extend the resulting Contract to address immediate operational or service delivery needs. A Contract extension under this section is subject to all requirements and limitations as may be provided under applicable law.

### 1.1.2.3 Historical Compensation

The cumulative annual compensation under prior contracts resulting from a STAR & CHIP solicitation was approximately $9,700,000,000.00.

### 1.1.3 No Guarantee of Volume, Usage, or Compensation

HHSC makes no guarantee of volume, usage, or total compensation to be paid to any Respondent under any awarded Contract, if any, resulting from this Solicitation. Any awarded Contract is subject to appropriations and the continuing availability of funds.

HHSC reserves the right to cancel or decline to award a Contract under this Solicitation at any time at its sole discretion.

### 1.2 DEFINITIONS

Refer to **Exhibit A, HHSC Managed Care Uniform Contract Terms and Conditions v. 1.0**; **Exhibit B, Texas Medicaid and CHIP - Uniform Managed Care Manual (UMCM)**; and **Exhibit H, STAR & CHIP Scope of Work (SOW)**, for additional definitions.

As used in this Solicitation, unless a different definition is specified or the context clearly indicates otherwise, the following terms and conditions have the meanings assigned below:

"533.004 Claim" is a Respondent's request to be considered for a contract awarded pursuant to Texas Government Code Section 533.004, as provided by **Section 3.1.2 (Mandatory Contracts)**, in a Service Area designated by the Respondent in **Exhibit D, Service Area Map and Selection Form**.

"533.004 Claim Rejected" or "Rejected 533.004 Claim" is a Respondent's 533.004 Claim that HHSC, in its sole discretion, determines does not meet the requirements of contract award under Texas Government Code Section 533.004(a). If a Respondent's 533.004 Claim is denied, the

HHSC_CP_0019301

P-038.006

Respondent will proceed through the procurement process as though they made no 533.004 Claim for the Service Area.

"533.004 Claim Validated by HHSC" or "Valid 533.004 Claim" is a Respondent's 533.004 Claim that HHSC, in its sole discretion, determines qualifies the Respondent to be considered for a contract awarded pursuant to Texas Government Code Section 533.004, based on the Respondent's demonstration and HHSC's determination that, with respect to the designated Service Area, the Respondent is described by Texas Government Code Sections 533.004(a)(1), (2), or (3). May also be referred to as "Validated 533.004 Claim."

"533.004 Claim Assigned for 533.004 Contract" is a Respondent's Validated 533.004 Claim that results in assignment of the Respondent to the designated Service Area in accordance with **Section 3.1.7.3 (Service Area Assignment)** based on the Respondent having the highest Final Weighted Score of all Respondents with a Valid 533.004 Claim proposing that Service Area. A Respondent with a Valid 533.004 Claim, but not assigned for a Contract in that Service Area, will proceed through the procurement process as though they made no 533.004 Claim for that Service Area.

"Addendum" means a written clarification or revision to this Solicitation issued by HHSC PCS and posted to the ESBD.

"Advancement Criteria" means the criteria advertised in the Solicitation by which a Respondent may advance to the next phase of evaluation.

"Award Consideration (AC) Documents" means the documents Respondent must submit as part of the Proposal to be considered for negotiations or award.

"Best Value Evaluation Criteria" means the criteria against which all responses to the Technical Questions, and any Oral Presentation, will be measured; may also be referred to as "Best Value Criteria" and "BVC."

"Competitive Range" has the same meaning as the definition under Title 1 of the Texas Administrative Code Part 15, Chapter 391, Subchapter A, Rule § 391.107(3).

"Consensus Scoring Meeting" means the process whereby the HHSC evaluation team members meet to collectively discuss Technical Question or Oral Presentation responses, select a score, and justify their decision.

"DFPS" means the Department of Family and Protective Services.

"DSHS" means the Department of State Health Services.

"ESBD" means the Electronic State Business Daily, the electronic marketplace where State of Texas bid opportunities over $25,000 are posted. The ESBD may currently be accessed at http://www.txsmartbuy.com/#esbd.

HHSC_CP_0019302

P-038.007

"Final Weighted Score" means the combination of the Weighted Technical Question Score and the Weighted Oral Presentation Score.

"HHSC" means the Health and Human Services Commission.

"HHSC PCS" means Procurement and Contracting Services (PCS), a division of HHSC.

"HUB" has the same meaning as the definition in **Exhibit A, HHSC Managed Care Uniform Contract Terms and Conditions v. 1.0**.

"HUB Subcontracting Plan" or "HSP" means written documentation regarding the use of Subcontractors, which is required to be submitted with all responses to state agency contracts with an expected value of $100,000 or more where the state agency has determined subcontracting opportunities are probable. The HSP subsequently becomes a provision of the awarded Contract and shall be monitored for compliance by the state agency during the term of the Contract.

"Oral Presentation" means a secondary evaluation method following the evaluation of the written responses. The method is utilized for the purpose of distinguishing between Respondents that meet the Advancement Criteria specified in this Solicitation.

"Oral Presentation Score" means the 0-5 score provided for each scenario following the evaluation of the Respondent's Oral Presentation as described by **Section 3.1.3.4 (Oral Presentations)** and conducted in accordance with the criteria in **Section 3.1.5 (Oral Presentation Criteria)** and **Exhibit O, Scoring Guides**.

"Points" means the unit of measurement for the Weighted Technical Question Score and the Weighted Oral Presentation Score, as provided by **Exhibit P-1, Evaluation Tool and Sample Scoring Example**.

"Proposal" means the entire written response to the Technical Questions and all documents listed in **Section 2.5.4 (Submission Checklist)** as submitted by Respondent.

"Respondent" means the individual or entity responding to this Solicitation, regardless of whether the individual or entity is making a 533.004 Claim in a particular Service Area.

"Sole Point of Contact" means the person listed in **Section 2.3.1 (Sole Point of Contact).**

"Solicitation" means this RFP including all exhibits, attachments, forms, and Addenda, if any.

"Solicitation Consideration (SC) Documents" means the documents that must be submitted by Respondent as part of the Proposal in order to be considered for evaluation and cannot be resubmitted or have errors remedied after the submission due date and time in **Section 2.1 (Schedule of Events)** has passed.

"State" means the State of Texas and its instrumentalities, including HHSC, and any other state agency, its officers, employees, or authorized agents.

HHSC_CP_0019303

P-038.008

"Technical Questions" means the questions in **Article IV** which will be used to assess the Respondent's ability to meet the **Best Value Evaluation Criteria** in **Section 3.1.4**.

"Technical Question Score" means the 0-5 score from the evaluation of the **Technical Questions (Article IV)** as described by **Section 3.1.3.2 (Proposal Evaluation)** and conducted in accordance with the criteria in **Section 3.1.4 (Best Value Evaluation Criteria)** and **Exhibit O, Scoring Guides**.

"VPTS" means Vendor Performance Tracking System, as defined under Section 2262.055 of the Texas Government Code and Title 34 of the Texas Administrative Code Part 1, Chapter 20, Subchapter B, Division 2, Rule § 20.115 and Subchapter F, Division 2, Rule § 20.509.

"Weighted Oral Presentation Score" means the sum of the number of Points earned by a Respondent based on the Oral Presentation Score received for each scenario, in accordance with **Exhibit O, Scoring Guides,** and the Points available for each scenario in **Exhibit P- 1, Evaluation Tool and Sample Scoring Example**.

"Weighted Technical Question Score" means the sum of the number of Points earned by a Respondent based on the Technical Question Score received for each Technical Question, in accordance with **Exhibit O, Scoring Guides,** and the Points available for each Technical Question in **Exhibit P-1, Evaluation Tool and Sample Scoring Example**.

## 1.3 AUTHORITY

HHSC is soliciting the Services stated in this Solicitation through its authority under the Texas Government Code Chapters 531, 533, and 536 and Section 2155.144.

HHSC_CP_0019304

P-038.009

# ARTICLE II. ADMINISTRATIVE INFORMATION

## 2.1 SCHEDULE OF EVENTS

| EVENT | DATE/TIME |
|---|---|
| Solicitation Posting to ESBD Date | December 7, 2022 |
| Pre-proposal Conference <br> **(Section 2.3.5, Pre-Proposal Conference)** | December 21, 2022 at 12:00 PM – 4:00 PM Central Time |
| Deadline for Submitting Questions or Requests for Clarification **(Section 2.3.4, Solicitation Questions)** | January 3, 2023 at 10:30 AM Central Time |
| Tentative Date Responses to Questions or Requests for Clarification Posted on ESBD **(Section 2.3.4, Solicitation Questions)** | January 25, 2023 |
| Deadline for courtesy HSP review **(Section 5.2, HUB Subcontracting Plan)** | January 30, 2023 at 2:00 PM Central Time |
| Deadline for Submission of Proposals Proposals must be RECEIVED by HHSC by the deadline **(Section 2.5, Proposal Submission and Delivery)** | February 17, 2023 at 10:30 AM Central Time |
| Evaluation Period **(Section 3.1.3, Selection Methodology)** | February - June 2023 |
| Respondent Oral Presentation **(Section 3.1.3.4, Oral Presentations)** | July - August 2023 |
| Anticipated Notice of Award | February 2024 |
| Anticipated Operational Start | February 2025 |

Respondents must submit their Proposals to HHSC in accordance with the due date and time indicated in this Schedule of Events or as changed via an Addendum posted to the ESBD.

NOTE: All dates are tentative and HHSC reserves the right to modify these dates at any time. At the sole discretion of HHSC, events listed in the Schedule of Events are subject to scheduling changes and cancellation. Scheduling changes or cancellation determinations made prior to the Deadline for Submission will be published by posting an Addendum to the ESBD. After the Deadline for Submission, if there are delays that significantly impact the anticipated award date,

HHSC_CP_0019305

**P-038.010**

HHSC, at its sole discretion, may post updates regarding the anticipated award date to the Procurement Forecast on the HHS Procurement Opportunities web page. Each Respondent is responsible for checking the ESBD and Procurement Forecast for updates.

By submitting a Proposal, Respondent represents and warrants that any individual submitting the Proposal and any related documents on behalf of the Respondent is authorized to do so and to bind the Respondent under any Contract that may result from this Solicitation.

## 2.2 AMBIGUITY, CONFLICT, OR DISCREPANCY

Respondent must notify the Sole Point of Contact **(Section 2.3.1)** of any ambiguity, conflict, discrepancy, exclusionary specification, omission, or other error in the Solicitation in the manner and by the deadline described in **Section 2.3.4 (Solicitation Questions)**.

Each Respondent submits a Proposal at its own risk.

If Respondent fails to properly and timely notify the Sole Point of Contact identified in **Section 2.3.1** of any ambiguity, conflict, discrepancy, exclusionary specification, omission, or other error in the Solicitation, the Respondent, whether awarded a Contract or not:

a. Waives any claim of error or ambiguity in the Solicitation and any resulting Contract;

b. Must not contest the interpretation by HHSC of such provision(s); and

c. Is not entitled to additional compensation, relief, or time by reason of ambiguity, conflict, discrepancy, exclusionary specification, omission, or other error or its later correction.

## 2.3 INQUIRIES

### 2.3.1 Sole Point of Contact

All requests, questions, or other communication about this Solicitation shall be made in writing to HHSC PCS addressed to the person listed below (Sole Point of Contact). Additionally, a phone number is provided for purposes such as instructing a potential Respondent through an IT system or website referenced in this Solicitation. Communications via telephone are not binding.

| Name | Iris Triana-Zuniga, CTCD |
|---|---|
| Title | PCS Purchaser |
| Address | 1100 W. 49th Street, MC 2020, Austin, TX 78756 |
| E-mail | iris.triana-zuniga@hhs.texas.gov |

The Sole Point of Contact will authorize a secondary purchaser to serve as the Sole Point of Contact in the event of their absence and, in such an event, will include the contact information for the secondary point of contact in their automatic reply out-of-office message. Respondents seeking to contact the Sole Point of Contact should do so via e-mail in order to receive updated contact information.

HHSC_CP_0019306

P-038.011

See also **Section 2.3.3 (Exception to Sole Point of Contact)** below.

### 2.3.2 Prohibited Communication

Except as provided in **Sections 2.3.1** and **2.3.3**, Respondents are prohibited from any communication with HHSC regarding the Solicitation. HHSC and its representative(s), will not otherwise discuss the contents of this Solicitation with any potential Respondent or its representative(s). Attempts to ask questions by phone or in person will not be allowed or recognized as valid. Respondent shall rely only on written statements issued by or through HHSC PCS as provided by **Section 2.3 (Inquiries)**. This restriction does not preclude discussions between affected parties for the purposes of conducting business unrelated to this Solicitation. **Failure to comply with these restrictions may result in disqualification of Respondent's Proposal.**

### 2.3.3 Exception to Sole Point of Contact

Exceptions to **Section 2.3.1 (Sole Point of Contact)** are as follows:

a. Respondents with questions relating to the HUB Subcontracting Plan are permitted to direct those questions to the HUB coordinator at Cheryl.Bradley@hhs.texas.gov; and

b. Where it is expressly directed by the Sole Point of Contact that another designated HHSC representative may speak to the Respondent, such as during Contract negotiations. Respondents are required to ensure that communications have been authorized by the Sole Point of Contact before engaging in such communication. **Failure to comply with this requirement may result in the disqualification of a Respondent's Proposal.**

### 2.3.4 Solicitation Questions

HHSC allows for the submission of written questions (including requests for clarification) regarding this Solicitation. Questions must be submitted by e-mail to the Sole Point of Contact **(Section 2.3.1)** by the deadline established in **Section 2.1 (Schedule of Events)**. Responses to written questions will be consolidated and posted to the ESBD and will not be provided individually to requestors. Questions submitted during the pre-proposal conference will be addressed in accordance with **Section 2.3.5.2 (Questions at Pre-Proposal Conference).**

HHSC reserves the right to amend answers previously posted, prior to the Proposal deadline in **Section 2.1 (Schedule of Events)**. Amended answers will be posted on the ESBD. It is the Respondent's responsibility to check the ESBD. Only answers posted to the ESBD are binding.

All questions should include the following information:

a. Solicitation number;

b. Solicitation reference (e.g., page number, section, and where applicable, the exhibit or procurement library document title);

HHSC_CP_0019307

P-038.012

c.  Question topic (e.g., "Schedule of Events" or "Technical Question # _");

d.  The question the Respondent would like HHSC to address; and

e.  Contact information, including:

    1.  Company name;

    2.  Name of company's representative;

    3.  Contact phone number for representative; and

    4.  E-mail address for representative.

HHSC reserves the right to not respond to questions that do not include the above listed information. Questions received after the deadline in **Section 2.1 (Schedule of Events)** may be reviewed by HHSC but may not be answered. Only answers to questions submitted to the Sole Point of Contact in writing, in accordance with this section, are binding.

### 2.3.5 Pre-Proposal Conference

HHSC PCS will conduct a pre-proposal conference. Attendance is optional but highly recommended as the pre-proposal conference will include the training on the proper completion of the HUB Subcontracting Plan. See **Section 5.2 (HUB Subcontracting Plan)**.

Attendees to the virtual pre-proposal conference are required to send an e-mail to the Sole Point of Contact **(Section 2.3.1)** prior to the pre-proposal conference, advising of participation in the pre-proposal conference. The attendee's e-mail must provide the following:

a.  The legal business entity name which will be used if submitting a proposal;

b.  The name of each representative on the call; and

c.  The e-mail address for the entity's point of contact.

Attendees will receive a reply e-mail containing the log-in information for the pre-proposal conference.

#### 2.3.5.1 Conference Logistical Information

HHSC PCS will hold the pre-proposal conference via Microsoft Teams, on the date and time set out in **Section 2.1 (Schedule of Events)**.

People with disabilities who wish to attend the pre-proposal conference and require auxiliary aids or accessibility services should contact the Sole Point of Contact **(Section 2.3.1)** at least seventy-two (72) hours before the pre-proposal conference so appropriate arrangements can be made.

HHSC_CP_0019308

P-038.013

*Pre-proposal Microsoft Teams Information:*

HHSC will broadcast the pre-proposal conference via Microsoft Teams at the date and time listed in **Section 2.1 (Schedule of Events)**.

Participants must register for the pre-proposal conference via Microsoft Teams prior to the event according to **Section 2.3.5 (Pre-Proposal Conference)**. After registration, participants will receive another e-mail with the link to the Microsoft Teams pre-proposal conference meeting.

*By telephone:*

Participants may call-in to the pre-proposal conference using the information below and use a telephone as the speaker and microphone when attending the pre-proposal conference via Microsoft Teams.

United States: +1 (512) 580-4366

Pre-proposal conference phone ID: To be provided to registered participants via e-mail.

### 2.3.5.2 Questions at Pre-Proposal Conference

The following apply to questions submitted at the pre-proposal conference:

a. Reference **Section 2.3.4 (Solicitation Questions)** for the required format and information to be provided for submission of questions and requests for clarification.

b. Attendees may submit questions in writing at the pre-proposal conference. All questions must be in the required format and include the participant information as referenced in **Section 2.3.4 (Solicitation Questions)**. Questions must be submitted via e-mail to the Sole Point of Contact **(Section 2.3.1)**.

c. During the pre-proposal conference, HHSC may provide verbal responses to questions but only written responses posted by HHSC PCS as an Addendum to the Solicitation on the ESBD will be considered binding.

d. HHSC reserves the right to amend, prior to the Proposal deadline, answers previously posted. Amended answers will be posted on the ESBD.

e. Except for the Sole Point of Contact, conversations with HHSC staff **before or after the pre-proposal conference** are prohibited.

HHSC_CP_0019309

P-038.014

## 2.4 PROPOSAL COMPOSITION REQUIREMENTS

### 2.4.1 General Information

Failure to submit all Proposal documents in the required format(s) may result in disqualification of the Proposal without further consideration, see **Section 2.5.4 (Submission Checklist).** Respondent shall prepare a Proposal that clearly and concisely represents its qualifications and capabilities. Colored displays, promotional materials, etc. are not necessary or desired. Respondent should focus on the instructions and requirements of the Solicitation.

### 2.4.2 Page Limit and Supporting Documentation

The number of pages for the responses to the Technical Questions must not exceed the page limitations specified in **Section 4.2 (Technical Questions)**. All documents submitted with the Proposal except as expressly provided in this section, including the Technical Questions, must be properly paginated, formatted as an 8 ½" x 11" page with 1-inch margins, and use a 12 point or larger font, except that a smaller font may be used for page headers and footers, footnotes, and illustrations such as tables, charts, diagrams, figures, graphs and other visual aids. If a font smaller than 12 point is used, the text when printed on 8 ½" x 11" paper must not require magnification to be legible. Times New Roman font is preferred. Supporting documents such as SEC Filings and financial statements that cannot be altered may be submitted in their native format as long as the supporting documents are submitted electronically in accordance with **Section 2.5.2 (Submission Instructions)**. Large organizational charts, such as those required by **Section 5.5.1 (Company Organization)**, may be formatted as an 11" x 17" page.

The responses to the Technical Questions must not include other documents embedded as electronic files within the text. The responses to the Technical Questions, submitted as an electronic file, should be pre-formatted for printing on 8 ½" x 11" paper.

### 2.4.3 Discrepancies

In the event of any discrepancies or variations between copies, HHSC is under no obligation to resolve the inconsistencies and may make its scoring and selection decisions accordingly, including the decision to disqualify a Proposal. If Respondent is required to designate an "Original Proposal," but fails to do so, HHSC, in its sole discretion, will determine the unredacted version to be used as the "Original Proposal" or may disqualify the Proposal (see **Section 6.1.5 (Public Information Act – Respondent Requirements Regarding Disclosure)** regarding redacted Public Information Act copies). If the Respondent submits a redacted Proposal as the "Original Proposal," HHSC will disqualify the Proposal, and it will not be evaluated. HHSC will not accept submissions after the "Deadline for Submission of Proposals" in the **Schedule of Events (Section 2.1)** to remedy discrepancies or variations in Proposal submissions.

HHSC_CP_0019310

**P-038.015**

### 2.4.4   Exceptions

Although permitted, exceptions are disfavored. Instead, Respondents are highly encouraged, in lieu of including exceptions in their Proposals, to address all issues that might be advanced by way of exception by submitting such issues as questions or requests for clarification pursuant to **Section 2.3.4 (Solicitation Questions)**.

Changes or exceptions to RFP requirements or exceptions to Solicitation or Contract terms required by law or otherwise required by HHSC policy or practice, as determined by the agency in its sole discretion, may disqualify a potential Respondent. If a Respondent includes exceptions in its Proposal, Respondent is required to use the **Exceptions Form** included as **Exhibit L** to this Solicitation and provide all information requested on the form. Any exception that does not provide all required information in the format set forth in **Exhibit L, Exceptions Form,** may be rejected without consideration.

No exception, nor any other term, condition, or provision in a Proposal that differs, varies from, or contradicts this Solicitation will be considered to be part of any Contract resulting from this Solicitation unless expressly identified, incorporated, and made a part of the Contract in writing by HHSC.

### 2.4.5   Assumptions

Respondent must identify on the **Assumptions Form**, included as **Exhibit M**, any business, economic, legal, programmatic, or practical assumptions that underlie the Respondent's response to the Solicitation. HHSC reserves the right to accept or reject any assumptions. All assumptions not expressly identified and incorporated in writing by HHSC into any Contract resulting from this RFP are deemed rejected by HHSC.

### 2.4.6   Binding Offer

A Proposal should be responsive to the Solicitation as worded and without any assumption that any or all terms, conditions, or provisions of the Solicitation will be negotiated. Furthermore, all Proposals constitute binding offers. **Any Proposal that includes any type of disclaimer or other statement indicating that the response does not constitute a binding offer will be disqualified.**

If a Respondent's ability to enter into a Contract is contingent upon any exception or assumption provided in accordance with **Section 2.4.4 (Exceptions)** or **Section 2.4.5 (Assumptions)**, the Respondent may be disqualified from further consideration for Contract award.

By submitting a Proposal, Respondent grants HHSC the right to ask questions, request clarifications and to obtain any information from any lawful source regarding the past history, practices, conduct, ability and eligibility of the Respondent to fulfill requirements under this RFP, and the past history, practices, conduct, ability, and eligibility of any director, officer, or key employee of the Respondent. Such information may be taken into consideration in evaluating the

HHSC_CP_0019311

P-038.016

Proposal. By submitting a Proposal, the Respondent releases from liability and waives all claims against any party providing information about the Respondent at the request of HHSC.

## 2.4.7 Modifications and Withdrawals

Prior to the Proposal submission deadline in **Section 2.1 (Schedule of Events)**, Respondent may: (1) withdraw its Proposal by submitting a written request via e-mail to the Sole Point of Contact **(Section 2.3.1)**; or (2) modify its Proposal by submitting a written amendment to the Sole Point of Contact **(Section 2.3.1)**. The Respondent must reference the section(s) of its submission that will be replaced by the amendment or removed by written request.

## 2.5 PROPOSAL SUBMISSION AND DELIVERY

### 2.5.1 Deadline

Proposals must be received at the address in **Section 2.5.3 (Labeling and Delivery)** and delivered in a shipping box or package time stamped by HHSC PCS no later than the date and time specified for the "Deadline of Submission of Proposals" in **Section 2.1 (Schedule of Events)**.

All received Proposals will remain sealed until the date and time specified for the "Deadline for Submission of Proposals" in **Section 2.1 (Schedule of Events)**.

Late submittals will not be accepted.

### 2.5.2 Submission Instructions

Respondents must propose their desired Service Areas (SAs) using **Exhibit D, Service Area Map and Selection Form** in accordance with **Section 3.1.7.2 (Service Areas)**. Regardless of the number of SAs in which a Respondent proposes, Respondents must submit only one Proposal in accordance with this section; see also **Sections 2.4.1 (General Information)** and **2.4.3 (Discrepancies)**. Respondent shall submit two (2) USB drives – one (1) labeled "Original Submission" and one (1) labeled "Copy of Submission" – containing the following documents:

a. Each USB drive must contain one folder named "Original Proposal" that contains the Respondent's entire Proposal in searchable portable document format (PDF).

b. In accordance with **Section 6.1.5 (Public Information Act – Respondent Requirements Regarding Disclosure)**, each USB must contain one (1) folder named "Public Information Act Copy" that contains the Respondent's entire Proposal in searchable PDF, if applicable.

c. In accordance with **Section 5.2 (HUB Subcontracting Plan)**, each USB must contain one (1) file named "HUB Subcontracting Plan" in searchable PDF, that contains the Respondent's HUB Subcontracting Plan and all supporting documentation.

HHSC_CP_0019312

P-038.017

d.  Respondent may submit a Proposal with electronic signatures (e.g., a handwritten signature on a paper document that is converted to electronic format, or a digital signature placed on an electronic document using a software application).

## 2.5.3  Labeling and Delivery

Respondent must deliver Proposals submitted via USB drive(s) in a shipping box or package by one of the methods below.

| Overnight/Express/Priority Mail | Hand Delivery |
|---|---|
| Health and Human Services Commission ATTN: Response Coordinator Tower Building Room 108 1100 W. 49th St., MC 2020 Austin, Texas 78756 | Health and Human Services Commission ATTN: Response Coordinator Procurement & Contracting Services Building 1100 W. 49th St., MC 2020 Austin, Texas 78756 |

BE ADVISED, all Proposals become the property of HHSC after submission and will not be returned to Respondent. It is Respondent's responsibility to appropriately mark and deliver the Proposal to HHSC by the specified date. A U.S. Postal Service (USPS) postmark or round validation stamp; a mail receipt with the date of mailing, stamped by the USPS; a dated shipping label, invoice of receipt from a commercial carrier; or any other documentation in lieu of the on-site time stamp WILL NOT be accepted.

Each Respondent is solely responsible for ensuring its Proposal is submitted in accordance with all Solicitation requirements, including, but not limited to, proper labeling of packages, sufficient postage, or delivery fees, and ensuring timely receipt by HHSC. **In no event will HHSC be responsible or liable for any delay or error in delivery. Proposal must be received by HHSC by the Proposal deadline identified in Section 2.1 (Schedule of Events).**

Proposals submitted via USB drive(s) by mail or hand delivery shall be placed in a sealed package. Due to COVID-19, a Respondent submitting a Proposal by hand delivery must contact the **Sole Point of Contact (Section 2.3.1)** one (1) business day prior to the delivery attempt. Hand deliveries will not be accepted outside normal business hours, which are Monday-Friday 8:00 am – 5:00 pm, not including state and federal holidays. The sealed package as well as the USB drive(s) shall be clearly labeled on the outside as follows:

| | |
|---|---|
| Solicitation No: | HHS0011152 |
| Solicitation Name: | STAR & CHIP Managed Care Services |
| Proposal Deadline: | February 17, 2023 at 10:30 AM Central Time |
| Purchaser Name: | Iris Triana-Zuniga, CTCD |
| Respondent Name: | [Respondent Name] |

HHSC_CP_0019313

P-038.018

It is Respondent's sole responsibility to ensure that packaging is sufficient to prevent damage to contents. HHSC is not responsible or liable for any damage, and damaged Proposals will not be considered at HHSC's sole discretion.

HHSC is not responsible for any Proposal that is mishandled prior to receipt by HHSC. It is the Respondent's sole responsibility to appropriately label and deliver the Proposal to HHSC by the specified date and time. HHSC is not responsible for late delivery, inappropriately identified documents, or other submission errors that may lead to disqualification or nonreceipt of the Respondent's Proposal. Respondent USB drive submissions that contain a Solicitation Consideration Document (see **Section 2.5.4**) that is corrupted or otherwise inaccessible to HHSC in both the "Original Submission" and the "Copy of Submission," as required by **Section 2.5.2 (Submission Instructions)**, will be disqualified.

### 2.5.4    Submission Checklist

Solicitation Consideration and Award Consideration Documents, reference **Section 1.2 (Definitions)**, must be submitted by the deadline for Proposal submissions in **Section 2.1 (Schedule of Events)**. Solicitation Consideration Documents will be reviewed as-is, without any opportunity to remedy missed requirements. HHSC, at its sole discretion, may request some or all of the Respondents to remedy missing elements of Award Consideration Documents.

The Proposal must be submitted using the approved method identified in **Section 2.5.2 (Submission Instructions)** and labeled and delivered in accordance with **Section 2.5.3 (Labeling and Delivery)**. **Proposals submitted through any other method will not be accepted or considered for Contract award.** The subsections below set out all the required documents that make up the Proposal. Those documents marked "SC" are Solicitation Consideration Documents and those marked "AC" are Award Consideration Documents (see **Section 1.2, Definitions**) as follows:

### Required Proposal Documents

| | | | | |
|---|---|---|---|---|
| **a.** | Executive Summary | (Section 4.1) | SC | _____ |
| **b.** | Technical Question Responses | (Section 4.2) | SC | _____ |
| **c.** | HHS Solicitation Affirmations | (Section 5.1 and Exhibit I) | SC | _____ |
| **d.** | HUB Subcontracting Plan | (Section 5.2 and Exhibit N) | SC | _____ |
| **e.** | Authorization to Conduct Business in Texas | (Section 5.3) | AC | _____ |
| **f.** | Exceptions (if applicable) | (Section 2.4.4 and Exhibit L) | AC | _____ |

HHSC_CP_0019314

P-038.019

| | | | | |
|---|---|---|---|---|
| **g.** | Assumptions (if applicable) | (Section 2.4.5 and Exhibit M) | AC | _____ |
| **h.** | Supporting Documentation for 533.004 Claim for each SA (if applicable) | (Section 3.1.2) | AC | _____ |
| **i.** | Service Area Map and Selection Form | (Section 3.1.7.2 and Exhibit D) | AC | _____ |
| **j.** | Assurances – Non-Construction Programs | (Section 5.1 and Exhibit J) | AC | _____ |
| **k.** | Certification Regarding Lobbying | (Section 5.1 and Exhibit K) | AC | _____ |
| **l.** | Company Profile | (Section 5.4) | AC | _____ |
| **m.** | Required Financial Information | (Section 5.5) | AC | _____ |
| **n.** | Key Personnel | (Section 5.6) | AC | _____ |

HHSC_CP_0019315

P-038.020

# ARTICLE III. PROPOSAL EVALUATION AND AWARD PROCESS

### 3.1 EVALUATION CRITERIA

#### 3.1.1 Conformance with State Law

Proposals shall be evaluated in accordance with State law, including, but not limited to, applicable provisions of Chapters 533, 536, and 2155 of the Texas Government Code. HHSC will also review the reports available in the VPTS for each responsive Respondent in accordance with Texas Government Code Section 2262.055(d). HHSC shall make an award to the Respondent that, in HHSC's sole determination, provides the best value to the State of Texas as set out in this Solicitation.

#### 3.1.2 Mandatory Contracts

Respondent making a 533.004 Claim must include, in its Proposal, supporting documentation (e.g., organization charter, city ordinance, commissioners court order) that evidences its eligibility under Texas Government Code Section 533.004(a). Respondent must include such documentation for each SA in which Respondent asserts a 533.004 Claim. Respondent claiming eligibility under Texas Government Code Section 533.004(a)(1) must provide a certificate of fact (or similar document) showing Respondent is "wholly owned and operated by a hospital district in that region." Respondent claiming eligibility under Texas Government Code Section 533.004(a)(2) must provide a copy of the "contract, agreement, or other arrangement with a hospital district in that region or with a municipality in that region that owns a hospital licensed under Chapter 241, Health and Safety Code." Respondent claiming eligibility under Texas Government Code Section 533.004(a)(3) must provide a copy of "the contract, agreement, or other arrangement with a hospital district in that region." Respondent must designate all SAs where it asserts a 533.004 Claim in **Exhibit D, Service Area Map and Selection Form**, **Table D-1: Proposed Service Area(s)**. HHSC will reject Respondent's 533.004 Claim in an SA if HHSC determines Respondent does not meet the eligibility criteria of Section 533.004(a)(1), (2), or (3) in the SA. In that event, Respondent will proceed through the procurement process as though it made no 533.004 Claim for that SA.

#### 3.1.3 Selection Methodology

Proposals that satisfy the initial compliance screening, **Section 3.1.3.1 (Initial Screening)**, will be submitted to the HHSC evaluation team for review and scoring. Each member of the HHSC evaluation team will receive a copy of each Proposal that satisfies the initial compliance screening for review. The HHSC evaluators will not individually score the Technical Questions or Oral Presentations. This procurement will utilize a consensus scoring methodology as outlined by this section.

HHSC_CP_0019316

P-038.021

The HHSC evaluators will score the responses to the Technical Questions in accordance with the **Exhibit O, Scoring Guides**. Respondents meeting the Advancement Criteria **(Section 3.1.3.3)** will be invited to Oral Presentations **(Section 3.1.3.4)**.

The following subsections describe the evaluation process, including the criteria for advancement to the various phases of evaluation, where applicable.

### 3.1.3.1 Initial Screening

During the initial screening of the Proposals, HHSC will review the Proposals for compliance with the submission requirements in **Article II** of this RFP ("initial compliance screening"). Failure to meet the submission requirements in **Article II** may, at any time, result in disqualification of the Respondent without further consideration or evaluation of its Proposal.

**HHSC will automatically disqualify any Proposal that does not include any document identified as a Solicitation Consideration Document in Section 2.5.4 (Submission Checklist).**

At its sole discretion, HHSC may disqualify any Proposal that does not include all required Award Consideration Documents. Reference **Section 2.5.4 (Submission Checklist)**.

HHSC will also identify Respondents making one or more 533.004 Claims in accordance with **Section 3.1.2 (Mandatory Contracts)**. Additionally, HHSC will record each Respondent's proposed SA(s) and order of SA preference as submitted on **Exhibit D, Service Area Map and Selection Form** in accordance with **Section 3.1.7.2 (Service Areas)**.

### 3.1.3.2 Proposal Evaluation

Each member of the HHSC evaluation team will read their assigned Technical Question responses in the Proposals in preparation for evaluation. In accordance with **Section 4.2 (Technical Questions)**, each Technical Question response must be a complete response to the Technical Question at issue and Respondents should not assume the evaluators will consider or look for additional information in the response to other Technical Questions not at issue. The HHSC evaluation team will score the responses to the Technical Questions **(Article IV)** for all Proposals that pass initial compliance screening **(Section 3.1.3.1, Initial Screening)** against the criteria in **Section 3.1.4 (Best Value Evaluation Criteria)** using the **Technical Question Scoring Guide** in **Exhibit O, Scoring Guides**. Each one of these 0-5 scores given to a Respondent's Technical Question are known as a Technical Question Score.

There will not be individual scores from each HHSC evaluation team member. Rather, the HHSC evaluation team will participate in one or more Consensus Scoring Meetings. At the Consensus Scoring Meetings, the HHSC evaluation team will come to a consensus on the Technical Question Scores for responses to each Technical Question. The Consensus Scoring Meetings will be led by a facilitation team who will facilitate the discussion and record the scores. The HHSC evaluation team may be assisted by non-scoring technical advisors as needed.

HHSC_CP_0019317

P-038.022

*3.1.3.3 Advancement Criteria*

After the evaluation of the Proposal responses to the Technical Questions, certain Respondents will be selected for invitation to Oral Presentations using the Competitive Range Advancement Criteria specified by this section.

As defined in Texas Administrative Code, Title 1, Part 15, Chapter 391, Subchapter A, Rule § 391.107(3), the Competitive Range consists of the "[P]roposals that have a reasonable chance of being selected for award taking into account the evaluation criteria and basis for award as stated in the [S]olicitation." A Respondent meeting the Competitive Range must receive a Technical Evaluation Score that has, in the sole determination of HHSC based on the Respondent's highest possible Final Weighted Score if all available Oral Presentation points were awarded to that Respondent, a reasonable chance of being selected for award when considered in addition to the following factors:

    a.  Respondent's proposed SAs and order of SA preference as submitted on **Exhibit D, Service Area Map and Selection Form**;

    b.  The maximum number of SAs allowed to be awarded to any individual Respondent as set out in **Section 3.1.7.2 (Service Areas)** and **Section 3.1.7.3 (Service Area Assignment)**; and

    c.  The maximum number of MCOs per SA as set out in Table 1 of **Section 3.1.7.2 (Service Areas)** including whether a Valid 533.004 Claim exists for an SA.

After HHSC's consideration of the factors set out in this section, all Respondents without a reasonable chance for award will be eliminated from the Competitive Range and will not advance to Oral Presentations. Notwithstanding the factors stated in this section, all Respondents with a Validated 533.004 Claim will advance to Oral Presentations.

*3.1.3.4 Oral Presentations*

To further identify the Respondents providing best value, Oral Presentations will be requested. The Advancement Criteria, as described by **Section 3.1.3.3 (Advancement Criteria)**, will be utilized to determine which Respondents will advance to Oral Presentations. Failure to participate in Oral Presentations will result in disqualification from further consideration for Contract award.

Respondents selected for Oral Presentations will be the final group of Respondents eligible for potential Contract award. A Consensus Scoring Meeting will take place following each presentation, in order to score the Respondent's Oral Presentation. Information from the Oral Presentation will be used to score the scenarios using the **Oral Presentation Scenario Scoring Guide** in **Exhibit O, Scoring Guides** and **Section 3.1.4 (Best Value Evaluation Criteria)** in accordance with Points available for Oral Presentation scenarios specified by **Exhibit P-1, Evaluation Tool and Sample Scoring Example.** Each one of these 0-5 scores given to a Respondent's Oral Presentation scenarios are known as an Oral Presentation Score.

HHSC_CP_0019318

Respondents will be provided with advance notice of any such Oral Presentation and are responsible for their own presentation equipment. All Respondents will be provided the same scenarios and given the same amount of time to prepare and respond. HHSC plans to conduct the Oral Presentations in-person, however HHSC reserves the right to conduct Oral Presentations virtually. This policy may change as needed and logistical information will be provided to invited Respondents prior to their presentation.

Advance notice will include an agenda, ground rules, and any other logistical information HHSC wishes to provide. The specific scenarios for the topic areas listed in **Section 3.1.5 (Oral Presentation Criteria)** will be provided on the day of the presentation, as outlined below.

Each Oral Presentation will be scheduled for a block of time to be used as follows:

| | |
|---|---|
| Introductions and Provision of Question(s) | 15 minutes |
| Respondent Prep Time | 60 minutes |
| Respondent Presentation | 90 minutes |

The Respondent's presentation team will be limited to individuals identified as Key Personnel or those who are responsible for direct oversight of the program in Texas if awarded a Contract; **no other consultants or staff, including Respondent corporate executives, will be allowed to participate in Oral Presentations.**

HHSC will ask each Respondent to confirm the Respondent's intent to participate in the Oral Presentation and provide names, current positions, length of employment with the organization, areas of responsibility within the organization, and role under the STAR & CHIP Contract (if awarded), which must be submitted by the deadline provided in any invitation to Oral Presentations.

Respondents will be given a maximum of ninety (90) minutes to provide a comprehensive response to the questions. If any visual aids are presented, Respondents must e-mail the visual aids to the Sole Point of Contact immediately following the presentation. Visual aids will be considered part of Respondent's Oral Presentation and will be retained by HHSC.

HHSC is not responsible for any costs incurred by the Respondents in preparation for any Oral Presentation. All costs incurred by Respondents are the responsibility of Respondents.

### 3.1.4  Best Value Evaluation Criteria

Best Value Evaluation Criteria for this Solicitation is the basis upon which the written responses to the Technical Questions in **Article IV** will be scored, in addition to the considerations provided by the **Technical Question Scoring Guide** in **Exhibit O, Scoring Guides**. Responses to the Oral Presentation scenarios will also be scored against Best Value Evaluation Criteria and the **Oral Presentation Scoring Guide** in **Exhibit O, Scoring Guides**, in accordance with **Sections 3.1.3.4 and 3.1.5**. See also, **Exhibit P, Consensus Scoring Rubric**.

HHSC_CP_0019319

P-038.024

Best Value Evaluation Criteria, Technical Questions, and Oral Presentation Scenarios were developed to ensure HHSC requests the information necessary to ensure that the Respondent selected for Contract award can achieve the outcomes mandated in Texas Government Code Sections 533.002, 533.003(a)(1), 536.052, and 2155.144.

BVC 1.    Delivers Person-Centered Service Coordination that connects Member needs to effective care.

    a.  Demonstrates an understanding of the unique elements of Service Coordination and the needs of the STAR & CHIP population with special physical and behavioral health care needs.

    b.  Demonstrates an effective, Person-Centered process and infrastructure to identify, assess, and respond to individual Member's needs and strengths.

    c.  Demonstrates engagement of Providers, Member's family, and community supports serving the Member in the Service Coordination process.

    d.  Supports successful transitions of care for Members between programs, services, and settings, including transitions between Medicaid and Healthy Texas Women (HTW).

    e.  Demonstrates how data will be used to inform Service Coordination approaches and to measure success.

BVC 2.    Ensures Members have timely access to the Services they need.

    a.  Demonstrates the ability to deliver person-centered Services timely in the most clinically appropriate and cost-effective setting for Members covered in the STAR & CHIP Program.

    b.  Demonstrates use of innovative and proven strategies to promote access to Providers and Services, including addressing Provider shortages and barriers to care in specific areas of the State.

    c.  Demonstrates the ability to provide, arrange, and coordinate preventive, primary, acute care, behavioral health and pharmacy services that contribute to the well-being of women, children, and families.

    d.  Demonstrates a proactive approach to outreach and education regarding a Member's management of their services and supports that is culturally and linguistically appropriate, accessible, and responsive to the needs of Members in the STAR & CHIP Program.

BVC 3.    Encourages Providers to participate in the Medicaid program.

    a.  Demonstrates effective collaboration and communication with the Provider community as evidenced by Network participation and Provider satisfaction.

    b.  Demonstrates proactive strategies to streamline processes and reduce administrative burden for Providers.

    c.  Demonstrates transparent and efficient policies and processes for key business

HHSC_CP_0019320

P-038.025

operations, such as Credentialing, contracting, claims payment, and Utilization Management.

d. Demonstrates support to Providers in complex clinical decision-making through decision-support tools, best practice guidelines, and Utilization Management approaches.

e. Utilizes Network development strategies and incentives that ensure appropriate access for Members, including access to consistent providers across programs and services.

f. Demonstrates support to Providers serving the Member using technology, data, and processes and tools to better inform and improve care.

BVC 4.   Ensures a sustainable Medicaid program by incentivizing value in the Service delivery model and optimizing resources.

a. Demonstrates proven strategies to monitor and manage healthcare quality and improve key quality metrics that align with the goals of the State.

b. Demonstrates a system of care that identifies, invests in, and rewards desired outcomes for access and high-value care.

c. Demonstrates advances in value-based care and delivery system reform and supports Providers through the transition to value-based payment arrangements with necessary data and information.

d. Demonstrates achievable cost efficiencies and program integrity through effective monitoring and control of spending and Utilization Management trends.

BVC 5.   Uses data, technology, and reporting to facilitate and demonstrate strong performance and oversight.

a. Demonstrates capability to meet all requirements related to access to Services, Service delivery, quality of care, operations, and financial performance.

b. Demonstrates consistent, timely, and accurate delivery of data, analysis, and reporting.

c. Demonstrates process improvements and cost efficiencies using automation and data solutions.

d. Utilizes integrated systems and processes with the State and other vendors to facilitate appropriate Member transitions.

### 3.1.5   Oral Presentation Criteria

Oral Presentations will add up to a possible **200 additional Points** to a Respondent's **Final Weighted Score (Section 3.1.6).**

The opportunity to participate in Oral Presentations will be given in accordance with **Section 3.1.3.3 (Advancement Criteria)**. Only one oral presentation will occur per selected Respondent

HHSC_CP_0019321

regardless of the number of proposed SAs submitted in **Exhibit D, Service Area Map and Selection Form**. Additional information can be found in **Section 3.1.3.4 (Oral Presentations)**.

Oral Presentations will be scored based on Respondent's performance in addressing specific Oral Presentation scenarios which will cover the following topics:

a.   Oversight and coordination with subcontractors;

b.   Addressing maternal mortality and morbidity;

c.   Coordination with Dental Maintenance Organizations (DMOs); and

d.   Addressing preventive care rates.

This section is meant to provide an indication of the scenarios the Respondent will be expected to address. The complete scenarios will be provided only to Respondents that are invited to Oral Presentations and not before completion of the **Proposal Evaluation (Section 3.1.3.2)**. Scenarios will be scored using the **Oral Presentation Scenario Scoring Guide** in **Exhibit O, Scoring Guides** and **Section 3.1.4 (Best Value Evaluation Criteria)**, in accordance with Points available for Oral Presentation scenarios specified by **Exhibit P-1, Evaluation Tool and Sample Scoring Example.**

### 3.1.6   Final Weighted Score

A Respondent's Final Weighted Score will be a combination of the Weighted Technical Question Score (see **Article IV**) and the Weighted Oral Presentation Score except as provided below.

The Weighted Technical Question Score is the score from the evaluation of the Technical Questions **(Article IV)** as described by **Section 3.1.3.2 (Proposal Evaluation)** and scored using the **Technical Question Scoring Guide** in **Exhibit O, Scoring Guides,** and **Section 3.1.4 (Best Value Evaluation Criteria),** in accordance with Points available for Technical Questions specified by **Exhibit P-1, Evaluation Tool and Sample Scoring Example.**

A Respondent who does not meet the **Advancement Criteria (Section 3.1.3.3)** will not be asked to Oral Presentations and therefore receives no Points for the Weighted Oral Presentation Score added to the Weighted Technical Question Score. A Respondent with a 533.004 Validated Claim by HHSC in one or more SAs will only receive a Weighted Oral Presentation Score in those SAs with a 533.004 Validated Claim or in those SAs in which they meet the Competitive Range in **Section 3.1.3.3 (Advancement Criteria)**. In SAs with multiple Respondents with Validated 533.004 Claims, Respondents that are not the 533.004 Claim Assigned for 533.004 Contract in that SA will only maintain the Weighted Oral Presentation Score in that SA if they meet the Competitive Range in **Section 3.1.3.3 (Advancement Criteria)** in the same manner as Respondents with no 533.004 Claim. The total number of available Points for the Weighted Technical Question Score is 1,800 and the total number of available Points for the Weighted Oral Presentation Score is 200. The total number of Points available for the Final Weighted Score is

HHSC_CP_0019322

P-038.027

2,000 and is the maximum number of Points available to a Respondent resulting from the evaluation activities for this Solicitation.

All Respondents with a Validated 533.004 Claim will advance to Oral Presentations in accordance with **Section 3.1.3.3 (Advancement Criteria)** and receive a Final Weighted Score.

### 3.1.7 Final Consideration for Award

Respondents must satisfactorily meet each of the final considerations in the manner described by this Solicitation in order to be eligible for Contract award. The scope and criteria for each review is provided by this section.

#### 3.1.7.1 Required Financial Information

Respondents must submit the required financial information in the manner and form provided by **Section 5.5 (Required Financial Information)** and **Section 5.4 (Company Profile).** The financial due diligence review process may take place concurrently with the Oral Presentations. The information submitted in **Section 5.4 (Company Profile)** and **Section 5.5 (Required Financial Information)** will be reviewed to establish that Respondent provided satisfactory assurances regarding its financial solvency in accordance with the requirements under 42 C.F.R. § 438.116, Solvency Standards and this Solicitation. The requested financial information will be analyzed in accordance with accepted financial industry standards and HHSC's financial requirements set forth in **Exhibit A, HHSC Managed Care Uniform Contract Terms and Conditions v. 1.0**, **Section 12.03**, Minimum Net Worth, and **Section 12.04**, Solvency. Respondents must demonstrate financial solvency based on the following requirements:

1. **Exhibit B, Texas Medicaid and CHIP – Uniform Managed Care Manual (UMCM)**, and **Sections 2.5**, **2.6** and **2.7** of **Exhibit H, STAR & CHIP Scope of Work (SOW)**;

2. Reasonableness and likelihood of compliance with the contractual performance measures (e.g., the ability to meet immediate liabilities and sufficient capitalization to perform all requirements of the resulting Contract and the preservation of Medicaid funds for Medicaid operations by Respondent);

3. Liquidity and capital resources, assets and liabilities, commonly used financial ratios, audit and/or actuarial opinions and written risk factors; and

4. Dun and Bradstreet report (if any).

HHSC reserves the right, at any time, to request additional information to supplement the information required by **Section 5.4 (Company Profile)** and **Section 5.5 (Required Financial Information)**. To the extent Respondent does not provide adequate assurance of financial stability or solvency, whether initially or through supplementation, and in HHSC's sole discretion, Respondents will be required to provide an explanation and other assurances (e.g., capital contributions, high-cost reinsurance, letters-of-credit, etc.) based on the needs of HHSC to resolve

HHSC_CP_0019323

P-038.028

any financial viability or solvency concerns raised in the review of this selection criterion. The sufficiency of any such remedial efforts will be determined by HHSC in its sole discretion. If a Respondent refuses to, or is unable to, give such explanation or assurance to HHSC's reasonable satisfaction, Respondent may not be considered for Contract award. HHSC's determination whether Respondent has provided satisfactory assurances regarding its financial solvency shall be final.

*3.1.7.2 Service Areas*

After the Final Weighted Score is calculated, Respondents will be further reviewed according to the final considerations described by this section.

All Respondents must submit a single Proposal in response to the Solicitation and must use **Exhibit D, Service Area Map and Selection Form** to designate the Service Areas (may also be referred to as SAs, Service Delivery Areas, and SDAs) the Respondent is proposing. Respondents will rank their desired SAs in order of preference on **Exhibit D, Service Area Map and Selection Form** for consideration by HHSC as provided by this section. The order of preference is not dispositive nor a guarantee of Contract award. Respondent will be recommended for Contract award in SAs following the calculation of the Final Weighted Score and in accordance with **Section 3.1.7.3 (Service Area Assignment)**.

HHSC will not award more than 7 SAs to any individual Respondent except as provided by **Section 3.1.7.4 (Additional SA Assignment).** Respondents may propose in and rank all SAs desired on **Exhibit D, Service Area Map and Selection Form** including selecting and ranking all thirteen SAs. Respondents will not be assigned in SAs not selected on **Exhibit D, Service Area Map and Selection Form.**

The maximum number of MCOs to be awarded per SA is set out in **Table 1: Maximum Number of MCOs per SA**.

### Table 1: Maximum Number of MCOs per SA

| SA | Maximum Number of MCOs per SA | FY2020 Average Monthly Enrollment (excludes HTW) |
|---|---|---|
| Harris | 5 | 820,837 |
| Hidalgo | 4 | 346,241 |
| Dallas | 4 | 453,350 |
| Bexar | 4 | 295,882 |
| Tarrant | 4 | 315,257 |
| Northeast Texas | 3 | 174,129 |
| West Texas | 3 | 156,294 |

HHSC_CP_0019324

P-038.029

| SA | Maximum Number of MCOs per SA | FY2020 Average Monthly Enrollment (excludes HTW) |
|---|---|---|
| Central Texas | 3 | 144,270 |
| Travis | 3 | 173,775 |
| El Paso | 3 | 131,552 |
| Nueces | 3 | 98,507 |
| Jefferson | 3 | 90,840 |
| Lubbock | 3 | 86,240 |

The goals of SA assignments are to provide best value to the State of Texas by providing Members a choice of plans in accordance with federal law, encouraging competition among plans to promote efficiency and quality of service delivery, and minimizing financial and operational risk to the State from plan performance issues or exit from the program. In order to achieve these goals, HHSC will follow the SA assignment methodology as provided by this section and **Section 3.1.7.3 (Service Area Assignment)**.

*3.1.7.3 Service Area Assignment*

SA assignments will be determined by the following method:

a. In each SA with only one Respondent with a Validated 533.004 Claim, the Respondent with the Validated 533.004 Claim will be assigned to the SA.

b. In each SA with more than one Respondent with a Validated 533.004 Claim, the Respondent with the highest Final Weighted Score of those Respondents with Validated 533.004 Claims in the SA will be assigned to that SA. All other Respondents with a Validated 533.004 Claim in the SA will be considered in the same manner as Respondents without a Validated 533.004 Claim in the SA; and

c. Following assignment of Respondents to SAs under **Section 3.1.7.3(a) and (b)**, Respondents will be assigned to SAs designated by its **Exhibit D, Service Area Map and Selection Form** by order of ranked preference with a maximum total assignment of 7 SAs per Respondent except as provided in **Section 3.1.7.4 (Additional SA Assignment)**. Assignment of Respondents to SAs will proceed in descending order of Final Weighted Score, until the maximum number of MCOs per SA has been assigned as set forth in **Table 1: Maximum Number of MCOs per SA**.

*3.1.7.4 Additional SA Assignment*

HHSC may assign Respondents to more than 7 SAs if, for any reason following the SA assignments made in accordance with **Section 3.1.7.3 (Service Area Assignment)**, an SA has not

HHSC_CP_0019325

P-038.030

reached the maximum number of MCOs as set forth in **Table 1: Maximum Number of MCOs per SA**.

To make additional SA assignments under this section, HHSC will assign to the SA the Respondent with the highest Final Weighted Score of the Respondents who designated the SA in **Exhibit D, Service Area Map and Selection Form.** Such assignments will continue in this manner until each SA has the maximum number of MCOs. Accordingly, Respondents may select and rank as many SAs as desired on **Exhibit D, Service Area Map and Selection Form** including selecting and ranking all thirteen SAs. A Respondent will not be assigned SAs it has not selected on **Exhibit D, Service Area Map and Selection Form**.

### 3.1.7.5 Certification

All Respondents recommended for Contract award must be certified by HHSC as reasonably able to fulfill the terms of the Contract, as required by Texas Government Code Section 533.0035. Certification will not impact a Respondent's Final Weighted Score described by **Section 3.1.6 (Final Weighted Score)**, but failure to obtain certification will result in no further consideration for Contract award, and another Respondent may be considered for Contract award in accordance with this section.

### 3.1.8 Final Award Determination

The final determination for award will be based on the evaluation process described in **Section 3.1.3 (Selection Methodology)** in accordance with **Section 3.1.4 (Best Value Evaluation Criteria), Section 3.1.5 (Oral Presentation Criteria)** as well as the reviews conducted in accordance with **Section 3.1.7 (Final Considerations for Award)**. A Respondent's Proposal must pass the initial compliance screening **(Section 3.1.3.1)**, meet the Advancement Criteria **(Section 3.1.3.3)** for Oral Presentations following the Proposal evaluation **(Section 3.1.3.2)**, receive a Final Weighted Score **(Section 3.1.6)** following Oral Presentations **(Section 3.1.3.4)**, and meet the requirements in **Section 3.1.7 (Final Considerations for Award)** in order to be considered for Contract award.

## ARTICLE IV. EXECUTIVE SUMMARY AND TECHNICAL QUESTIONS

### 4.1 EXECUTIVE SUMMARY

Respondent must provide a high-level overview of their approach to meeting the requirements contained in **Exhibit H, STAR & CHIP Scope of Work (SOW)**. The Summary must demonstrate an understanding of HHSC goals and objectives for this Solicitation.

If the Respondent is providing Services or Deliverables beyond those specifically requested, those Services or Deliverables must be identified. If the Respondent is offering Services or Deliverables

HHSC_CP_0019326

P-038.031

that do not meet the specific requirements of this RFP, but in the opinion of the Respondent are equivalent or superior to those specifically requested, any such differences must be noted in the Executive Summary. The Respondent should realize, however, that failure to provide the Services and Deliverables specifically requested may result in disqualification.

The Executive Summary must not exceed two (2) pages and should represent a full and concise summary of the contents of the Proposal. HHSC will not read or consider any response in excess of the page limitations. While the Executive Summary is not a scored element of the Proposal, a Proposal with an Executive Summary that does not adhere to the requirements in **Section 2.4.2 (Page Limits and Supporting Documentation)** may be disqualified from further consideration for Contract award.

## 4.2 TECHNICAL QUESTIONS

Respondents must submit with each Proposal a written response to the Technical Questions provided below. Respondents must provide a complete answer to each Technical Question that does not reference other Technical Questions or materials. Each Technical Question response must be clearly labeled to indicate which Technical Question it is applicable to and where that Technical Question's response begins and ends. Repeating the Technical Question within the response is not required. Each Technical Question will be reviewed in isolation and it should not be assumed that any evaluator has read or will read any other Technical Question response. Technical Questions will be evaluated in accordance with the Technical Question Scoring Guide in **Exhibit O, Scoring Guides**, **Section 3.1.3.2 (Proposal Evaluation)**, and **Section 3.1.4 (Best Value Evaluation Criteria)**.

Respondents must answer each question with consideration of the "SOW Reference" and the "BVC Descriptor" listed for that Technical Question. Sections listed for the "SOW Reference" refer to **Exhibit H, STAR & CHIP Scope of Work (SOW)**. "SOW References" are inclusive of all subsections unless expressly limited. Sections listed for "BVC Descriptor" refer to this document, **Section 3.1.4 (Best Value Evaluation Criteria)**. To the extent that any exhibits or attachments documenting the BVC, "BVC Descriptors," and "SOW References" associated with a Technical Question differ from this section of the RFP, this section of the RFP prevails. In answering some Technical Questions, it may be beneficial to reference the **Exhibit Q, Procurement Library**.

Respondents must also adhere to the page limitations for each Technical Question and must number all pages submitted with the Proposal. HHSC will not read or consider any response in excess of the page limitations. In addition, Technical Question responses that do not adhere to the requirements in **Section 2.4.2 (Page Limits and Supporting Documentation)** may be disqualified from further consideration for Contract award.

HHSC_CP_0019327

P-038.032

## BVC 1 (Section 3.1.4. Best Value Evaluation Criteria)

### Technical Question No. 1

Describe the Respondent's model for managing and coordinating services for Members with multiple complex medical, physical health, and/or Behavioral Health (BH) needs. At a minimum, the response should:

    a. Describe processes to conduct initial and periodic assessments of Members' needs;

    b. Describe how a Person-Centered Service Plan is developed within required timeframes;

    c. Describe elements of the Service Coordination model design specific to meeting the needs of Members with Special Health Care Needs (MSHCN); and

    d. Describe communication of initial and subsequent risk assessments to a Member's Primary Care Provider (PCP) and prenatal care Provider and include specific strategies to ensure the coordination of physical health and BH.

**SOW Reference: 2.6.33; 2.6.34; 2.6.36; 2.6.43; 2.6.44; 2.6.46; 2.6.48; 2.6.50; 2.6.53.7; and 2.6.53.11**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 1a; 1b; 1c; and 1e**
**Page Limit: 10**

### Technical Question No. 2

Describe the Respondent's process for completing Member outreach and engagement, including education and messaging to a Member about available Service Coordination. At a minimum, the response should:

    a. Include a description of how attempts are made to contact and engage a Member; and

    b. Describe best practices for contacting and engaging with Members or a parent/legal guardian of a Member who declines Service Coordination.

**SOW Reference: 2.6.16; 2.6.17; 2.6.18; 2.6.19; and 2.6.44**
**BVC Descriptor:  Section 3.1.4 (Best Value Evaluation Criteria) 1a; 1b; and 1e**
**Page Limit: 5**

HHSC_CP_0019328

P-038.033

A Member is a 36-year-old woman in her second trimester of pregnancy. She has received no prenatal care to date. She is noted to have relapsed in her substance use about six months ago, abusing alcohol and opiates after two years of sobriety. Since becoming pregnant, she has experienced blood pressure and blood sugar hitting high and low levels with little stability or predictability. She is noted to have high-levels of stress after losing her job and she has little family support. Describe the Service Coordination plan during the remainder of this Member's pregnancy and the post-partum period.

**SOW Reference: 2.6.33; 2.6.34; 2.6.36; 2.6.43;**
**2.6.44; 2.6.46; 2.6.48; 2.6.50; 2.6.53.3; 2.6.53.8; and 2.6.53.11**
**BVC Descriptor:  Section 3.1.4 (Best Value Evaluation Criteria) 1a; 1b; 1c; and 1e**
**Page Limit: 5**

**Technical Question No. 4**

A Member is a six-year-old boy diagnosed with asthma and Type 1 diabetes. The child was recently admitted to the Hospital for pneumonia that exacerbated his asthma. A few days after discharge, he was assessed in the emergency department due to lightheadedness and low blood sugar. He is the oldest of four siblings and his parents describe being overwhelmed by his medical needs. Describe the Service Coordination plan following the child's Hospital stay and emergency department care and how services will be coordinated to achieve improved health outcomes for this child. Please include a description of how preventative care and family support will be provided.

**SOW Reference: 2.6.33; 2.6.34; 2.6.36; 2.6.43; 2.6.44; 2.6.45; 2.6.46; 2.6.48; 2.6.50; 2.6.53.1; 2.6.53.8; and 2.6.53.11**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 1a; 1b; 1c; 1d; and 1e**
**Page Limit: 5**

HHSC_CP_0019329

P-038.034

Describe the Respondent's initiatives to educate Members on seeking non-emergency care in the primary care setting and to encourage Members to establish and maintain a PCP relationship.

**SOW Reference: 2.4.2; 2.6.17.1; and 2.6.18**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 2a and 2d**
**Page Limit: 7**

**Technical Question No. 6**

Describe the Respondent's strategies for monitoring and addressing Network Provider issues including:
  a. Compliance with timely access standards and improving a Member's ability to obtain Services as needed;
  b. Ongoing Provider compliance with appointment timeliness standards;
  c. Provider Network adequacy including developing Services and Providers where they are needed, including Non-Emergency Medical Transportation (NEMT) and Healthy Texas Women (HTW) Providers;
  d. Developing and promoting the use of Telemedicine/Telehealth; and
  e. Potential challenges, including Network gaps, and how the Respondent would address those challenges.

**SOW Reference: 2.6.23.3; 2.6.34; and 2.6.35**
**BVC Descriptor:  Section 3.1.4 (Best Value Evaluation Criteria) 2b and 2c**
**Page Limit: 10**

**Technical Question No. 7**

Describe how the Respondent will ensure the delivery of the federally mandated Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) Services. Please describe the process, including tracking routine screening and immunizations and addressing low utilization of these services, education to Members, and monitoring the provision of treatment and related health outcomes. Describe how the Respondent will use the information to improve Member checkup rates.

**SOW Reference: 2.6.18; 2.6.50; and 2.6.51**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 2b and 2c**
**Page Limit: 5**

HHSC_CP_0019330

Ms. Myat is a 24-year-old woman who is seeking care for her 2 ½ year-old son, Arkar. She has become concerned that he doesn't seem to be talking as much as other children his age. Of note, Ms. Myat, her husband, and their son Arkar are Karenni and emigrated from Myanmar about 2 years ago seeking asylum. Ms. Myat has limited English proficiency and her preferred language is Karenni. After discussing her concern with a fellow parent, it was suggested that Ms. Myat set up an appointment with Arkar's pediatrician so Arkar can be evaluated. Arkar's last visit to the pediatrician was over a year ago when he last received immunizations. Ms. Myat was directed to call the number on the back of Arkar's Medicaid identification card. Upon calling, Ms. Myat had difficulty understanding the instructions. She then sought the assistance of a representative from the local advocacy organization. Please describe Respondent's approach to address this scenario. At a minimum, the response should:

    a.  Describe how the Respondent will address the communication barrier for a Member with limited English proficiency;

    b.  Describe how the Respondent will address a Member's need for a developmental assessment in a culturally sensitive manner; and

    c.  Describe how the Respondent will identify additional health promotion opportunities and provide health education activities.

**SOW Reference: 2.6.7.3; 2.6.16; 2.6.17; 2.6.18; 2.6.19; and 2.6.51**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 2c and 2d**
**Page Limit: 5**

HHSC_CP_0019331

P-038.036

## BVC 3 (Section 3.1.4, Best Value Evaluation Criteria)

### Technical Question No. 9

Describe the Respondent's approach to developing, contracting, and managing a robust, qualified, and culturally competent Provider Network. The response should describe the Respondent's strategies to collaborate and evaluate Provider satisfaction, processes for Provider contracting and credentialing, and incentive programs or other mechanisms to promote Provider participation.

**SOW Reference: 2.6.6; 2.6.7; 2.6.10; 2.6.11; 2.6.23.4; 2.6.30; 2.6.31; 2.6.36; 2.6.37; and Chapters 3, 5.28 and 8 (except 8.3 and 8.6) of <u>Exhibit B, Texas Medicaid and CHIP –</u> <u>UMCM.</u>**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 3a; 3c; and 3e**
**Page Limit: 10**

### Technical Question No. 10

Describe areas of Provider burden the Respondent has identified and the proposed approaches to mitigating these barriers and challenges. The response should explain how the Respondent shares and maintains key business operations policies and processes with Providers and the approach to minimize Provider complaints, contracting issues, Prior Authorization (PA) disputes, and claims/reimbursement concerns.

**SOW Reference: 2.6.6; 2.6.7; 2.6.11; 2.6.15; 2.6.23; 2.6.30; 2.6.31; 2.6.37; and Chapter 3 of <u>Exhibit B, Texas Medicaid and CHIP - UMCM.</u>**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 3a; 3b; 3c; and 3f**
**Page Limit: 7**

### Technical Question No. 11

Describe how the Respondent supports Providers in decision-making, trainings, best practices guidelines, and other Utilization Management (UM) tools available to Providers.

**SOW Reference: 2.6.7; 2.6.24; 2.6.36; and 2.6.48**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 3c; 3d; and 3f**
**Page Limit: 7**

HHSC_CP_0019332

P-038.037

Describe the Respondent's approach for proper UM of Covered Services under STAR, CHIP, and HTW. Describe any strategies and/or intervention(s) aimed at improving the consistency and quality of care of Covered Services.

**SOW Reference: 2.6.7; 2.6.9; 2.6.10; and 2.6.24**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 4a and 4b**
**Page Limit: 5**

**Technical Question No. 13**

Describe the Respondent's Quality Improvement and performance evaluation strategies and initiatives specific to the STAR, CHIP, and HTW populations. At a minimum, the response should:
  a. Identify methods for evaluating Member outcomes and how the evaluation results are incorporated into the Respondent's Quality Improvement program;
  b. Describe processes for incorporating Provider input into the design and evaluation of the Respondent's Quality Improvement strategies and initiatives and processes for disseminating outcome results to Providers for continued improvement; and
  c. Describe a clinical or non-clinical initiative that Respondent proposes to pursue in the first year of the Contract specific to the HTW population and why the topic warrants investment. Describe the Respondent's measurable goals for the initiative and how its impact will be evaluated.

**SOW Reference: 2.6.23**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 4a; 4b; and 4c**
**Page Limit: 10**

**Technical Question No. 14**

Describe Alternative Payment Models (APM) that the Respondent intends to implement for the STAR, CHIP, and HTW populations. The response should include a description of how those APMs improve health outcomes or experience of Members, lower healthcare cost trends, and increase quality and efficiency of the program. Once the APMs have been implemented, the Respondent should describe how APMs will be evaluated on an ongoing basis to determine the effectiveness and how the Respondent will increase the use of APMs over the term of the Contract.

**SOW Reference: 2.6.23.4; 2.6.23.5**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 4a; 4b; and 4c**
**Page Limit: 5**

HHSC_CP_0019333

P-038.038

| BVC 4 (Section 3.1.4, Best Value Evaluation Criteria) |
| Technical Question No. 15 |

Explain the Respondent's strategies to detect, prevent, and report on Provider and Member Fraud, Waste, and Abuse (FWA). The explanation should include how the Respondent will use resources to identify possible areas of Overpayment or overutilization of Services which lead to inefficiencies and increased cost to the program and how these strategies will be effective for the populations covered under STAR, CHIP, and HTW.

**SOW Reference: 2.6.11.4; 2.6.24; and 2.6.29**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 4a and 4d**
**Page Limit: 5**

HHSC_CP_0019334

P-038.039

**BVC 5 (Section 3.1.4, Best Value Evaluation Criteria)**

**Technical Question No. 16**

Describe the Respondent's proposed information systems and processes that, at a minimum, address the functional areas listed below:
  a. Implementation cycles for systems change management, including Member, utilization, Provider, and Network management;
  b. Claims processing and Encounters, payments, and coordination of benefits;
  c. Formularies and Medicaid Preferred Drug Listing (PDL);
  d. Electronic Visit Verification (EVV); and
  e. Any other ancillary systems supporting the program.

**SOW Reference: 2.5.3.6; 2.6.13; and 2.6.28**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 5a and 5d**
**Page Limit: 15**

**Technical Question No. 17**

Describe how the Respondent will use systems, data, and technology to identify trends in Service delivery and utilization. Provide examples of how trends are identified and used to inform continuous improvement activities and Service delivery.

**SOW Reference: 2.6.23; 2.6.24; 2.6.27; and 2.6.28**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 5a and 5c**
**Page Limit: 7**

**Technical Question No. 18**

Describe the Respondent's capability to meet current and possibly new reporting requirements specified in the SOW. At a minimum, the response should include:
  a. Capabilities and processes to build, configure, and/or expand systems to produce reports in predetermined formats, such as the reports included in the SOW;
  b. Processes for compiling data from multiple sources/systems for the purpose of reporting, including processes to obtain, validate, and monitor compliance data from Subcontractors;
  c. Processes to ensure accuracy and timeliness of reported information and compliance with contractual reporting requirements;
  d. Capabilities to produce financial and non-financial Medicaid and CHIP reports on a monthly, quarterly, annual, and ad hoc basis; and
  e. The approach to continuous Quality Improvement activities related to reporting, including development, implementation, and monitoring of internal plans of correction.

**SOW Reference: 2.6.23; 2.6.27; and 2.6.28**
**BVC Descriptor: Section 3.1.4 (Best Value Evaluation Criteria) 5b and 5c**
**Page Limit: 7**

HHSC_CP_0019335

P-038.040

# ARTICLE V. ADDITIONAL REQUIRED DOCUMENTATION

### 5.1 AFFIRMATIONS AND CERTIFICATIONS

Respondent must complete and return in its Proposal all of the following affirmations and certifications:

    a. **Exhibit I, HHS Solicitation Affirmations v. 2.3**;

    b. Federal Assurance and Certifications:

        1. **Exhibit J, Assurances – Non-Construction Programs**; and

        2. **Exhibit K, Certification Regarding Lobbying**.

### 5.2 HUB SUBCONTRACTING PLAN

Respondent must submit the HUB Subcontracting Plan in accordance with **Section 2.5 (Proposal Submission and Delivery).** The HSP should be labeled: "HUB Subcontracting Plan (HSP)" and include all supporting documentation in accordance with **Exhibit N, HUB Subcontracting Plan,** and the HSP.

In accordance with Texas Government Code Section 2161.252(b), a Proposal that does not contain an HSP is non-responsive. *See also* Texas Administrative Code, Title 34, Part 1, Chapter 20, Subchapter D, Division 1, Rule § 20.285(b)(3). Proposals that do not include a completed HSP in accordance with **Exhibit N, HUB Subcontracting Plan** shall be rejected without further evaluation. In addition, if HHSC determines that the HSP was not developed in good faith, it will reject the Proposal for failing to comply with material RFP specifications.

**OPTIONAL HUB HSP TRAINING AND COURTESY HSP REVIEW ARE OFFERED FOR THIS SOLICITATION. PLEASE CONTACT THE HUB COORDINATOR (SECTION 2.3.3, EXCEPTION TO THE SOLE POINT OF CONTACT) FOR MORE INFORMATION.**

### 5.3 AUTHORIZATION TO CONDUCT BUSINESS IN TEXAS

Respondent must be authorized to do business in the State of Texas prior to an award. Respondent must provide either a Certificate of Fact from the Texas Secretary of State showing that it is authorized to do business in Texas, or a Certificate of Compliance from the Texas Department of Insurance (TDI), as applicable.

Respondent must be set up in the Texas franchise tax system prior to Contract award. Respondents claiming an exemption under Tax Code Chapter 171, Subchapter B must submit in its Proposal a

HHSC_CP_0019336

P-038.041

copy of Respondent's exemption status with the Texas Comptroller. Texas franchise tax information can be accessed at https://comptroller.texas.gov/taxes/franchise/.

Respondent must submit in its Proposal a copy of Respondent's licensure, certification, or approval from the TDI to operate as a health maintenance organization (HMO), approved non-profit health corporation (ANHC), or exclusive provider organization (EPO)/issuer of an exclusive provider benefit plan (EPBP). If Respondent has not received TDI licensure, certification, or approval then Respondent must submit in its Proposal a copy of the application filed with TDI. In accordance with **Section 2.5.6** of **Exhibit H, STAR & CHIP Scope of Work (SOW)**, Respondent must receive TDI approval no later than 60 Days after the Effective Date of the Contract.

Respondent must complete with its Proposal the **TDI Certificate of Authority Table** in the **Exhibit Q, Procurement Library,** located on the ESBD, to indicate whether the Respondent is currently authorized by TDI to operate as an MCO in all counties in the State. For each county where the Respondent is not authorized to conduct business as an MCO in all or part of the county, the Respondent must state in the **TDI Certificate of Authority Table** the date that it applied for such approval and the status of its TDI application.

## 5.4    COMPANY PROFILE

Respondent must provide in its Proposal a company profile that includes the following information:

a.  Ownership structure and legal status (e.g., corporation, partnership, LLC, or sole proprietorship, wholly owned subsidiary of a publicly traded corporation, wholly owned subsidiary of a private closely held non-traded corporation, subsidiary or component of a tax-exempt, non-governmental foundation, etc.). Respondent must provide the ownership structure and legal status in a narrative and as a graphical representation. If Respondent is an Affiliate, as defined in **Exhibit H**, **STAR & CHIP Scope of Work (SOW)**, of or has a joint venture or strategic alliance with another company, Respondent must identify the percentage of ownership of each joint venture member or Affiliate and the percentage of the parent's ownership. The entity performing the majority of the Services and Deliverables under the Contract resulting from this RFP, throughout the duration of the Contract, must be the primary Respondent;

b.  The year the company was founded and/or incorporated and where it is commercially domiciled. If incorporated, Respondent must indicate the state where the company is incorporated and the date of incorporation. Respondent must also include all states in which Respondent is licensed to do business as an HMO, ANHC, or EPO/EPBP;

c.  The number of employees in the company, both locally and nationally, and the location(s) from which employees will be assigned;

d.  The full name, title, and address of Respondent's executive authorized to sign the Contract(s);

HHSC_CP_0019337

e.   The full name, address, and telephone number of Respondent's point of contact(s) for the Contract;

f.   Indicate whether the company has ever contracted with any State agency. If "Yes," specify the term of the contract, the company's duties, and the State agency;

g.   Respondent's complete and exact legal name, as well as any trade name, d.b.a., acronym, and any other name under which Respondent currently does business or has done business in the past five (5) years of the Solicitation Posting to ESBD Date;

h.   The complete and exact legal name of the ultimate parent, if any, of Respondent. Further, state whether Respondent's ultimate parent or its Subsidiaries operate in multiple states or only in Texas;

i.   With respect to Respondent and its ultimate parent, including other managed care Subsidiaries of the ultimate parent, briefly describe all regulatory actions, sanctions, or fines imposed by any federal or Texas regulatory entity, or a regulatory entity in another state, within the five (5) years prior to the Solicitation Posting to ESBD Date, related to financial issues or maintenance of status as an insurer in a state;

j.   If Respondent has Affiliates operating under a different legal name or trade name that do business with HHSC, or are applying to do business with HHSC, provide the complete and exact legal name, as well as any trade name, d.b.a., acronym, and any other name under which the Affiliate currently does business or has done business in the past five (5) years, and describe each contract involved;

k.   State whether Respondent, including its ultimate parent and all Affiliates, directly or indirectly, wholly or partially, own, control, operate, or lease any Hospitals. If so, briefly describe each Hospital, including the name of the Hospital; the city it is in; the number of beds; and any population type focus, such as being a children's Hospital;

l.   State whether Respondent, including its ultimate parent and all Affiliates, own or control any of the following types of health services providers, networks, companies, or facilities directly or indirectly, wholly or partially:

1.   Behavioral Health (BH);

2.   Vision;

3.   Pharmacy Benefit Manager (PBM);

4.   Physician groups;

5.   Health clinics;

6.   Emergency centers or urgent care centers;

HHSC_CP_0019338

7. Diagnostic or specialty (includes facilities that provide such services as x-ray, blood work, colonoscopy, labs, chemotherapy, physical therapy, counseling, rehabilitation, medical supplies, nursing home, and similar);

8. Dental;

9. Medical transportation;

10. Utilization Management (UM);

11. Real estate management, commercial space leasing, or similar services;

12. Workforce services, including temporary or contract workers, and placement services;

13. Consulting services or information technology (IT) services; or

14. Reinsurance.

m. The physical location of all businesses potentially associated with the Proposal;

n. A statement attesting that all business functions associated with any resulting Contract, including call lines and data, will remain within the United States;

o. The name and address of all other sponsoring corporations or others, excluding the Respondent's ultimate parent, who provide financial support to Respondent and the type of support provided, e.g., guarantees or letters of credit. Indicate whether there are maximum limits of the additional financial support;

p. The name and address of each health professional that has a five (5) percent or greater financial interest in Respondent and the type of financial interest it has; and

q. If any change of ownership of Respondent's company or its parent is anticipated during the 12 months following the Solicitation Posting to ESBD Date, Respondent must describe the circumstances of the change and indicate when the change is likely to occur.

## 5.5 REQUIRED FINANCIAL INFORMATION

As a financial due diligence process, prior to awarding the Contract, HHSC will review the required financial information submitted by Respondent in accordance with this section, and information in **Section 5.4 (Company Profile)**. The Required Financial Information and Company Profile will be considered in accordance with **Section 3.1.7 (Final Considerations for Award)**.

In addition to the following required financial information, Respondents may choose to submit other information that Respondent believes should be taken into consideration to address any concerns or other unfavorable items disclosed in accordance with this section.

HHSC_CP_0019339

P-038.044

### 5.5.1 Company Organization

In its Proposal, Respondent must provide its planned operating structure for the Services required in this Solicitation and designate which entities (e.g., parent company, Affiliate, joint venture, Subcontractor) will be performing the Services by submitting the organizational charts and information requested below. For each organizational chart, include an explanatory narrative no more than one-page in length, in the format prescribed by **Article II.** The narrative must highlight the key functional responsibilities and reporting requirements of each organizational unit relating to Respondent's proposed management of the Program. With regard to any proposed Material Subcontractors managing BH Services, dental services, vision services, or pharmacy services, indicate whether Respondent and any proposed Material Subcontractor will collocate their offices, and if so, how and where. Each narrative must be labelled so it is associated with the appropriate chart, e.g., "Narrative for Chart A."

Respondent must include the following:

a.  An organizational chart (labelled as Chart A) showing the corporate structure and lines of responsibility and authority in the administration of Respondent's business as a whole;

b.  An organizational chart (labelled as Chart B) showing the Texas organizational structure, including staffing and functions performed within the State, including the organizational structure in each city if Respondent proposes to maintain offices in more than one city in Texas;

c.  An organizational chart (labelled as Chart C) illustrating how administration of Services to Members is integrated into the overall organizational structure. Specifically, show the organizational structure if Respondent proposes to maintain offices in more than one city in Texas;

d.  An organizational chart (labelled as Chart D) showing the Management Information Systems' (MIS) staff organizational structure. Specifically, show the organizational structure if Respondent proposes to maintain offices in more than one city in Texas;

e.  An organizational chart (labelled as Chart E) showing Respondent's structure and lines of accountability; and

f.  If applicable, an organizational chart (labelled as Chart F) demonstrating how the Material Subcontractors will be managed within Respondent's Texas organizational structure, including the primary individuals at the Respondent's organization and at each Material Subcontractor who will be responsible for overseeing the Subcontract.

### 5.5.2 Material Subcontractor Information

Respondent must identify any current or anticipated Material Subcontractors who will perform under the Contract. Material Subcontractor is a defined term in **Exhibit A, HHSC Managed Care**

HHSC_CP_0019340

P-038.045

**Uniform Contract Terms and Conditions v. 1.0**. Respondent must list the identified Material Subcontractors in descending order of estimated annual payments, i.e., the estimated total under all managed care programs, and provide the following information for each Material Subcontractor:

a. The Material Subcontractor's legal name, trade name, acronym, d.b.a., and all other names under which the Material Subcontractor does business or has done business in the past five (5) years from the Solicitation Posting to ESBD Date.

b. The full and exact legal name of the Material Subcontractor's ultimate parent.

c. All of Respondent's estimated annual payments to the Material Subcontractor that may be included in any Financial Statistical Reports submitted by Respondent under the Contract or any other HHSC contract. Show separate amounts by managed care program for each Material Subcontractor.

d. The physical address, mailing address, and telephone number of the Material Subcontractor's headquarters office, and the name of its chief executive officer.

e. A definitive statement specifying whether the Material Subcontractor is an Affiliate of the Respondent or an unrelated third party.

f. If the Material Subcontractor is an Affiliate, Respondent must provide the following information:

   1. The Material Subcontractor's relationship to Respondent;

   2. The proportion, if any, of the Material Subcontractor's total Revenues received from non-Affiliates. If the Material Subcontractor has significant Revenues from non-Affiliates, then also indicate the portion, if any, of those external, non-Affiliate Revenues that are for Services similar to those that Respondent would procure under the proposed Material Subcontract;

   3. A description of the proposed method of pricing under the Material Subcontract;

   4. A statement as to whether there is, or is not, any anticipated mark-up, margin, profit, or amount in excess of actual incurred costs anticipated to be included in the pricing;

   5. The number of employees, both staff and management, who are dedicated full-time to the Affiliate's business. Do not include any staff or management that have other duties in addition to working on this specific Affiliate's business; and

   6. A statement regarding whether the Affiliate's office facilities are completely separate from Respondent and Respondent's ultimate parent. If not completely separate, include the approximate number of square feet of office space dedicated solely to the Affiliate's business.

HHSC_CP_0019341

P-038.046

### 5.5.3  Dun and Bradstreet Report

Respondent with a Dun and Bradstreet number must include a Comprehensive Insight Plus Report, Business Information Report, or Credit Evaluator Report in its Proposal.

### 5.5.4  Financial Statements

Respondent must submit the following information:

a. Audited financial statements from the three (3) years immediately prior to the Solicitation Posting to ESBD Date, including all supplements, management discussion and analysis, and actuarial opinions. If audited financial statements are not available, Respondent must submit unaudited financial information and any other information Respondent believes meets the requirements of this section. Reference **Section 5.5.5 (Alternate Report). At a minimum, financial statements must include a balance sheet, income statements, statement of changes in financial position, statement of cash flows, and capital expenditures**.

   Note that these must be the financial statements of the legal entity of Respondent itself and not those of the ultimate parent or any other entity or operating component. However, if Respondent is substantially owned or controlled, in whole or in part, by one or more other legal entities, Respondent must also submit in its Proposal the most recent financial statement and documentation required under this section for each such entity. These statements must include the independent auditor's report, audit opinion letter to the board or shareholders, the notes to the financial statements, any written description of legal issues or contingencies, and any management discussion or analysis. Ensure that the name and address of any firm that has audited Respondent within the three (3) years immediately prior to the Solicitation Posting to ESBD Date is included. State the date of the most recent audit and whether Respondent is audited annually or otherwise. State definitively if there has or has not been any of the following:

   1. A "going concern" statement by any auditor issued in the three (3) years immediately prior to the Solicitation Posting to ESBD Date and, if so, include the relevant audit report and opinion letter;

   2. A qualified opinion by any auditor issued in the three (3) years immediately prior to the Solicitation Posting to ESBD Date and if so, include the relevant audit report and opinion letter;

   3. A change of audit firms in the three (3) years immediately prior to the Solicitation Posting to ESBD Date; and

   4. Any delay of two (2) months or more in completing the current audit.

HHSC_CP_0019342

P-038.047

b. A description of the organization and operation of all of Respondent's business outside of that with HHSC, including ownership, markets served, type of entity, number of locations and employees, and dollar amount and type.

c. A disclosure of any material contingencies and any current, past (i.e., in the three (3) years immediately prior to the Solicitation Posting to ESBD Date), or known potential material litigation, regulatory proceedings, bankruptcies, award of punitive damages against Respondent, legal matters, or similar issues;

d. Respondent's most recent quarterly and annual financial statements filed with TDI, and, if Respondent is domiciled in another state, the financial statements filed with the state insurance department in its state of domicile. The annual financial statement must include all schedules, attachments, supplements, management discussion, analysis, and actuarial opinions;

e. Respondent's most recent financial examination report issued by TDI and Respondent's most recent financial examination reports issued by any state insurance department in states where Respondent operates a Medicaid or comparable managed care product. If any financial examination report submitted is two (2) or more years old, or if Respondent has never had a financial examination report issued, submit the anticipated approximate date of the next issuance of a TDI or other state department of insurance financial examination report;

f. Respondent's most recent Form B Registration Statement disclosure filed with TDI and any similar form filed with any state insurance department in other states where Respondent operates a Medicaid or comparable managed care product. If Respondent is exempt from the TDI Form B filing requirement, demonstrate and explain the nature of the exemption;

g. In the three (3) years immediately prior to the Solicitation Posting to ESBD Date, if Respondent has been the subject of any bond rating analysis, ratings affirmation, write-up, or related report, such as by AM Best, Fitch Ratings, Moody's, or Standard & Poor's, submit the most recent detailed report from each rating entity that has produced such a report;

h. If applicable, submit the consolidated statements for any holding companies or Affiliates for the three (3) years immediately prior to the Solicitation Posting to ESBD Date;

i. A full disclosure of any events, liabilities, or contingent liabilities that could affect Respondent's financial ability to perform this Contract, inclusive of financially relevant press releases, in the 12 months immediately prior to the Solicitation Posting to ESBD Date;

j. If Respondent is a corporation required to report to the Securities and Exchange Commission (SEC), then submit its three (3) most recent SEC Form 10K, Annual Reports, pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, Title 15 of the United States Code Chapter 2B, Sections 78m or 78o(d);

HHSC_CP_0019343

P-038.048

k. If Respondent is a tax-exempt entity, then submit the most recent annual IRS Form 990 filing, including all attachments and schedules. If Respondent is a tax-exempt entity that is exempt from the IRS Form 990 filing requirement, then demonstrate and explain the nature of the exemption;

l. If Respondent is a tax-exempt entity that is a component or Subsidiary of a county Hospital district, or otherwise an entity of a government, then submit the most recent annual financial statements as prepared under the relevant rules or statutes governing annual financial reporting and disclosure for Respondent, including all attachments, schedules, and supplements. This may be the Comprehensive Annual Financial Report (CAFR) or other existing county Hospital district financial statements;

m. If Respondent is either substantially or wholly owned by another corporate (or legal) entity, then Respondent must include the information required for each such entity, including the most recent detailed financial report for each such entity; and

n. In additional to the above-referenced documents, Respondent must submit an annual report or similar item if it is different than, or supplementary to, the other financial statements submitted and particularly if such documents are distributed to shareholders, customers, employees, owners, ultimate parent, banks, creditors, donors, communities, any regulatory body, or constituents, or is otherwise externally distributed or posted. Respondent must provide the most recent version of such annual reports or similar items.

## 5.5.5 Alternate Report

If Respondent is unable to provide the annual report specified above, Respondent must provide an alternate report. **At a minimum, financial statements must include a balance sheet, income statement, statement of changes in financial position, statement of cash flows, and capital expenditures.** The alternate report must contain the following information:

a. Unaudited financial statements from the three (3) years immediately prior to the Solicitation Posting to ESBD Date, including all supplements, management discussions and analyses, and actuarial opinions;

b. An unaudited financial statement of the most recent quarter of operations; and

c. A full disclosure of any events, liabilities, or contingent liabilities that could affect Respondent's financial ability to perform this Contract.

## 5.5.6 Disclosures

Respondent must submit with its Proposal the following information from the three (3) years immediately prior to the Solicitation Posting to ESBD Date:

HHSC_CP_0019344

P-038.049

a. Report of Legal and Other Proceedings and Related Events – Respondent must submit a report as described in **Chapter 5.8 of Exhibit B, Texas Medicaid and CHIP – Uniform Managed Care Manual (UMCM)**, regarding the disclosure of certain matters involving either Respondent, its Affiliates, or its anticipated Material Subcontractors;

b. Affiliate Report – Respondent must submit an Affiliate Report as described in **Chapter 5.11 of Exhibit B, Texas Medicaid and CHIP - Uniform Managed Care Manual (UMCM)**. This report must include all anticipated transactions with Affiliates applicable to the Contract, including parental overhead assessments. Failure to include Affiliate transactions may result in such transactions being deemed as unallowable costs in the Contract; and

c. Disclosure Statement – Respondent must submit an MCO Disclosure Statement as described in **Chapter 5.3.2 of Exhibit B, Texas Medicaid and CHIP - Uniform Managed Care Manual (UMCM)**. This Disclosure Statement must include disclosures of other contracts held, amount of assets and net equity, information on facilities in Texas, number of employees, requirements to pay the health insurer providers' fee, and certain federally required disclosures. Material omissions or misrepresentations in the Disclosure Statement could be deemed a material breach of the Contract, which could lead to termination or other remedies as may be available to HHSC.

If Respondent previously filed these Reports and the Disclosure Statement with HHSC under a different contract, then Respondent may instead provide an updated submission of those documents, current as of the approximate time of the Solicitation Posting to ESBD Date.

### 5.5.7 Corporate Guarantee

If Respondent is substantially owned or controlled, in whole or in part, by one or more other legal entities, Respondent must also include a statement that the entity or entities will unconditionally guarantee performance by Respondent for each and every obligation, warranty, covenant, term, and condition of any Contract resulting from this Solicitation. If HHSC determines that an entity does not have sufficient financial resources to guarantee Respondent's performance, HHSC may require Respondent to obtain another acceptable financial instrument or resource from such entity, or to obtain an acceptable guarantee from another entity with sufficient financial resources to guarantee Respondent's performance. Acceptability of such instruments, resources, and/or guarantees shall be determined by HHSC at its sole discretion.

### 5.6 KEY PERSONNEL

Respondents must provide key staffing profiles for all key staff who will be responsible for the performance of the Services in accordance with **Section 4.02 of Exhibit A, HHSC Managed Care Uniform Contract Terms and Conditions v. 1.0**.

HHSC_CP_0019345

P-038.050

# ARTICLE VI. GENERAL TERMS AND CONDITIONS

## 6.1    GENERAL CONDITIONS

### 6.1.1    Changes, Modifications, and Cancellation

HHSC reserves the right to make changes to and/or cancel this RFP and will post all changes and modifications, whether made as a result of a potential Respondent's written inquiries or otherwise, and cancellation notices on the ESBD. It is the responsibility of the Respondent to check the ESBD regularly for any additional information regarding this RFP. If the Respondent fails to monitor the ESBD for any changes or modifications to the RFP, such failure will not relieve the Respondent of its obligation to fulfill the requirements as posted.

### 6.1.2    Offer Period

Proposals shall be binding for a period of 240 Days after the submission due date. A Respondent may extend the time for which its Proposal will be honored. No other costs, rates, or fees shall be payable to the successful Respondent unless expressly agreed upon in writing by HHSC.

### 6.1.3    Cost Incurred

Respondents understand that issuance of this Solicitation in no way constitutes a commitment by HHSC to award a Contract or to pay any costs incurred by a Respondent in the preparation of a Proposal or response to this Solicitation. HHSC is not liable for any costs incurred by a Respondent. Costs of developing Proposals, preparing for or participating in Oral Presentations, or any other similar expenses incurred by a Respondent, are entirely the responsibility of the Respondent and will not be reimbursed in any manner by the State of Texas.

### 6.1.4    Contract Responsibility

HHSC will look solely to the successful Respondent for the performance of all contractual obligations that may result from an award based on this Solicitation. The successful Respondent shall not be relieved of its obligations for any nonperformance by its Subcontractors.

### 6.1.5    Public Information Act – Respondent Requirements Regarding Disclosure

Proposals and any resulting contracts are subject to the Texas Public Information Act (PIA), Texas Government Code Chapter 552, and may be disclosed to the public upon request. Other legal authority also requires HHSC to post contracts and proposals on its public website and to provide such information to the Legislative Budget Board for posting on its public website.

HHSC will strictly adhere to the requirements of the PIA regarding the disclosure of public information. As a result, by participating in this Solicitation process, Respondent acknowledges that all information, documentation, and other materials submitted in the Proposal in response to this Solicitation may be subject to public disclosure under the PIA. HHSC does not have authority

HHSC_CP_0019346

to agree that any information submitted will not be subject to disclosure. Disclosure is governed by the PIA and by rulings of the Office of the Texas Attorney General. Respondents are advised to consult with their legal counsel concerning disclosure issues resulting from this process and to take precautions to safeguard trade secrets and proprietary or otherwise confidential information. HHSC assumes no obligation or responsibility relating to the disclosure or nondisclosure of information submitted by Respondents.

Proposals should not be marked or asserted as copyrighted material. By submitting a proposal, Respondent agrees to reproduction and posting on public websites by the State of Texas, including all other state agencies, without cost or liability and, additionally, agrees to allow the State of Texas to provide a copy of the Proposal to individuals making a PIA request for the proposal.

Exemptions from Disclosure: Under the PIA, certain information is protected from public release. If Respondent asserts that information provided in its Proposal is exempt from disclosure under the PIA, Respondent must do all of the following:

a. **Mark Original Proposal**:

   1. Mark the Original Proposal, on the top of the front page, with the words "CONTAINS CONFIDENTIAL INFORMATION" in large, bold, capitalized letters (the size of or equivalent to 12-point Times New Roman font or larger);

   2. Mark the bottom of each page on the Proposal that contains information that Respondent claims is exempt from public disclosure with the words "CONTAINS CONFIDENTIAL INFORMATION"; and

   3. Identify, adjacent to each portion of the Proposal that Respondent claims is exempt from public disclosure, the claimed exemption from disclosure (*NOTE*: *no redactions are to be made in the Original Proposal*).

b. **Submit Public Information Act Copy of Proposal:**

   Submit a separate "Public Information Act Copy" of the Original Proposal (in addition to the original and all copies otherwise required under the provisions of this Solicitation). The Public Information Act Copy must meet the following requirements:

   1. The copy must be clearly marked as "Public Information Act Copy" on the front page in large, bold, capitalized letters (the size of or equivalent to 12-point Times New Roman font or larger);

   2. Each portion Respondent claims is exempt from public disclosure must be redacted (blacked out); and

   3. Respondent must identify, adjacent to each redaction, the claimed exemption from disclosure. Each identification provided in the Public Information Act Copy must be

HHSC_CP_0019347

identical to those set forth in the Original Proposal as required in Subsection (a)(2), above. The only difference in required markings and information between the Original Proposal and the "Public Information Act Copy" of the Proposal will be redactions - which can only be included in the "Public Information Act Copy." *There must be no redactions in the Original Proposal.*

c. **Certify in Original Proposal – HHS Solicitation Affirmations v. 2.3 (attached as Exhibit I to this Solicitation):**

Certify, in the designated section of the HHS Solicitation Affirmations v. 2.3, Respondent's confidential information assertion and the filing of its Public Information Act Copy.

Respondent should not submit a Public Information Act Copy indicating that the entire Proposal is exempt from disclosure. Merely making a blanket claim that the entire Proposal is protected from disclosure because it contains any amount of confidential, proprietary, trade secret, or privileged information is not acceptable.

If any Respondent submits partial information suggesting inclusion of confidential information in their document and fails to comply with the requirements set forth in this section, HHSC, in its sole discretion, reserves the right to (1) disqualify all Respondents that fail to fully comply with the requirements set forth in this section or (2) offer all Respondents that fail to fully comply with the requirements set forth in this section additional time to comply.

**By submitting a response to this Solicitation, Respondent agrees that if Respondent does not mark the Original Proposal, provide the required certification in the HHS Solicitation Affirmations v. 2.3, and submit the Public Information Act Copy, Respondent's Proposal will be considered public information that, without notice to the Respondent, may be released to the public in any manner including, but not limited to, being posted on the HHSC public website, being posted on the Legislative Budget Board's public website, or released in accordance with the Public Information Act.**

For more information concerning the PIA, including the types of information that may be withheld, please refer to the Public Information Act Handbook published by the Office of the Texas Attorney General or contact the Attorney General's Open Government Hotline at (512) 478-OPEN (6736) or toll-free at (877) 673-6839 (877- OPEN TEX). To access the Public Information Act Handbook, please visit the attorney general's website at http://www.texasattorneygeneral.gov.

HHSC_CP_0019348

P-038.053

### 6.1.6 Respondent Waiver – Intellectual Property

**SUBMISSION OF ANY DOCUMENT TO HHSC IN RESPONSE TO THIS SOLICITATION CONSTITUTES AN IRREVOCABLE WAIVER AND AGREEMENT BY RESPONDENT TO FULLY INDEMNIFY THE STATE OF TEXAS AND HHSC FROM ANY CLAIM OF INFRINGEMENT BY HHSC REGARDING THE INTELLECTUAL PROPERTY RIGHTS OF RESPONDENT OR ANY THIRD PARTYFOR ANY MATERIALS SUBMITTED TO HHSC BY RESPONDENT.**

### 6.1.7 Standards of Conduct for Vendors

Pursuant to Title 1 of the Texas Administrative Code Part 15, Chapter 391, Subchapter D, Rule § 391.405, Contractors, Subcontractors, Respondents, and Vendors interested in working with HHSC are required to implement standards of conduct for their own personnel and agents on terms at least as restrictive as those applicable to HHSC. These standards must adhere to ethics requirements adopted in rule, in addition to any ethics policy or code of ethics approved by the HHSC Executive Commissioner. Respondent must sign and submit all ethics, disclosure, confidentiality, and other forms required under the procurement and any resulting contract.

The standards of conduct must include the ten standards of ethical conduct set forth in Section I of the HHS Ethics Policy and must also include requirements to comply with ethical standards set forth in federal and State law (including, but not limited to, Title 1 of the Texas Administrative Code Part 15, Chapter 391, Subchapter D, Rule § 391.405). Standards of conduct of any Contractor, Respondent, or Vendor may be reviewed and/or audited by the State Auditor and HHSC. The Contractor, Respondent, or Vendor must cooperate with the review and/or audit. Additionally, pursuant to Title 1 of the Texas Administrative Code Part 15, Chapter 391, Subchapter D, Rule § 391.405(a), HHSC may examine a Respondent's standards of conduct in the evaluation of any bid, offer, proposal, quote, or other applicable expression of interest in a proposed purchase of Goods or Services.

As a condition of contracting with HHS, any vendor or contractor, must (1) cooperate with any audit conducted by the state auditor; and (2) cooperate with any audit conducted by HHSC or any entity designated by HHSC, including the Office of Inspector General.

Any Vendor, Contractor, or Subcontractor, that violates a provision of Title 1 of the Texas Administrative Code Part 15, Chapter 391, Subchapter D may be barred from receiving future contracts or may have an existing contract canceled. Additionally, HHSC may report the vendor's actions to the Comptroller of Public Accounts for statewide debarment, or law enforcement.

### 6.1.8 Disclosure of Interested Parties

Pursuant to Section 2252.908 of the Texas Government Code, a successful Respondent to be awarded a Contract with a value of $1 million or more or awarded a Contract that would require

HHSC_CP_0019349

P-038.054

the successful Respondent to register as a lobbyist under Texas Government Code Chapter 305 must submit a disclosure of interested parties form to HHSC at the time the Respondent submits the signed Contract. Rules and filing instructions may be found on the Texas Ethics Commission's public website and additional instructions will be given by HHSC to the successful Respondent.

## 6.2    INSURANCE

### 6.2.1    Required Coverage

For the duration of any Contract resulting from this Solicitation, the successful Respondent shall acquire insurance, bonds, or both, with financially sound and reputable independent insurers, in the type and amount listed in **Exhibit A, HHSC Managed Care Uniform Contract Terms and Conditions v. 1.0**, **Section 15.01, Insurance Coverage**. Failure to maintain insurance coverage or acceptable alternative methods of insurance shall be deemed a breach of the Contract. Acceptability of such alternative methods of insurance shall be determined by HHSC in its sole discretion.

## 6.3    BONDS

Prior to beginning any Services and Deliverables under any Contract resulting from this Solicitation, the successful Respondent shall acquire bonds in the type and on the form listed in **Exhibit A, HHSC Managed Care Uniform Contract Terms and Conditions v. 1.0**, **Section 15.02, Performance Bond**, and **Section 15.03, TDI Fidelity Bond**.

## 6.4    PROTEST

Any protest shall be governed by the rules published by HHSC in the Texas Administrative Code, Title 1, Part 15, Chapter 391, Subchapter C, Protests.

HHSC_CP_0019350

P-038.055

# ARTICLE VII. LIST OF EXHIBITS AND ATTACHMENTS

**Exhibit B, Texas Medicaid and CHIP Uniform Managed Care Manual (UMCM)** and **Exhibit E, Texas Medicaid Provider Procedures Manual (TMPPM)** to this procurement, are two documents that contain policy and procedures relating to the delivery of Managed Care Services and related Deliverables that are frequently amended to reflect the most current delivery of Services and reporting requirements. As such, **Exhibit B** provides a link to the live documents maintained on the Agency's website, and information contained within **Exhibit E** reflects the documents' contents as of the date noted within each document at the time of posting. By submitting a response to this procurement, Respondent understands and agrees to the fact that **Exhibit B** is a live document that may be amended at any time during this Solicitation and to the "snapshot in time" format of **Exhibit E**. Furthermore, Respondent understands and agrees that if awarded a Contract as a result of this procurement, the Respondent will accept and be bound to the terms of **Exhibit B, Texas Medicaid and CHIP Uniform Managed Care Manual (UMCM)** and **Exhibit E, Texas Medicaid Provider Procedures Manual (TMPPM)**, as written at the time of the execution of the Contract including any amendments that may be issued during the term of the Contract.

| | |
|---|---|
| EXHIBIT A | HHSC MANAGED CARE UNIFORM CONTRACT TERMS AND CONDITIONS V. 1.0 |
| EXHIBIT B | TEXAS MEDICAID AND CHIP - UNIFORM MANAGED CARE MANUAL (UMCM) |
| EXHIBIT C | DELIVERABLES/LIQUIDATED DAMAGES MATRIX |
| EXHIBIT D | SERVICE AREA MAP AND SELECTION FORM |
| EXHIBIT E | TEXAS MEDICAID PROVIDER PROCEDURES MANUAL (TMPPM) |
| EXHIBIT F | ACCESS STANDARDS MAP |
| EXHIBIT G | CHIRP PROVIDERS AND RATE INCREASES |
| EXHIBIT H | STAR & CHIP SCOPE OF WORK (SOW) |
| EXHIBIT I | HHS SOLICITATION AFFIRMATIONS V. 2.3 |
| EXHIBIT J | ASSURANCES – NON-CONSTRUCTION PROGRAMS |
| EXHIBIT K | CERTIFICATION REGARDING LOBBYING |
| EXHIBIT L | EXCEPTIONS FORM |
| EXHIBIT M | ASSUMPTIONS FORM |
| EXHIBIT N | HUB SUBCONTRACTING PLAN |
| EXHIBIT O | SCORING GUIDES |

HHSC_CP_0019351

P-038.056

| EXHIBIT P | CONSENSUS SCORING RUBRIC |
| --- | --- |
| EXHIBIT P-1 | EVALUATION TOOL AND SAMPLE SCORING EXAMPLE |
| EXHIBIT Q | PROCUREMENT LIBRARY |
| EXHIBIT R | STAR & CHIP CONTRACT SIGNATURE DRAFT TEMPLATE |
| ATTACHMENT A | HHS CONTRACT AFFIRMATIONS V. 2.2 |

HHSC_CP_0019352

P-038.057

# TAB 3

Sec. 522.0051.  NEGOTIATION AND REVIEW OF CERTAIN CONTRACTS FOR HEALTH CARE PURPOSES.  (a)  This section applies to a contract with a contract amount of $250 million or more:

(1)  under which a person will provide goods or services in connection with the provision of medical or health care services, coverage, or benefits; and

(2)  that will be entered into by the person and:

(A)  the commission;

(B)  a health and human services agency; or

(C)  any other state agency under the commission's jurisdiction.

(b)  An agency described by Subsection (a)(2) must notify the office of the attorney general at the time the agency initiates the planning phase of the contracting process for a contract described by Subsection (a).  A representative of the office of the attorney general or another attorney advising the agency as provided by Subsection (d) may:

(1)  participate in negotiations or discussions with proposed contractors; and

(2)  be physically present during those negotiations or discussions.

(c)  Notwithstanding any other law, before an agency described by Subsection (a)(2) may enter into a contract described by Subsection (a), a representative of the office of the attorney general shall review the form and terms of the contract and may make recommendations to the agency for changes to the contract if the attorney general determines that the office of the attorney general has sufficient subject matter expertise and resources available to provide this service.

(d)  If the attorney general determines that the office of the attorney general does not have sufficient subject matter expertise or resources available to provide the services described by this section, the office of the attorney general may require the agency described by Subsection (a)(2) to enter into an interagency agreement or obtain outside legal services under Section 402.0212 for the provision of services described by this section.

(e)  The agency described by Subsection (a)(2) shall provide to the office of the attorney general any information the office of the attorney general determines is necessary to administer this section.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 4

Sec. 523.0051.  EXECUTIVE COMMISSIONER.  (a)  The commission is governed by an executive commissioner.

(b)  The governor appoints the executive commissioner with the advice and consent of the senate, and shall make the appointment without regard to race, color, disability, sex, religion, age, or national origin.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 5

Sec. 525.0101.  GENERAL CONTRACT AUTHORITY.  The commission may enter into contracts as necessary to perform any of the commission's powers or duties.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 6

Sec. 532.0051.  COMMISSION ADMINISTRATION OF MEDICAID.  (a)  The commission is the state agency designated to administer federal Medicaid funds.

(b)  The commission shall:

(1)  in each agency that operates a portion of Medicaid, plan and direct Medicaid, including the management of the Medicaid managed care system and the development, procurement, management, and monitoring of contracts necessary to implement that system; and

(2)  establish requirements for and define the scope of the ongoing evaluation of the Medicaid managed care system conducted in conjunction with the Department of State Health Services under Section 108.0065, Health and Safety Code.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 7

Sec. 540.0051.  PURPOSE AND IMPLEMENTATION.  The commission shall implement the Medicaid managed care program by contracting with managed care organizations in a manner that, to the extent possible:

(1)  improves the health of Texans by:

(A)  emphasizing prevention;

(B)  promoting continuity of care; and

(C)  providing a medical home for recipients;

(2)  ensures each recipient receives high quality, comprehensive health care services in the recipient's local community;

(3)  encourages training of and access to primary care physicians and providers;

(4)  maximizes cooperation with existing public health entities, including local health departments;

(5)  provides incentives to managed care organizations to improve the quality of health care services for recipients by providing value-added services; and

(6)  reduces administrative and other nonfinancial barriers for recipients in obtaining health care services.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 8

Sec. 540.0203.  CERTIFICATION BY COMMISSION.  (a)  Before the commission may award a contract under this chapter to a managed care organization, the commission shall evaluate and certify that the organization is reasonably able to fulfill the contract terms, including all federal and state law requirements.  Notwithstanding any other law, the commission may not award a contract under this chapter to an organization that does not receive the required certification.

(b)  A managed care organization may appeal the commission's denial of certification.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 9

Sec. 540.0204.  CONTRACT CONSIDERATIONS RELATING TO MANAGED CARE ORGANIZATIONS.  In awarding contracts to managed care organizations, the commission shall:

(1)  give preference to an organization that has significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients;

(2)  give extra consideration to an organization that agrees to assure continuity of care for at least three months beyond a recipient's Medicaid eligibility period;

(3)  consider the need to use different managed care plans to meet the needs of different populations; and

(4)  consider the ability of an organization to process Medicaid claims electronically.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 10

Sec. 540.0206.  MANDATORY CONTRACTS.  (a)  Subject to the certification required under Section 540.0203 and the considerations required under Section 540.0204, in providing health care services through Medicaid managed care to recipients in a health care service region, the commission shall contract with a managed care organization in that region that holds a certificate of authority issued under Chapter 843, Insurance Code, to provide health care in that region and that is:

          (1)  wholly owned and operated by a hospital district in that region;

          (2)  created by a nonprofit corporation that:

               (A)  has a contract, agreement, or other arrangement with a hospital district in that region or with a municipality in that region that owns a hospital licensed under Chapter 241, Health and Safety Code, and has an obligation to provide health care to indigent patients; and

               (B)  under the contract, agreement, or other arrangement, assumes the obligation to provide health care to indigent patients and leases, manages, or operates a hospital facility the hospital district or municipality owns; or

          (3)  created by a nonprofit corporation that has a contract, agreement, or other arrangement with a hospital district in that region under which the nonprofit corporation acts as an agent of the district and assumes the district's obligation to arrange for services under the Medicaid expansion for children as authorized by Chapter 444 (S.B. 10), Acts of the 74th Legislature, Regular Session, 1995.

     (b)  A managed care organization described by Subsection (a) is subject to all terms to which other managed care organizations are subject, including all contractual, regulatory, and statutory provisions relating to participation in the Medicaid managed care program.

     (c)  The commission shall make the awarding and renewal of a mandatory contract under this section to a managed care organization affiliated with a hospital district or municipality contingent on the district or municipality entering into a matching funds agreement to expand Medicaid for children as authorized by Chapter 444 (S.B. 10), Acts of the 74th Legislature, Regular Session, 1995. The commission shall make compliance with the matching funds agreement a condition of the continuation of the contract with the managed care organization to provide health care services to recipients.

     (d)  Subsection (c) does not apply if:

          (1)  the commission does not expand Medicaid for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session,

1995; or

        (2)  a waiver from a federal agency necessary for the expansion is not granted.

    (e)  In providing health care services through Medicaid managed care to recipients in a health care service region, with the exception of the Harris service area for the STAR Medicaid managed care program, as the commission defined as of September 1, 1999, the commission shall also contract with a managed care organization in that region that holds a certificate of authority as a health maintenance organization issued under Chapter 843, Insurance Code, and that:

        (1)  is certified under Section 162.001, Occupations Code;

        (2)  is created by The University of Texas Medical Branch at Galveston; and

        (3)  has obtained a certificate of authority as a health maintenance organization to serve one or more counties in that region from the Texas Department of Insurance before September 2, 1999.

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 11

Sec. 543A.0052.  FINANCIAL INCENTIVES AND CONTRACT AWARD PREFERENCES. (a)  The commission may allow a managed care organization participating in the child health plan program or Medicaid increased flexibility to implement quality initiatives in a managed care plan offered by the organization, including flexibility with respect to financial arrangements, to:

(1)  achieve high-quality, cost-effective health care;

(2)  increase the use of high-quality, cost-effective delivery models;

(3)  reduce the incidence of unnecessary institutionalization and potentially preventable events; and

(4)  in collaboration with physicians and other health care providers, increase the use of alternative payment systems, including shared savings models.

(b)  The commission shall develop quality-of-care and cost-efficiency benchmarks, including benchmarks based on a managed care organization's performance with respect to:

(1)  reducing potentially preventable events; and

(2)  containing the growth rate of health care costs.

(c)  The commission may include in a contract between a managed care organization and the commission financial incentives that are based on the organization's successful implementation of quality initiatives under Subsection (a) or success in achieving quality-of-care and cost-efficiency benchmarks under Subsection (b).  The commission may implement the financial incentives only if implementing the incentives would be cost-effective.

(d)  In awarding contracts to managed care organizations under the child health plan program and Medicaid, the commission shall, in addition to considerations under Section 540.0204 of this code and Section 62.155, Health and Safety Code, give preference to an organization that offers a managed care plan that:

(1)  successfully implements quality initiatives under Subsection (a) as the commission determines based on data or other evidence the organization provides; or

(2)  meets quality-of-care and cost-efficiency benchmarks under Subsection (b).

Added by Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 1.01, eff. April 1, 2025.

# TAB 12

Sec. 2155.076.  PROTEST PROCEDURES.  (a)  The comptroller and each state agency by rule shall develop and adopt protest procedures for resolving vendor protests relating to purchasing issues.  An agency's rules must be consistent with the comptroller's rules.  The rules must include standards for maintaining documentation about the purchasing process to be used in the event of a protest.

(b)  A state agency that is not subject to Chapter 2001 shall provide public notice of its proposed and adopted protest rules and provide a procedure for public comment on the proposed rules.

Added by Acts 1997, 75th Leg., ch. 1206, Sec. 6, eff. Sept. 1, 1997.
Amended by:
Acts 2019, 86th Leg., R.S., Ch. 1071 (H.B. 1524), Sec. 15, eff. September 1, 2019.

# TAB 13

Sec. 2155.144.  PROCUREMENTS BY HEALTH AND HUMAN SERVICES AGENCIES. (a)  This section applies only to the Health and Human Services Commission, each health and human services agency, the Department of Family and Protective Services, and agencies administratively attached to the Health and Human Services Commission.  For the purposes of this section, the Department of Family and Protective Services or an agency administratively attached to the Health and Human Services Commission is considered a health and human services agency.

(b)  An agency to which this section applies is delegated the authority to procure its goods and services, except as provided by this section.

(b-1)  An agency to which this section applies is not delegated the authority to procure common commodities or services:

(1)  including goods and services acquired for direct consumption or use by the agency in the day-to-day support of the agency's administrative operations, such as office supplies and equipment, building maintenance and cleaning services, or temporary employment services;  and

(2)  not including consulting services, professional services, health care services, information resources technology, goods or services acquired for the benefit or on behalf of clients of programs operated by the agency, procurements specifically authorized or delegated to the agency by statute, or the contracting out of agency purchasing functions or other administrative or program functions.

(b-2)  The Health and Human Services Commission is delegated the authority to procure goods and services related to a contract for:

(1)  a project to construct or expand a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code; or

(2)  a deferred maintenance project for a health facility described by Subdivision (1).

(b-3)  Notwithstanding any other law, the Texas Civil Commitment Office is delegated the authority to procure common commodities or services described by Subsection (b-1)(1) for office use if the total cost of the purchase is less than the total cost of the purchase under the comptroller's purchasing authority or as offered for sale as provided by Chapter 122, Human Resources Code.  The Texas Civil Commitment Office, in collaboration with the comptroller, shall identify best practices for comparing the total costs and documenting cost savings.

(c)  An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human

Services Commission that provides the best value to the agency.  The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition.

(d)  Subject to Subsection (e), the agency may consider all relevant factors in determining the best value, including:

(1)  any installation costs;

(2)  the delivery terms;

(3)  the quality and reliability of the vendor's goods or services;

(4)  the extent to which the goods or services meet the agency's needs;

(5)  indicators of probable vendor performance under the contract such as past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability to provide reliable maintenance agreements;

(6)  the impact on the ability of the agency to comply with laws and rules relating to historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities;

(7)  the total long-term cost to the agency of acquiring the vendor's goods or services;

(8)  the cost of any employee training associated with the acquisition;

(9)  the effect of an acquisition on agency productivity;

(10)  the acquisition price;  and

(11)  any other factor relevant to determining the best value for the agency in the context of a particular acquisition.

(e)  Repealed by Acts 2003, 78th Leg., ch. 785, Sec. 75(2).

(f)  The state auditor may audit the agency's acquisitions of goods and services before or after a warrant is issued to pay for an acquisition.

(g)  The agency may adopt rules and procedures for the acquisition of goods and services under this section.

(h)  The Health and Human Services Commission shall adopt rules and procedures for the acquisition of goods and services under this section that apply to all health and human services agencies, including rules adopted with the commission's assistance that allow an agency to make purchases through a group purchasing program except when a better value is available through another procurement method.  The rules of the health and human services agencies must be consistent with the rules of the Health and Human Services Commission.

(i)  Subject to Section 524.0001(b), the Health and Human Services Commission shall develop a single statewide risk analysis procedure.  Each health and human services agency shall comply with the procedure.  The procedure must provide for:

(1)  assessing the risk of fraud, abuse, or waste in health and human services agencies contractor selection processes, contract provisions, and payment and reimbursement rates and methods for the different types of goods and services for which health and human services agencies contract;

(2)  identifying contracts that require enhanced contract monitoring; and

(3)  coordinating contract monitoring efforts among health and human services agencies.

(j)  Subject to Section 524.0001(b), the Health and Human Services Commission shall publish a contract management handbook that establishes consistent contracting policies and practices to be followed by health and human services agencies.  The handbook may include standard contract provisions and formats for health and human services agencies to incorporate as applicable in their contracts.

(k)  Subject to Section 524.0001(b), the Health and Human Services Commission, in cooperation with the comptroller, shall establish a central contract management database that identifies each contract made with a health and human services agency.  The comptroller may use the database to monitor health and human services agency contracts, and health and human services agencies may use the database in contracting.  A state agency shall send to the comptroller in the manner prescribed by the comptroller the information the agency possesses that the comptroller requires for inclusion in the database.

(l)  The Health and Human Services Commission shall coordinate the procurement practices of all health and human services agencies and encourage those agencies to use efficient procurement practices such as the use of a group purchasing program, combining maintenance contracts into one contract, and obtaining prompt payment discounts.  In implementing this duty, the Health and Human Services Commission may review the procurement and rate-setting procedures of each health and human services agency to ensure that amounts paid to contractors are consistent and represent the best value for the state.  The Health and Human Services Commission may disapprove a procurement and rate-setting procedure of a health and human services agency.  A health and human services agency may not use a procurement or rate-setting procedure that has been disapproved by the

commission.  The Health and Human Services Commission may transfer the procurement functions of a health and human services agency to another appropriate state agency if it determines that transferring those functions would be advantageous to the state.  Other state agencies and institutions with experience in acquiring goods and services using the procedures allowed under Subsections (c) and (d) shall on request assist the Health and Human Services Commission to perform its functions under this section.

(m)  Subject to Section 524.0001(b), the Health and Human Services Commission shall develop and implement a statewide plan to ensure that each entity that contracts with a health and human services agency and any subcontractor of the entity complies with the accessibility requirements of the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.).

(n)  To the extent of any conflict, this section prevails over any other state law relating to the procurement of goods and services except a law relating to contracting with historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities.

(o)  If the Health and Human Services Commission does not receive any responsive bids on a competitive solicitation for goods or services for a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code, the commission after making a written determination that competition is not available may negotiate with and award the contract to any qualified vendor who meets the requirements of the original solicitation:

(1)  at a price consistent with the current market value of the goods or services; and

(2)  for a term not to exceed five years.

(p)  In this section, "health and human services agency" has the meaning assigned by Section 521.0001.

Added by Acts 1997, 75th Leg., ch. 1045, Sec. 1, eff. Sept. 1, 1997.
Amended by Acts 1999, 76th Leg., ch. 1460, Sec. 3.11, eff. Sept. 1, 1999;
Acts 2003, 78th Leg., ch. 309, Sec. 7.07, eff. June 18, 2003;  Acts 2003, 78th Leg., ch. 785, Sec. 75(2), eff. Sept. 1, 2003.
Amended by:
Acts 2007, 80th Leg., R.S., Ch. 937 (H.B. 3560), Sec. 1.09, eff. September 1, 2007.
Acts 2015, 84th Leg., R.S., Ch. 837 (S.B. 200), Sec. 2.08(b)(3), eff. September 1, 2015.

Acts 2019, 86th Leg., R.S., Ch. 953 (S.B. 65), Sec. 16, eff. September 1, 2019.

Acts 2021, 87th Leg., R.S., Ch. 621 (S.B. 1896), Sec. 15, eff. June 14, 2021.

Acts 2021, 87th Leg., R.S., Ch. 855 (S.B. 799), Sec. 9, eff. September 1, 2021.

Acts 2023, 88th Leg., R.S., Ch. 351 (S.B. 1179), Sec. 17, eff. September 1, 2023.

Acts 2023, 88th Leg., R.S., Ch. 769 (H.B. 4611), Sec. 2.20, eff. April 1, 2025.

Acts 2025, 89th Leg., R.S., Ch. 1145 (S.B. 1610), Sec. 27, eff. September 1, 2025.

# TAB 14

Sec. 62.051.  DUTIES OF EXECUTIVE COMMISSIONER AND COMMISSION IN GENERAL.  (a)  The executive commissioner shall administer a state-designed child health plan program to obtain health benefits coverage for children in low-income families.  The executive commissioner shall ensure that the child health plan program is designed and administered in a manner that qualifies for federal funding under Title XXI of the Social Security Act (42 U.S.C. Section 1397aa et seq.), as amended, and any other applicable law or regulations.

(b)  The executive commissioner is responsible for making policy for the child health plan program, including policy related to covered benefits provided under the child health plan.  The executive commissioner may not delegate this duty to another agency or entity.

(c)  The executive commissioner shall oversee the implementation of the child health plan program and coordinate the activities of each agency necessary to the implementation of the program, including the Texas Department of Insurance.

(d)  The executive commissioner shall adopt rules as necessary to implement this chapter.

(e)  The commission shall conduct a review of each entity that enters into a contract under Section 62.055 or 62.155 to ensure that the entity is available, prepared, and able to fulfill the entity's obligations under the contract in compliance with the contract, this chapter, and rules adopted under this chapter.

(f)  The commission shall ensure that the amounts spent for administration of the child health plan program do not exceed any limit on those expenditures imposed by federal law.

Added by Acts 1999, 76th Leg., ch. 235, Sec. 1, eff. Aug. 30, 1999.
Amended by:
Acts 2015, 84th Leg., R.S., Ch. 1 (S.B. 219), Sec. 3.0192, eff. April 2, 2015.

# TAB 15

Sec. 62.053.  AUTHORITY OF COMMISSION RELATING TO ELIGIBILITY AND MEDICAID COORDINATION.  The commission may:

(1)  accept applications for coverage under the child health plan and implement the child health plan program eligibility screening and enrollment procedures;

(2)  resolve grievances relating to eligibility determinations; and

(3)  coordinate the child health plan program with the Medicaid program.

Added by Acts 1999, 76th Leg., ch. 235, Sec. 1, eff. Aug. 30, 1999. Amended by:

Acts 2015, 84th Leg., R.S., Ch. 1 (S.B. 219), Sec. 3.0193, eff. April 2, 2015.

# TAB 16

Sec. 62.055.  CONTRACTS FOR IMPLEMENTATION OF CHILD HEALTH PLAN.  (a) It is the intent of the legislature that the commission maximize the use of private resources in administering the child health plan created under this chapter.  In administering the child health plan, the commission may contract with a third party administrator to provide enrollment and related services under the state child health plan.

(b), (c) Repealed by Acts 2003, 78th Leg., ch. 198, Sec. 2.156(a)(1).

(d)  Repealed by Acts 2015, 84th Leg., R.S., Ch. 1, Sec. 3.1639(23), eff. April 2, 2015.

(e)  The executive commissioner shall  retain all policymaking authority over the state child health plan.

(f)  The commission shall:

(1)  procure all contracts with a third party administrator through a competitive procurement process in compliance with all applicable federal and state laws or regulations; and

(2)  ensure that all contracts with child health plan providers under Section 62.155 are procured through a competitive procurement process in compliance with all applicable federal and state laws or regulations.

# TAB 17

Sec. 62.155.  HEALTH PLAN PROVIDERS.  (a)  The commission shall select the health plan providers under the program through a competitive procurement process.  A health plan provider, other than a state administered primary care case management network, must hold a certificate of authority or other appropriate license issued by the Texas Department of Insurance that authorizes the health plan provider to provide the type of child health plan offered and must satisfy, except as provided by this chapter, any applicable requirement of the Insurance Code or another insurance law of this state.

(b)  A managed care organization or other entity shall seek to obtain, in the organization's or entity's provider network, the participation of significant traditional providers, as defined by commission rule, if that organization or entity:

(1)  contracts with the commission or with another agency or entity to operate a part of the child health plan under this chapter;  and

(2)  uses a provider network to provide or arrange for health care services under the child health plan.

(c)  In selecting a health plan provider, the commission:

(1)  may give preference to a person who provides similar coverage under the Medicaid program;  and

(2)  shall provide for a choice of at least two health plan providers in each service area.

(d)  The executive commissioner may authorize an exception to Subsection (c)(2) if there is only one acceptable applicant to become a health plan provider in the service area.

Added by Acts 1999, 76th Leg., ch. 235, Sec. 1, eff. Aug. 30, 1999.
Amended by Acts 2003, 78th Leg., ch. 198, Sec. 2.52, eff. Sept. 1, 2003.
Amended by:

Acts 2015, 84th Leg., R.S., Ch. 1 (S.B. 219), Sec. 3.0205, eff. April 2, 2015.

# TAB 18

**MISCELLANEOUS PROVISIONS**
(Continued)

review described below, the General Revenue Fund shall be reduced and an equal amount of the Sporting Goods Sales Tax (SGST) transfer to General Revenue-Dedicated State Parks Account No. 64 is appropriated to TPFA for debt service expenditures on GO bonds issued and authorized for statewide park repairs.

(1)  Before October 1 of each year, Texas Parks and Wildlife Department (TPWD) in cooperation with TPFA shall use expenditure schedules and any other necessary documentation to determine the actual amount of debt service expended from both sources on statewide park repairs and submit the findings of this review to the Comptroller of Public Accounts and the Legislative Budget Board.

(2)  Before October 31 of each year, TPWD shall transfer an amount equal to the actual costs of debt service to TPFA from the SGST allocation in General Revenue-Dedicated State Parks Account No. 64. In the event that the sum of the actual costs for debt service exceeds SGST cash available for these purposes, the additional amounts shall be funded from the available remaining balance of General Revenue-Dedicated State Parks Account No. 64. The Comptroller shall authorize the necessary expenditure transfers at TPFA needed to credit the General Revenue Fund from General Revenue-Dedicated State Parks Account No. 64 for the actual costs of debt service.

(b)  In the event that actual costs of debt service for statewide park repairs exceed the available remaining balance of General Revenue-Dedicated State Parks Account No. 64, the Comptroller shall adjust debt service payments to be made from other revenues deposited to the credit of the General Revenue Fund accordingly.

**Sec. 17.08. Reporting Requirement for Funds Held Outside the Treasury.**

(a)  The Comptroller of Public Accounts and the Legislative Budget Board shall jointly prepare a report on funds held outside the Treasury on a biennial basis. The report should contain the following information for operating funds and any other funds held outside the Treasury selected by the Comptroller of Public Accounts and the Legislative Budget Board:

(1)  the legal/statutory basis for the fund or revenue held outside the Treasury;

(2)  the allowable uses of the fund or revenue held outside the Treasury;

(3)  a listing of programs for which the fund or revenue held outside the Treasury is currently expended or could be expended;

(4)  the estimated or actual revenues and expended or budgeted amounts by fiscal year for the most recently completed and current fiscal biennia; and

(5)  the estimated or actual balance as of August 31 of each year in the most recently completed and current fiscal biennia.

(b)  Any state agency that receives, expends, or administers funds or revenues held outside the Treasury, either by the Comptroller of Public Accounts, the Texas Treasury Safekeeping Trust Company, or a private financial institution shall assist the Comptroller of Public Accounts and the Legislative Budget Board in preparing this report and shall submit all data and information as prescribed by the Comptroller of Public Accounts or the Legislative Budget Board.

(c)  In prescribing data to be reported and reporting deadlines, the Comptroller of Public Accounts and the Legislative Budget Board shall collaborate with state agencies to maximize the use of existing data sources and minimize work required to compile and submit information.

(d)  The report shall be available to the Governor, members of the Legislative Budget Board, the Senate Finance Committee and the House Appropriations Committee no later than the last day in February of each year in which a regular session of the Texas Legislature convenes.

**Sec. 17.09. Contract Management and Oversight.**

(a)  It is the intent of the Legislature that all agencies and institutions of higher education establish effective processes and controls to manage contracts and ensure the cost-effective use of state appropriations for contracted goods and services.

**MISCELLANEOUS PROVISIONS**
(Continued)

(b) Agencies and institutions should manage contracts consistent with state statute, the General Appropriations Act, and the State of Texas Procurement and Contract Management Guide and ensure proper oversight of contract processes including:

(1) provide adequate time for applicable external reviews by the Quality Assurance Team (QAT) and Contract Advisory Team when establishing procurement timelines;

(2) follow recommendations made by the Contract Advisory Team or adequately explain any deviations from the recommendations and why the deviation is necessary;

(3) ensure proper justification for proprietary purchases and that contracts are established and approved by the Statewide Procurement Division of the Office of the Comptroller;

(4) ensure that contract award decisions are determined based on best value criteria established in solicitation documents to ensure fair and open competition;

(5) ensure that staff involved in contract management or administration duties are adequately trained to perform those duties;

(6) periodically review internal contracting practices and manuals to ensure that they are current and updated with current regulations and best practices;

(7) ensure that provisions related to service level and pricing mechanisms in existing contracts are correctly enforced;

(8) enforce damage provisions for vendor non-performance and collect monetary refunds for improper payments to vendors;

(9) ensure dollar values of performance bonds and insurance are consistent with risk of non-performance; and

(10) ensure that vendor performance is reported to the Vendor Performance Tracking System (VPTS) and that VPTS data is used in selecting vendors for contract awards.

(c) Agencies shall make a good faith effort to identify and execute savings and efficiencies in their use of contracted goods and services. An agency or institution of higher education may not use monies appropriated elsewhere in this Act to pay for a contract for goods or services unless it:

(1) Seeks competitive bids or proposals before renewing or extending a contract that has been in effect more than five years and is valued at the lesser of $10 million or 10 percent of the agency's All Funds budget for the 2024-25 biennium. The following contracts are exempt from the requirements of this Subsection (c)(1):

(A) TxSmartBuy, term, and cooperative contracts administered by the Comptroller or Department of Information Resources;
(B) grants;
(C) interagency contracts;
(D) contracts that relate to a construction project as defined by Government Code, Section 2166.001;
(E) contracts that relate to highway construction or highway engineering;
(F) contracts that relate to major information resources projects, as defined by Government Code, Section 2054.003(10);
(G) contracts not required by law to be competitively procured; and
(H) managed care contracts in the Medicaid and CHIP program.

(2) Conducts a cost-benefit analysis to compare canceling or continuing any major information resource project and related contracts subject to QAT monitoring that is more than 50 percent over budget or over schedule. QAT must approve the cost-benefit analysis for the project to continue. If this requirement is not met, corrective actions in Section 9.02 apply.

(d) An agency or institution may request, with regards to a contract, an additional exemption from the requirements of Subsection (c)(1) by submitting a request to the Legislative Budget Board which outlines the justification for requesting the exemption. The request shall be considered to be approved unless the Legislative Budget Board issues a written disapproval within 30

**4510**

**MISCELLANEOUS PROVISIONS**
(Continued)

business days of the date on which the staff of the Legislative Budget Board concludes its review of the proposal to exempt the contract and forwards its review to the Chair of the House Appropriations Committee, Chair of the Senate Finance Committee, Speaker of the House of Representatives, and Lieutenant Governor.

The request shall state that the agency or institution agrees to enhanced oversight of the contract upon Legislative Budget Board approval of the exemption. The Legislative Budget Board shall determine the level of enhanced oversight that is necessary or may choose to waive oversight. Enhanced oversight may include, but is not limited to, the following elements: additional reporting requirements, increased monitoring of the contract, and the formation of an executive steering committee for the project to which the contract relates. For information technology related contracts, an executive steering committee may include members of QAT and/or its designee(s). Responsibilities of an executive steering committee may include, but are not limited to, review of procurement and contract terms prior to solicitation/execution and ongoing oversight of the management of the contract. The Legislative Budget Board shall determine whether an agency or institution has met the requirements of enhanced oversight. If the Legislative Budget Board determines that the requirements have not been met, additional corrective actions, including but not limited to those specified in Section 9.02, may be applied.

(e) It is the intent of the Legislature that agencies and institutions minimize the use of extensions that extend a contract beyond the base term and any optional extensions provided in a contract. An agency or institution may not use monies appropriated elsewhere in this Act to pay for an extension to an existing agency contract beyond the base term and optional extensions provided for in that contract unless all the following conditions are met:

(1) The extension is limited in duration and cost to not more than one additional option period, as defined in the contract, to address the immediate operational or service delivery needs. If a contract does not contain a defined option period, the extension is limited to one year.

(2) The agency or institution provides notice of the extension at least 30 calendar days prior to execution of the extension by uploading required information to the Legislative Budget Board contracts database on a form prescribed by the Legislative Budget Board. Required information includes but is not limited to: the cost of the contract; the duration of the contract; the reason for the extension of the contract; and a plan to ensure that the contract can be completed within the extension period, signed by the executive director or other similar agency or institution administrator, or designee of the agency or institution.

(3) The agency or institution ensures, prior to providing notice pursuant to Subsection (e)(2), that all information and documents specified in Section 7.11(d) have been uploaded to the Legislative Budget Board contracts database regardless of whether the information and documents are otherwise required to be uploaded under Section 7.11.

(f) Each agency and institution of higher education that receives appropriations in this Act, shall provide a report to the Legislative Budget Board and the Governor that details the steps taken to ensure compliance with state procurement requirements and any other information required by the Legislative Budget Board. The report for activities undertaken in fiscal year 2024 is due not later than September 30, 2024, and a summary report for the 2024-25 biennium is due August 31, 2025.

(g) The State Preservation Board is exempt from the competitive bidding process described by this section and by Government Code, Sec. 2269.101, Contract for Facilities: Competitive Bidding, for work related to legislative facilities.

**Sec. 17.10. Energy Efficiency Savings for State Facilities.**

(a) In this section, "facility" means a facility with at least 100,000 gross square feet.

(b) It is the intent of the Legislature that a state agency that is appropriated money by this Act with charge and control over a facility shall have a remote or on-site assessment of the facility performed by the Energy Systems Laboratory at Texas A&M Engineering Experiment Station or another qualified provider to determine whether implementation of continuous commissioning or existing building commissioning practices would result in estimated savings

# TAB 19

Texas Administrative Code
   Title 1. Administration
      Part 15. Texas Health and Human Services Commission
         Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
         Subchapter A. General Provisions

**Effective: May 10, 2022**

1 TAC § 391.101

# § 391.101. Purpose

Currentness

The purpose of these rules is to:

(1) provide transparency to the public, the legislature, state agencies, and vendors on the procedures followed by HHSC procurement personnel;

(2) provide for consistent and uniform management of procurement and contracting processes; and

(3) obtain best value when purchasing goods and services to better serve Texas residents and businesses.

## Credits

**Source:** The provisions of this §391.101 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

# TAB 20

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
        Subchapter B. Procurement and Special Contracting Methods
          Division 1. Procurement Methods

**Effective: May 10, 2022**

1 TAC § 391.209

# § 391.209. Request for Proposals

[Currentness]

Goods or services may be purchased through a Request for Proposals (RFP) as authorized by this section.

(1) Advertisement. Public notice of the issuance of an RFP is posted on the Electronic State Business Daily in accordance with Texas Government Code §2155.083. The solicitation must include evaluation and selection criteria and the process for making a selection.

(2) Minor irregularities in a response. HHSC may waive a minor irregularity or permit a respondent to correct a minor irregularity in a response, if the irregularity:

(A) is purely a matter of form rather than substance; and

(B) does not materially affect price, quality, or delivery of the desired goods or services.

(3) Evaluation and selection. HHSC utilizes an evaluation method which provides for:

(A) the fair consideration of proposals; and

(B) if applicable, a process for determining the competitive range.

(4) Negotiations.

(A) HHS or DFPS may discuss acceptable or potentially acceptable proposals with respondents to assess a respondent's ability to meet the solicitation requirements.

(B) After receiving a proposal but before making an award, HHS or DFPS may permit the respondent to revise its proposal to obtain the best and final offer at any stage in the evaluation or negotiation process.

(5) Award. A contract is awarded to the respondent whose proposal offers the best value for the state in accordance with Texas Government Code §2155.144.

# Credits

**Source:** The provisions of this §391.209 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

# TAB 21

Texas Administrative Code

Title 1. Administration

Part 15. Texas Health and Human Services Commission

Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission

Subchapter C. Protests

---

**Effective: May 12, 2021**

1 TAC § 391.307
Formerly cited as 1 TX ADC § 391.407

# § 391.307. Review and Disposition of Protests

Currentness

(a) Upon receipt of a protest, the Deputy Executive Commissioner of Procurement and Contracting Services may:

(1) dismiss the protest if:

(A) it is not timely; or

(B) it does not meet the requirements of §391.305 of this subchapter (relating to Filing of a Protest);

(2) solicit written responses to the protest from other interested parties; or

(3) attempt to resolve the protest by mutual agreement.

(b) The Deputy Executive Commissioner of Procurement and Contracting Services may confer with the HHSC Chief Counsel at any time during the review of the protest.

(c) If the protest is not dismissed or resolved by mutual agreement, the Deputy Executive Commissioner of Procurement and Contracting Services will issue a written determination on the protest.

(1) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that no violation of the specific statutory or regulatory provision cited by the protestant has occurred, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination.

(2) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that HHS violated the specific statutory or regulatory provision cited by the protestant in a case where HHS has not awarded a contract, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination and any appropriate remedial action.

(3) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that HHS violated the specific statutory or regulatory provision cited by the protestant in a case where HHS awarded a contract, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination, which may include ordering the contract void.

(4) The Deputy Executive Commissioner of Procurement and Contracting Services' written determination is the final administrative action by HHSC on a protest filed under this subchapter unless the protestant files an appeal of the determination under subsection (d) of this section.

(d) The protestant may appeal the Deputy Executive Commissioner of Procurement and Contracting Services' determination on a protest to the HHSC Executive Commissioner. The appeal must be in writing

and submitted by electronic mail to HHSCExecutiveCommissioner@hhs.texas.gov no later than 10 business days after the date of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The appeal shall be limited to review of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The protestant must mail or deliver copies of the appeal to other interested parties, and each copy must contain a certified statement that such copies have been provided.

(1) A protest or appeal that is not timely filed shall not be considered unless good cause for delay is shown or the HHSC Executive Commissioner determines that an appeal raises issues that are significant to HHSC's procurement practices or procedures in general.

(2) The HHSC Executive Commissioner may confer with the HHSC Chief Counsel at any time during the review of the appeal.

(3) The HHSC Executive Commissioner will review the appeal of the Deputy Executive Commissioner of Procurement and Contracting Services' determination and render a final decision on the protest issues.

(4) A decision issued in writing by the HHSC Executive Commissioner shall be the final administrative action of HHSC on a protest determination that is appealed under this subchapter.

# TAB 22

OFFICIAL

# Texas Administrative Code

## Title 1
## Administration

---

## 1997

[Replaces 1996 Pamphlet]

---

Amendments effective through
January 1, 1997



Published by
West Group
St. Paul, Minn.

under authority of the Texas Secretary of State

COPYRIGHT © 1997

By

STATE OF TEXAS

and

WEST GROUP

 *PRINTED ON 10% POST CONSUMER RECYCLED PAPER*

Source: The provisions of this §111.1 adopted to be effective October 19, 1992, 17 TexReg 6894.

## § 111.2. Definitions

The following words and terms, when used in this title, shall have the following meanings, unless the context clearly indicates otherwise.

Act—The State Purchasing and General Services Act, Texas Civil Statutes, Article 601b.

Best interests of the state—Most advantageous to the state in light of all relevant circumstances.

Commission—The General Services Commission.

Competitive bidding—The process of inviting and obtaining bids from competing sources in response to advertised competitive specifications, by which an award is made to the lowest and best bidder meeting the specifications. The process contemplates giving potential bidders a reasonable opportunity to bid, and requires that all bidders be placed on the same plane of equality. Each bidder must bid on the same advertised specifications, terms, and conditions in all the items and parts of a contract. The purpose of competitive bidding is to stimulate competition, prevent favoritism, and secure the best goods and services at the lowest practicable price, for the benefit of the state. Competitive bidding cannot occur where contract specifications, terms, or conditions prevent or unduly restrict competition, favor a particular vendor, or increase the cost of goods or services without providing a corresponding benefit to the state.

Electronic data interchange (EDI)—Exchange of information electronically between business parties in a structured format, including, but not limited to, computer direct or indirect electronic information exchange, exchange of computer tapes and disks, and telefacsimile transmission.

Local government—A county, municipality, school district, special district, junior college district, or other legally constituted political subdivision of the state.

Minor technicality—A requirement in a bid invitation which, if waived or modified by the commission when evaluating bids, would not give a bidder an unfair advantage over other bidders or result in a material change in the contract.

Nonresident bidder—A bidder whose principal place of business is not in Texas, but does not include a bidder whose majority owner or parent company has its principal place of business in Texas.

Payment bond—A deposit, pledge, or contract of guaranty supplied by a successful bidder to protect the state against loss due to the bidder's failure to pay material suppliers and subcontractors. Acceptable forms of payment bonds are: cashier's check, certified check, or irrevocable letter of credit issued by a financial institution subject to the laws of Texas; a surety or blanket bond from a company chartered or authorized to do business in Texas; United States treasury bond; or certificate of deposit.

Performance bond—A deposit, pledge, or contract of guaranty supplied by a successful bidder to protect the state against loss due to the bidder's inability to complete the contract as agreed. Acceptable forms of performance bonds are those listed in the definition of payment bond.

Principal place of business in Texas—A permanent business office located in Texas from which a bid is submitted and from which business activities are conducted other than submitting bids to governmental agencies, where at least one employee works for the business entity submitting bids.

Texas resident bidder—A bidder with its principal place of business in Texas, including a bidder whose majority owner or parent company has its principal place of business in Texas.

Source: The provisions of this §111.2 adopted to be effective February 16, 1994, 19 TexReg 713.

## § 111.3. Protests/Dispute Resolution/Hearing

(a) Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation, evaluation, or award of a contract may formally protest to the division director (the director) in whose division the action is (was) being processed. Such protests must be in writing and received in the executive director's office within 10 working days after such aggrieved person knows, or should have known, of the occurrence of the action which is protested. Formal protests must conform to the requirements of this subsection and subsection (c) of this section, and shall be resolved in accordance with the procedure set forth in subsections (d) and (e) of this section. Copies of the protest must be mailed or delivered by the protesting party to the using agency and other interested parties. For the purposes of this section, "interested parties" means all vendors who have submitted bids or proposals for the contract involved.

413

(b) In the event of a timely protest or appeal under this section, the state shall not proceed further with the solicitation or with the award of the contract unless the executive director, after consultation with the using agency and the appropriate division director, makes a written determination that the award of contract without delay is necessary to protect substantial interests of the state.

(c) A formal protest must be sworn and contain:

(1) a specific identification of the statutory or regulatory provision(s) that the action complained of is alleged to have violated;

(2) a specific description of each act alleged to have violated the statutory or regulatory provision(s) identified in paragraph (1) of this subsection;

(3) a precise statement of the relevant facts;

(4) an identification of the issue or issues to be resolved;

(5) argument and authorities in support of the protest; and

(6) a statement that copies of the protest have been mailed or delivered to the using agency and other identifiable interested parties.

(d) The director shall have the authority, prior to appeal to the executive director of the commission, to settle and resolve the dispute concerning the solicitation or award of a contract. The director may solicit written responses to the protest from other interested parties.

(e) If the protest is not resolved by mutual agreement, the director will issue a written determination on the protest.

(1) If the director determines that no violation of rules or statutes has occurred, he shall so inform the protesting party, the using agency, and other interested parties by letter which sets forth the reasons for the determination.

(2) If the director determines that a violation of the rules or statutes has occurred in a case where a contract has not been awarded, he shall so inform the protesting party, the using agency, and other interested parties by letter which sets forth the reasons for the determination and the appropriate remedial action.

(3) If the director determines that a violation of the rules or statutes has occurred in a case where a contract has been awarded, he shall so inform the protesting party, the using agency, and other interested parties by letter which sets

forth the reasons for the determination, which may include ordering the contract void.

(f) The director's determination on a protest may be appealed by an interested party to the executive director of the commission. An appeal of the director's determination must be in writing and must be received in the executive director's office no later than 10 working days after the date of the director's determination. The appeal shall be limited to review of the director's determination. Copies of the appeal must be mailed or delivered by the appealing party to the using agency and other interested parties and must contain an affidavit that such copies have been provided.

(g) The general counsel shall review the protest, director's determination, and the appeal and prepare a written opinion with recommendation to the executive director. The executive director may, in his discretion, refer the matter to the commissioners for their consideration at a regularly scheduled open meeting or issue a written decision on the protest.

(h) When a protest has been appealed to the executive director under subsection (f) of this section and has been referred to the commissioners by the executive director under subsection (g) of this section, the following requirements shall apply.

(1) Copies of the appeal, responses of interested parties, if any, and general counsel recommendation shall be mailed to the commissioners, and copies of the general counsel's recommendation shall be mailed to the using agency, the appealing party, and other interested parties.

(2) All interested parties who wish to make an oral presentation at the open meeting are requested to notify the commission general counsel at least 48 hours in advance of the open meeting.

(3) The commissioners may consider oral presentations and written documents presented by staff and interested parties. The chairman shall set the order and amount of time allowed for presentations.

(4) The commissioners' determination of the appeal shall be by duly adopted resolution reflected in the minutes of the open meeting, and shall be final.

(i) Unless good cause for delay is shown or the commission determines that a protest or appeal raises issues significant to procurement practices or procedures, a protest or appeal that is not filed timely will not be considered.

(j) A decision issued either by the commissioners in open meeting, or in writing by the executive director, shall be the final administrative action of the commission.

**Source:** The provisions of this §111.3 adopted to be effective September 16, 1982, 7 TexReg 3205; amended to be effective September 7, 1983, 8 TexReg 3266; amended to be effective December 16, 1987, 12 TexReg 4523; amended to be effective October 19, 1992, 17 TexReg 6894.

**Cross References:** This Section cited in 1 TAC §113.19, (relating to Catalogue Purchase Procedure for Automated Information Systems).

## § 111.4. Ethical Standards

(a) This section states the ethical standards of conduct required of commission employees, vendors, potential vendors, and employees of other agencies when acting under authority delegated from the commission.

(b) An employee may not:

(1) participate in work on a commission contract knowing that the employee, or member of their immediate family has an actual or potential financial interest in the contract, including prospective employment;

(2) solicit or accept anything of value from an actual or potential vendor;

(3) be employed by, or agree to work for, a vendor or potential vendor;

(4) knowingly disclose confidential information for personal gain.

(c) A former employee who had a pay classification of Group 17, Step 1 or higher may not represent or receive compensation concerning any matter in which the former employee participated during his or her employment with the state.

(d) A vendor or potential vendor may not: offer, give, or agree to give an employee anything of value.

(e) When an actual or potential violation of subsections (b)-(d) is discovered, the person involved shall promptly file a written statement concerning the matter with an appropriate supervisor. The person may also request written instructions and disposition of the matter.

(f) If an actual violation of subsections (b)-(d) occurs or is not disclosed and remedied, the employee involved may be either reprimanded, suspended, or dismissed. The vendor or potential vendor may be barred from receiving future contracts and an existing contract may be canceled.

**Source:** The provisions of this §111.4 adopted to be effective April 20, 1993, 18 TexReg 2297.

**Cross References:** This Section cited in 1 TAC §113.20, (relating to Group Purchasing Programs).

## HISTORICALLY UNDERUTILIZED BUSINESS CERTIFICATION PROGRAM

**Authority:** The provisions of these §§111.11-111.23 issued under Chapter 684, §65(c), Acts of the 73rd Legislature (1993).

## § 111.11. Policy and Purpose

It is the policy of the commission to encourage the use of historically underutilized businesses by state agencies and to assist agencies to achieve these goals through race, ethnic, and gender neutral means. The goal of this program is to promote full and equal business opportunity for all businesses in state contracting.

**Source:** The provisions of this §111.11 adopted to be effective October 4, 1995, 20 TexReg 7473.

**Cross References:** This Section cited in 1 TAC §111.15, (relating to Agency Planning Responsibilities).

## § 111.12. Definitions

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

Applicant—A corporation, sole-proprietorship, partnership, joint venture, or supplier that applies to the commission as an historically underutilized business.

Application—A written request for certification as an historically underutilized business in the required format submitted to the commission.

Commodities—Materials, supplies, or equipment.

Comptroller—Comptroller of Public Accounts.

Contractor—A supplier of commodities or services to a state agency under a purchase order contract or other contract.

Directory—The Texas Certified Historically Underutilized Business Directory.

Disparity Study—The State of Texas Disparity Study, performed by the National Economic Research Associates, Inc. (NERA).

Historically Underutilized Business—A business outlined in subparagraphs (C)-(H) in which the owner(s):

(A) have a proportionate interest and demonstrate active participation in the control, operation, and management of the entities' affairs; and

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason LaFond on behalf of Jason LaFond
Bar No. 24103136
jlafond@scottdoug.com
Envelope ID: 106218880
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Molina Healthcare of Texas, Inc. Brief Requesting Oral Argument
Status as of 9/29/2025 4:29 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michaelle Peters | | mpeters@scottdoug.com | 9/29/2025 4:09:30 PM | SENT |
| Julie Wright | | julie.wright@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Amanda DoddsPrice | | amanda.price@squirepb.com | 9/29/2025 4:09:30 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |
| Mandy Patterson | | mpatterson@adjtlaw.com | 9/29/2025 4:09:30 PM | SENT |
| Michelle Joyner | | mjoyner@scottdoug.com | 9/29/2025 4:09:30 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 9/29/2025 4:09:30 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |
| Cory Scanlon | | cory.scanlon@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |
| David Johns | | david@cobbjohns.com | 9/29/2025 4:09:30 PM | SENT |
| Jessie Johnson | | jessie.johnson@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Stacey Jett | | sjett@adjltaw.com | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Cook Children's Health Plan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Karen Burgess | 796276 | kburgess@burgesslawpc.com | 9/29/2025 4:09:30 PM | SENT |
| Anna Baker | 791362 | abaker@adjtlaw.com | 9/29/2025 4:09:30 PM | SENT |
| Amy Warr | 795708 | awarr@adjtlaw.com | 9/29/2025 4:09:30 PM | SENT |
| Juliana Bennington | | jbennington@perkinscoie.com | 9/29/2025 4:09:30 PM | SENT |
| Jonathan Hawley | | jhawley@perkinscoie.com | 9/29/2025 4:09:30 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason LaFond on behalf of Jason LaFond
Bar No. 24103136
jlafond@scottdoug.com
Envelope ID: 106218880
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Molina Healthcare of Texas, Inc. Brief Requesting Oral Argument
Status as of 9/29/2025 4:29 PM CST

Associated Case Party: Cook Children's Health Plan

| | | | | |
|---|---|---|---|---|
| Jonathan Hawley | | jhawley@perkinscoie.com | 9/29/2025 4:09:30 PM | SENT |
| Trisha Marino | | tmarino@perkinscoie.com | 9/29/2025 4:09:30 PM | SENT |
| Katie Dolan-Galaviz | | kgalaviz@burgesslawpc.com | 9/29/2025 4:09:30 PM | SENT |
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 9/29/2025 4:09:30 PM | SENT |
| Matthew Gordon | | mgordon@perkinscoie.com | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Texas Children's Health Plan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Emery | 24050564 | mark.emery@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Warren Huang | 796788 | warren.huang@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Paul Trahan | 24003075 | paul.trahan@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Susan Harris | 6876980 | susan.harris@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |
| Kayla Ahmed | | kayla.ahmed@nortonrosefulbright.com | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Wellpoint Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Robert Johnson | 10786400 | rjohnson@foley.com | 9/29/2025 4:09:30 PM | SENT |
| Michelle Ku | 24071452 | mku@foley.com | 9/29/2025 4:09:30 PM | SENT |
| Kristin Hernandez | | kristin.hernandez@foley.com | 9/29/2025 4:09:30 PM | SENT |
| Stacey Obenhaus | | sobenhaus@foley.com | 9/29/2025 4:09:30 PM | SENT |
| Benjamin Grossman | | bjgrossman@foley.com | 9/29/2025 4:09:30 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason LaFond on behalf of Jason LaFond
Bar No. 24103136
jlafond@scottdoug.com
Envelope ID: 106218880
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Molina Healthcare of Texas, Inc. Brief Requesting Oral Argument
Status as of 9/29/2025 4:29 PM CST

Associated Case Party: Superior Healthplan Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 9/29/2025 4:09:30 PM | SENT |
| J McCaig | 24070083 | meghan.mccaig@outlook.com | 9/29/2025 4:09:30 PM | SENT |
| Karen Walker | | karen.walker@hklaw.com | 9/29/2025 4:09:30 PM | SENT |
| Tiffany Roddenberry | | tiffany.roddenberry@hklaw.com | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Texas Health and Human Services

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Molina Healthcare of Texas, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Cheryl LaFond | 24104015 | clafond@scottdoug.com | 9/29/2025 4:09:30 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Aetna Better Health of Texas, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Joseph Knight | 11601275 | jknight@ebbklaw.com | 9/29/2025 4:09:30 PM | SENT |

Associated Case Party: Cecile Erwin Young, Texas Health and Human Services

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason LaFond on behalf of Jason LaFond
Bar No. 24103136
jlafond@scottdoug.com
Envelope ID: 106218880
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Molina Healthcare of Texas, Inc. Brief Requesting Oral Argument
Status as of 9/29/2025 4:29 PM CST

Associated Case Party: Cecile Erwin Young, Texas Health and Human Services

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cory Scanlon | 24104599 | cory.scanlon@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |
| Jeffrey Stephens | | jeff.stephens@oag.texas.gov | 9/29/2025 4:09:30 PM | SENT |